**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**

CASE NO.: 26-cv-60059

JASON FYK,

     *Plaintiff*,

vs.

AMERICAN NEIGHBORHOOD
MORTGAGE ACCEPTANCE COMPANY,
LLC (d/b/a/ ANNIEMAC HOME MORTGAGE),
FAMILY FIRST FUNDING, LLC,
CHANGE LENDING, LLC, and
RE/MAX HOLDINGS, INC.,

     *Defendants*.

_____/

**AMENDED COMPLAINT**

Plaintiff, Jason Fyk ("Fyk"), by and through undersigned counsel, sues Defendants, American Neighborhood Mortgage Acceptance Company (d/b/a/ AnnieMac Home Mortgage, "AnnieMac"), Family First Funding, LLC, ("FFF"), Change Lending, LLC ("Change"), and RE/MAX Holdings, Inc. ("RE/MAX"), as follows:[1]

**NATURE OF THE ACTION, PARTIES,**
**JURISDICTION AND VENUE**

1. This is an action arising out of Defendants' breach of contract, breach of warranty (duty to perform in workmanlike manner), negligence, professional malpractice, negligent

---

[1] On the AnnieMac / FFF front, it was FFF whose prolific wrongdoing gives rise to this action. Upon information and belief, however, it was in late- 2022 (publicly announced in March 2023) that AnnieMac acquired or merged (or some combination or derivative thereof) with FFF as part of AnnieMac's mission "to expand [its] operations and offerings to various borrowers." Unless otherwise indicated hereafter, AnnieMac and FFF are referred to collectively as FFF.

misrepresentation, and *et cetera*, all relating to Defendants' failures in carrying out lending concerning Fyk's attempted purchase of Florida real estate, which such failures resulted in Fyk losing out on the Florida property (among other losses/damages suffered by Fyk, detailed below).

2.      The address of the Florida property central to this dispute is 2752 NE 3rd Street, Pompano Beach, Broward County, Florida, 33062 (the "Property").[2]

3.      At all material times, Fyk was/is a citizen and resident of Cochranville, Pennsylvania. Fyk was/is *sui juris* in all respects.

4.      At all material times, AnnieMac was/is a nationwide mortgage lender (AnnieMac Home Mortgage) that provides a wide range of home financing options, including conventional, FHA, VA, and USDA loans, specializing in personalized service, renovation loans, and unique programs like Cash2Keys to help buyers compete in hot markets, including in the State of Florida. At all material times, AnnieMac had branches throughout the United States and was/is headquartered in Mount Laurel, New Jersey. At all material times, AnnieMac's designated member/officer was Joseph Panebianco (domiciled in New Jersey, citizen of the United States upon information and belief, and designated as a "mgr").

5.      At all material times, FFF was a mortgage bank company doing business in myriad states throughout the United States, including in the State of Florida. At all material times, FFF was a limited liability company incorporated in the State of New Jersey with its citizenship (*i.e.*, principal place of business / "nerve center") in Toms River, Ocean County, New Jersey, United States of America.  At all material times, FFF's designated members/officers were Gabriel Gillen (domiciled in New Jersey, citizen of the United States of America upon information and belief,

---

[2] Property Tax ID/Folio No. 4843-31-17-0130; legal description HARBOT/HARBOR VILLAGE SEC B 30-46 B LOT 13 BLK 5).

and designated as a "MGR" for FFF) and Scott Weikel (domiciled in New Jersey, citizen of the United States of America upon information and belief, and designated as a "MGR" for FFF).

6.  At all material times, Change was/is a mortgage lending company doing business in myriad states throughout the United States, including in the State of Florida. At all material times, Change was a limited liability company incorporated in the State of California with its citizenship (*i.e.*, principal place of business / "nerve center") in Anaheim, Orange County, California, United States of America.  At all material times, Change's designated members/officers were as follows: (a) 2020 – Mario De Tomasi (domiciled in California, citizen of the United States of America upon information and belief, and designated as a "CEO" for Change), Angie Miranda (domiciled in California, citizen of the United States of America upon information and belief, and designated as a "Chief Risk Officer" for Change), Thedora Nickel (domiciled in California, citizen of the United States of America upon information and belief, and designated as an "Executive Director" for Change), Kari Hallowell (domiciled in California, citizen of the United States of America upon information and belief, and designated as a "Chief Accounting Officer" for Change), Theodore Ray (domiciled in California, citizen of the United States of America upon information and belief, and designated as "President" for Change), and Carlos Salas (domiciled in California, citizen of the United States of America upon information and belief, and designated as "Board Chair" for Change); (b) 2021 – same as 2020, except Ms. Hallowell's corporate designation was changed from "Chief Accounting Officer" to "CFO;" and (c) 2022 – Angie Miranda (domiciled in California, citizen of the United States of America upon information and belief, and designated as a "Chief Risk Officer" for Change), Thedora Nickel (domiciled in California, citizen of the United States of America upon information and belief, and designated as an "Executive Director" for Change), Kari Hallowell (domiciled in California, citizen of the United

States of America upon information and belief, and designated as a "CFO" for Change), Theodore Ray (domiciled in California, citizen of the United States of America upon information and belief, and designated as "President" for Change), Carlos Salas (domiciled in California, citizen of the United States of America upon information and belief, and designated as "CEO" and "Board Chair" for Change), Jason Biegel (domiciled in California, citizen of the United States of America upon information and belief, and designated as "COO" for Change), and Jon Irvine (domiciled in California, citizen of the United States of America upon information and belief, and designated as "Chief Production Officer" for Change).

7.      At all material times, RE/MAX was/is an international real estate franchise. With 100,000++ agents in nearly 10,000 offices worldwide, RE/MAX is one of the leading real estate franchisors globally. RE/MAX's realtor business operation spans the United States, including operations in the State of Florida. At all material times, RE/MAX was a company incorporated in the State of Colorado with is citizenship (*i.e.*, headquarters / principal place of business / "nerve center") in Denver, Denver County, Colorado, United States of America.

8.      This Court possesses original jurisdiction pursuant to Title 28, United States Code, Section 1332, as the parties are diverse and the amount in controversy exceeds $75,000.00, exclusive of attorney fees, costs, interest, or the like.

9.      Venue is proper in this Court pursuant to Title 28, United States Code, Section 1391(b)(2), since this judicial district is where a substantial part of the events or omissions giving rise to the claim occurred *and where the Property that is the subject of the action is situated*. And the Ft. Lauderdale Division of this Court has personal jurisdiction due to Defendants' minimum contacts in this forum.

10.     All conditions precedent to the institution of this action have occurred, been performed, been waived, were futile, and / or were not mandatory.

## COMMON ALLEGATIONS

11.     Given the volume and complexity of the facts underlying Defendants' gross misconduct, the following Introduction is provided to orient the Court to the issues presented.

## I.     Introduction

12.     This case arises from a cascading series of avoidable failures by FFF, Change, and RE/MAX that derailed Fyk's purchase of a Florida waterfront home (the Property). Fyk performed every contractual and lender-requested obligation promptly and in good faith, whereas the Defendants did anything but.

13.     FFF was engaged as the originating broker responsible for preparing and submitting the loan file, while Change served as the wholesale lender responsible for underwriting and funding the loan. Although Fyk began working with FFF in early October 2021 (and although the November 9, 2021, Loan Approval deadline was well known), FFF did not submit his file to Change's underwriting until approximately November 4, 2021, leaving only five days before the deadline. Change later acknowledged that underwriting alone required approximately fifteen business days, meaning a legitimate approval could not have occurred until early December 2021.

14.     When FFF realized that Change could not complete underwriting in time, FFF unilaterally created and circulated a so-called "Preliminary Loan Approval" on FFF's own letterhead. Sent only minutes before the 5:00 p.m. contractual deadline, the document was affirmatively presented as the official Loan Approval issued by the bank, a misrepresentation FFF later maintained even under oath. In reality, the document was never reviewed, authorized, issued, or signed by Change's underwriters and fell entirely outside FFF's authority as the broker.

15.     At the time, the Buyer had no knowledge that Change (not FFF) was the actual underwriting lender, nor any reason to suspect that FFF lacked authority to issue such a document. Fyk accordingly reasonably relied on the falsified approval, continued performing under the contract, and believed his financing had been properly approved. Change did not issue its first legitimate underwriting approval until December 10, 2021, more than a month after FFF's false approval and long after the contractual Loan Approval deadline had passed.

16.     Following the false November 9, 2021, approval, and in an apparent effort to conceal its misconduct, FFF chose not to forward or disclose Change's legitimate December 10, 2021, underwriting approval to the Buyer. Instead of providing the formal written approval with its listed conditions (as it should), FFF sent only an email containing select copied-and-pasted conditions. This deliberate concealment left the Buyer wholly unaware of the true status of his loan and caused ongoing misalignment of conditions between broker, lender, and buyer. From there, the loan process continued to deteriorate due to additional failures by both FFF and Change, including failure to lock the interest rate when instructed, failure to timely request and obtain required documentation, and repeated miscommunications regarding underwriting requirements.

17.     As a result, the loan was unready for the initial January 5, 2022, Closing Date. On January 6, 2022, an insurmountable underwriting condition finally emerged solely because of earlier lender errors, forcing the Buyer to switch to an entirely different and materially worse loan product in a last-ditch effort to keep the transaction alive. Even after making that remedial concession, Defendants still failed to complete underwriting in time to meet the extended January 18, 2022, Closing Date. Despite the Buyer's repeated warnings that the Seller was becoming unwilling to extend the contract (particularly as the Property's market value was rising sharply) the loan remained unready due to Defendants' continued lack of urgency and persistent mistakes.

6

18.     The transaction again failed to close on time. Although the Buyer attempted to force consummation after the Closing Date and pursuant to involuntary contract extensions, the Seller refused to sign, ultimately causing the Buyer to lose the uniquely valuable Property that has since appreciated by more than one million dollars.

19.     In the Buyer's subsequent lawsuit for specific performance, the trial court expressly found (based on sworn broker testimony) that the Buyer caused absolutely no delays, and that all delays were attributable to the Lender. Nevertheless, because the Lender had already invoked a CFPB extension to avoid default on January 5, 2022, the court held the Buyer was not entitled to a second extension on January 18, 2022. In short, the transaction was destroyed entirely by FFF's and Change's failures, misrepresentations, and lack of diligence, not by anything the Buyer did. And throughout this period, the Buyer was operating under the reasonable (but false) assumption that he had been legitimately approved for financing back on November 9, 2021.

20.     Additionally, RE/MAX (through its supervised agent) introduced further complications by failing to communicate the Buyer's loan-product change to the Seller at critical moments, further destabilizing an already fragile transaction. When the lender requested that a new extension be signed to move the Closing Date beyond January 18, 2022 (an extension the Seller never agreed to), the RE/MAX agent apparently forged the extension, provided it to the broker, and it was then submitted to the underwriter as a legitimate, mutually-agreed extension addendum, without the knowledge or consent of either party. After the deal collapsed, and recognizing the implications of the forged extension, the agent asked the broker to omit and destroy the document rather than produce it in response to subpoena. Once the Realtor anticipated litigation, she immediately retained counsel and became uncooperative, leaving the Buyer unable to call her as a credible witness because she was actively concealing her own misconduct.

7

21.     The Buyer ultimately discovered the forged Loan Approval only after reviewing his communications and locating a single automated FFF message referencing a second Loan Approval; and when the Buyer confronted the broker with this newly discovered evidence, the loan officer admitted the truth, including the Realtor's deception.

22.     This action seeks to hold each Defendant accountable for the specific and egregious roles they played in destroying the transaction through breach of contract, negligent misrepresentation, professional negligence, failure to perform in a workmanlike manner, and *et cetera*, all of which collectively caused the collapse of Fyk's purchase and the substantial damages that followed.

## II.     Body of the Common Allegations

23.     On June 9, 2021 (after Buyer and Seller had signed), Seller, A&P Home Investment LLC ("Seller"), and Buyer, Jason Fyk ("Buyer"), entered into an "AS IS" Residential Contract For Sale And Purchase ("Contract") for the Property located at 2752 NE 3rd Street, Pompano Beach, Florida 33062 (the "Property"). The Contract between Seller and Buyer ("Parties") had an effective date on or before June 10, 2021. Accordingly, on June 10, 2021, Buyer entered into a separate Residential Contract For Sale And Purchase to sell his property located at 111 Briny Avenue, PH1, Pompano Beach, Florida 33062 ("Penthouse") to fund the purchase of the subject Property.

24.     The Property purchase price was set at $1,310,000.00, with an initial deposit of $25,000.00 by way of ACES Title as Escrow/Closing Agent. The agreement also included a $10,000.00 Seller's concession toward closing costs. Buyer was to finance approximately sixty-five percent (65%) of the purchase price, with the stated balance to close in cash. Closing was

initially required "on or BEFORE 09-03-2021," but it was later adjusted to "on or BEFORE 01-05-2022" at the Seller's request.

25. The Parties executed Addendum No. 01 as part of the Contract (effective June 8, 2021), providing: (a) "No seller concession will be made for property repairs;" (b) "Appraisal contingency waived;" (c) Landlord/tenant will not make any alterations to property (besides fence) during tenancy;" and (d) "No extensions or changes to the existing tenant lease during the transaction period."

26. On June 11, 2021, Buyer was referred to Heidy Nolasco ("Nolasco") of Chase Bank by Buyer's accountant, Todd Marrazzo ("Marrazzo"). Recognizing that obtaining a loan commitment more than seven months in advance of closing would be impractical, Buyer requested an extension of time to provide the necessary pre-approval and loan commitment. On June 23, 2021, the Parties executed Addendum No. 02, establishing a "soft approval contingent" ("Prequalification") date of July 9, 2021, and a "loan commitment" ("Loan Approval") date of November 9, 2021.[3] Buyer subsequently provided the necessary prequalification letter timely; but, it was later determined that Chase did not offer the specific loan product Buyer sought. Consequently, Buyer and Nolasco ultimately parted ways.

27. On August 19, 2021, Buyer closed on the sale of his Penthouse. Because of Addendum 2's change in closing date from September 3, 2021, to January 5, 2022, Buyer had also made a side agreement with the purchaser ("Tony") of his Penthouse to continue occupying the

---

[3] During Buyer's subsequent lawsuit against Seller, Seller attempted to rely on semantics to argue that Buyer had failed to obtain a "Loan Commitment," treating that term as synonymous with "Clear to Close," when, in fact, it was universally recognized under the Contract and industry standards as a "Loan Approval." Likewise, Seller contended that the "soft loan approval" constituted the actual loan approval rather than a mere prequalification. These arguments were inconsistent with established lending practice and carried no persuasive relevance in the proceedings, a position the court ultimately did not accept.

Penthouse until January 4, 2022. This arrangement ensured that Buyer would be able to close on the subject Property and then move his belongings directly from one property to the other the following day (January 5, 2022).

28.     On October 4, 2021, Buyer was first introduced (also by Marrazzo) to Susan Belese ("Agent," "Belese") of FFF. FFF worked in conjunction with Change, wherein FFF served as the originating broker ("Broker") responsible for processing and submitting the loan application, and Change acted as the wholesale bank ("Bank") responsible for underwriting and funding the mortgage (collectively, "Lender(s)").

29.     Following a brief introductory call, by email dated October 4, 2021, to the Buyer, Belese outlined the initial requirements to begin the loan process, stating:

> Hello Gentlemen, thank you for the connection to Jason. It was a pleasure speaking with you today. I heard from our conversation that you understand how all of this works. Our objective is to offer you a few different scenarios with pricing and down payment. At this time you don't want me to pull your credit so taking an application at this time can probably wait. I will however, put together a few options for you to decide on, this will include Primary, Second home and Investment property, all of which I will do give you LTV's, approx. rates, and points and fees if necessary… as full doc and stated.
>
> Below is a list of documents that I will eventually need to review for accuracy and finalizing the program guidelines:
>
> 1. ID
> 2. SS card
> 3. 2019-2020 Tax Returns with ALL schedules Personal and Business
> 4. 2021 Profit and Loss (we can do this once I see the returns if we are going in this direction)
> 5. Business License/Formation documents if applicable
> 6. 2 most recent bank asset statements showing money for down payment and closing costs
> 7. Most recent mortgage statement on Primary home in PA
> 8. Tax Bill on Primary home in PA
> 9. Homeowners insurance Declaration Page on Primary in PA
>
> These items will get us started so we can back into a monthly income, either ONE Year tax return program or TWO years…. Also, we have piggyback loans, bank

statement loans or stated income investment properties loans. We will discuss and review all options to see what best suits your needs.

Have a great day. Give me at least 48 hours to put together some options to get started.

30.     Between October 4, 2021, and October 14, 2021, Buyer and Agent continued to communicate *via* phone and text message.[4] At that time, Buyer was still comparing rates between two potential mortgage lenders; but, on October 14, 2021, he ultimately decided to move forward with Belese as his lending agent. Subsequently, Buyer began providing all the necessary documentation previously requested in Agent's October 4 email.

31.     On October 27, 2021, Buyer inquired about reserve requirements. Buyer held approximately $43,000 in cryptocurrency. That same day, Buyer expressed concern to Agent about his Accountant's (Marrazzo's) diligence in completing the necessary tax returns and confirmed that Agent had everything she needed apart from those returns. Agent responded that she would review the file and let Buyer know if anything was missing. Buyer then reiterated the urgency of meeting his Loan Approval deadline, stating: "Ok. I'm ready to go. **I have a hard date of Nov 9th to get a commitment**" (*i.e.,* Loan Approval). Buyer also forwarded materials from his realtor, Maria Duval ("Realtor," "Duval"), thereby connecting Agent directly with Realtor for coordination on appraisal and other related matters.

32.     Buyer informed Agent that his mother-in-law would not be contributing funds toward the purchase. Agent indicated that the tax return was the only outstanding item and added, "Pray Todd get[s] it to us." At that point, both Buyer and Agent had become concerned about Accountant's diligence in completing the necessary tax returns.

---

[4] Note: in Buyer's mobile device, the Agent, Susan Belese, appeared under the contact name: "Susan Florida Loan."

33.     On October 29, 2021, Buyer again asked Agent if she had heard from Marrazzo. Agent replied, "Nope and it's kind of annoying. Sorry but it's not that hard to put the taxes together. I don't want you to lose this property but my hands are tied." This confirmed that the tax returns were necessary for the loan to proceed based on the loan product Buyer was seeking at that time. Agent continued, "Unless you buy it stated income and refinance later but there is costs to doing it this way. Let me know." Later that day, she added, "Yikes. Why is he [Accountant] not answering." Buyer, increasingly concerned that the tax returns would not be completed in time, suggested: "Maybe you should say something like I can't get this done until you get the taxes to me." Agent responded, "Omg lol." Buyer asked if there was anything else Lender needed besides the tax returns, noting he was flying to Florida the next day and planned to visit the Accountant's office directly to determine the delay. Agent indicated there was nothing else outstanding. The Accountant, despite having introduced Agent to Buyer, had apparently become uncooperative with her follow-ups.

34.     On November 2, 2021, at 11:55 a.m. EST, FFF Belese sent her first text message to Russel Rothstein ("Rothstein"), the Change representative with whom she would be working. This first message contained her contact information, which Rothstein confirmed he received. Later that day, Buyer followed up with Agent after receiving no updates by mid-afternoon. Duval had also begun inquiring about the status of loan approval. Agent responded that she was about to call Buyer with an update, and during that conversation, the parties discussed transitioning to a different loan product (a 1099 loan program, "1099 Loan") that would not require submission of Buyer's tax returns, thereby removing any potential delay caused by the Accountant. This resulted in a slightly higher interest rate, which the Buyer was not yet made aware of, but he was told it

12

removed the tax returns and the Accountant from the equation. Following the call, the Buyer promptly sent the additional information needed *via* email, and the Agent confirmed receipt.

35.     Agent then inquired whether Buyer was "getting $20,000 from agents and seller towards closing." Buyer clarified that $10,000.00 was from the Seller's contractual concession, and the remaining $10,000.00 resulted from Buyer's agreement with the listing agents to reduce their commission to facilitate closing. Shortly thereafter, Buyer attempted to call Agent but received an automated text message reply stating: "Sorry[,] I'm assisting another client and will call you back as soon as I can! [T]hank you[.]" Agent subsequently attempted to return Buyer's call, which he missed, and the two later connected again. During that call, Agent requested a copy of Buyer's 1099 from Red Blue Media ("RBM"), a company for which Buyer was then working. Buyer promptly sent the requested 1099 image. Agent confirmed that the document would suffice. Buyer also stated that he was attempting to have his son scan the 1099 and send it *via* email. At 6:10 p.m. EST that same day, and after the close of business, Agent informed Buyer that she planned to review all documentation with her assistant the following morning to "regroup and go over everything" with Buyer. Agent then asked whether Buyer had obtained homeowner's insurance or would he like her to quote it for him. Buyer explained that he no longer carried Florida homeowner's insurance following the sale of his Penthouse. Agent indicated that she would obtain quotes for Buyer, and Buyer agreed.

36.     On November 3, 2021, at 9:09 a.m. EST, Agent asked if Buyer was ready for a phone call. Buyer confirmed he was, and Agent replied that she would call in a few minutes. At 9:25 a.m. EST, Agent asked whether Buyer or his Realtor had obtained a wind mitigation report, four-point inspection, and elevation certificate, which are standard requirements for Florida

properties. Buyer indicated he did not have them and doubted that his Realtor did either. Agent responded, "No worries."

37.     Buyer then informed Agent, "The [Lender – *i.e.,* Change] are asking for tax records." Based on their earlier phone call, Buyer was under the impression that his tax returns were no longer needed due to the switch to the 1099 loan program. Agent replied, "No. Lol," confirming that Buyer did not need to send his tax records. Buyer immediately responded, "Yeaaah," jokingly acknowledging that Agent had previously told him the tax records were unnecessary under the 1099 program. A minute later, Buyer said, "Got an email requesting taxes." Seven minutes later, Agent replied, "Transcript but checking if not needed."

38.     Fourteen minutes later, Buyer messaged, "Forgot … wires," referring to documentation of his prior wire transfer. Agent responded, "Send." Buyer initially explained that he could not access the wire (send or receipt) information because he was out of town and his mother-in-law had initiated the wire deposit, so he did not have a copy. In the meantime, Buyer asked his mother-in-law to send a picture of the wire deposit, which she did promptly, and Buyer sent that to Agent. Buyer then explained to Agent, "Here is the wire out … Maria [Realtor] may be able to get the wire in." The wire had been sent to ACES Title Agency, LLC, the title company arranged by the Realtor. Buyer then messaged that he was unaware that the change to a 1099 loan program had resulted in an increase in points and interest rate, which he indicated Agent had not disclosed when switching programs.

39.     On Thursday, November 4, 2021, at 12:56 p.m., Buyer called Agent but received the automated unavailable text message in response. A minute later, Buyer followed up with a text stating, "Please [call back] asap." That same day, Agent and Buyer spoke by phone. At 5:02 p.m. EST, Buyer asked Agent if she had locked the rate yet, noting that he was "waiting to send these

14

documents." The documents Buyer was referring to were those necessary for the Loan Approval, which was due the following Tuesday, November 9, 2021 (only three business days later). Agent indicated that she was awaiting a response later that evening from Rothstein at Change and would let Buyer know once the rate was locked. Seeing no point in waiting for a late-day update, Buyer indicated that he would follow up for the locked rate and Loan Approval later and was heading to dinner, meaning he would be reasonably unavailable only for a short period.

40.    At 8:27 p.m. EST, after dinner, Buyer checked his email and saw that he was required to provide a credit card authorization. Buyer indicated that he had already completed the authorization digitally and asked if Agent still needed it. Buyer then requested guidance on how to proceed. Agent responded: "Yes I need it PDF to us we cannot retrieve those they digitally upload. Not sure why but that's why Lisa attached them. Sorry buddy. Also I'm still waiting on the points I'll find out first thing in the morning tho." Buyer was attempting to have the points waived on the 1099 loan. Buyer then asked Agent to call him "to be sure [he's] doing the papers right." This exchange again demonstrated Buyer's diligence and attentiveness, he continually verified each requirement and ensured that all documents were submitted accurately and promptly.

41.    On Friday, November 5, 2021, the loan process was still not complete enough to produce a Loan Approval. At 8:10 a.m. EST, Buyer sent a message explaining he was experiencing login issues while attempting to e-sign the initial closing disclosure ("preliminary disclosure"). Agent also informed Buyer that Brad, her insurance contact, would be reaching out, which he did. At 8:59 a.m. EST, Agent texted Rothstein: "Good Morning. Do we order 1099 transcripts or you???" Rothstein replied: "We [*i.e.,* Change] do, the form is in their [Buyer's] initial disclosures when they are sent." Agent responded, "Yes ok."

42.     At 12:57 p.m. EST, the login issues remained unresolved, but the Buyer messaged Agent: "Just trying to make sure I have everything done so I can have a less stressful weekend." Buyer wanted to ensure Agent knew he was continuing to work diligently to timely satisfy all conditions on his end (a recurring theme throughout this entire process, where the Lender and Agent were consistently dilatory and Buyer remained proactive and responsive). At 1:00 p.m. EST, Buyer was finally able to access the preliminary disclosure online, which showed estimated fees and costs. The rate was not yet quoted, and points were still included. Buyer noted: "This form does not show the lenders credit," and "[t]he points are still on this too." Agent explained that the numbers would remain that way until the loan was ultimately locked.

43.     At 3:32 p.m. EST, Agent emailed Buyer to reaffirm that the initial disclosure fees and points were not final numbers. She explained:

> Once we are able to lock the rate and get the final fees from all the appropriate parties will we send you a closing disclosure reflecting all credits from Seller and Realtors. When you get the new lock and closing disclosure, there will [be] some adjustments at the end from the title company for taxes and things, you will [then] sign off again for Final Final numbers. The disclosures you are signing now are initial, and fees and cash to close will change.

44.     What Agent referred to is governed by Regulation Z / 12 C.F.R. § 1026.19(f)(2)(ii), which requires that when material changes occur (such as adjustments to the annual percentage rate, "APR," or alterations to the "loan product" that render prior disclosures inaccurate), a revised "Final Final" (*i.e.,* accurate) Closing Disclosure ("CD") must be re-issued. This reissuance triggers a new mandatory three-business-day waiting period before consummation can occur, during which the borrower must review and re-acknowledge the final accurate disclosure before the loan may proceed to close.



45.     On the following Monday November 8, 2021, Buyer followed up again, asking, "Are we good with the commitment letter today or tomorrow?" (referring to the eminent Loan Approval deadline of November 9, 2021). Agent responded, "They're working on it. The rep [*i.e.,* Rothstein] is rushing it." This was somewhat alarming, as Buyer had engaged Agent more than a month earlier at this point and completed everything timely, yet the day before the Loan Approval was due, it needed to be "rushed." This was the first clear indication that the Lender was failing to perform its internal obligations with due care or to adhere to established contractual deadlines.

46.     Buyer then reconfirmed, "Ok but I have everything in that you need right?," showing his continued diligence and concern for his timeliness. Agent replied, "We[ll] sort of[.] I need a gift letter filled out by mom in law[.] I want [Change] to tell us what they need. But we have enough in for a commitment [*i.e.,* Loan Approval]." Buyer asked the Agent to "write out what [the gift letter] needs to say," and he would then get his mother-in-law's signature. Agent stated that Lisa Wood ("Wood"), the loan processor for FFF, would send it. Buyer clarified, "No way to just say [Buyer] borrowed it temporarily because the refund is in my statements," explaining that the funds were not an actual gift but a short-term loan to get the deposit out on time. Agent responded, "It's not worth the paperwork. I would have to show it out and in and out

and in. It's better with just the gift letter. It's truly easy." Although this was technically not proper, concerned about meeting his Loan Approval deadline, Buyer agreed to Agent's suggestion to expedite the process, replying, "Ok that's fine." Six hours later, at 4:03 p.m. EST, Buyer noted that Wood had not sent anything yet. Agent responded, "No not yet we will send commitment and all docs required at same time," indicating that the gift letter was not a requirement of the preliminary disclosure. Buyer replied, "Cool thanks," and Agent responded, "Yeah no worries."

47.     On Tuesday, November 9, 2021, at 7:33 a.m. EST  (the Loan Approval *deadline*), Buyer sent an early morning message to Agent stating: "Good Morning. It's crunch time. I really need to know the status of this commitment [*i.e.,* Loan Approval]. Asap." Buyer was becoming increasingly concerned that the Lender would not provide the Loan Approval in a timely manner, an event that, while not necessarily constituting a default under the Contract, could complicate the transaction[5] and influence Buyer's decision whether to proceed or cancel before risking forfeiture of his deposit. It would likewise affect the Seller's decision whether to continue with the sale, as failure to timely present the Loan Approval could permit the Seller to terminate the Contract by delivering written notice to Buyer within three days after expiration of the Loan Approval Period. Buyer's intent was to purchase the Property, not escape the Contract.

> (v) If Buyer fails to timely deliver either notice provided in Paragraph 8(b)(iii) or (iv), above, to Seller prior to expiration of the Loan Approval Period, then Loan Approval shall be deemed waived, in which event this Contract will continue as if Loan Approval had been obtained, provided however, Seller may elect to terminate this Contract by delivering written notice to Buyer within 3 days after expiration of the Loan Approval Period.

---

[5] As it later turned out, Seller attempted to claim that the Loan Approval was fake and that the Buyer failed to obtain a Loan Approval on time as a pretext to later terminate the Contract. That assertion, while true (unbeknownst to the Buyer at all material times), ultimately proved irrelevant because, under the express terms of the Contract, if the Loan Approval was not received by the deadline, Seller had three (3) days to cancel. Seller failed to do so within those three days, and the Contract accordingly continued "as if the Loan Approval had been obtained."

48.     Agent replied that she would call Buyer, to which Buyer responded jokingly, "Beat their ass if you have to… lol," attempting to lighten the growing tension caused by the Lender's delay. During that call, Buyer expressed his concern about meeting the Loan Approval deadline and emphasized the urgency of timely performance. Buyer also supplied Agent with a copy of the insurance policy he had just obtained. Agent reacted by saying, "Holy insurance policy," in reference to the high cost, which Buyer explained was temporary pending receipt of the inspection report.

49.     On November 9, 2021, at 11:12 a.m. EST, Buyer again texted, "It's 11:15. What is the status?" Agent responded, "Left message. Breathe." Upon information and belief, Agent had called Rothstein and left a voicemail. Not finding Agent's reassurance particularly convincing, Buyer replied, "I have 5 hours left. I can't breathe." Agent then responded, "I know I'm trying to ease your pain[.]" This statement is particularly significant, the Agent was fully aware Buyer was experiencing "pain," referring to the stress and anxiety directly caused by the Lender's delays. Buyer replied, "Getting the document [*i.e.,* Loan Approval] would[,] or at least an idea of when it would be done[,] would," indicating that either receiving the Loan Approval or knowing when it would arrive would actually "ease his pain."

50.     Buyer received no response from Agent for more than an hour. At 1:03 p.m. EST on November 9, 2021, he attempted to call Agent but received the automated unavailable text message. Having received no further communication, Buyer followed up again at 1:42 p.m. EST with, "Susan what is the status?" and then again at 2:08 p.m. EST, "Susan, I need a call back." By 2:38 p.m. EST on November 9, 2021, now just two hours and twenty-three minutes from the absolute 5:00 p.m. EST Loan Approval deadline, Buyer sent another message: "**If I don't have a**

19

commitment [*i.e.,* Loan Approval] with rates that are acceptable, **I'm backing out at 5pm and this deal is dead.**"

51.     Buyer was placed in a very difficult position. On the one hand, he wanted to purchase the Property, but proceeding without a formal Loan Approval risked losing his deposit if financing failed. On the other hand, withdrawal would terminate the deal entirely. By this point, Buyer had already sold his Penthouse (leaving him without a Florida residence if the transaction fell through) and he had already agreed to the rental of his Pennsylvania house (leaving him without any residence if the transaction fell through). One minute after the aforementioned 2:38 p.m. EST message, Agent indifferently replied with a single word: "Ok." Now, recognizing Agent was receiving his messages, Buyer immediately responded: "I don't understand what's holding this up if everything is done." Indeed, Buyer had already provided all the necessary documentation requested by Change through FFF, yet the process was still inexplicably stalled.

52.     At 2:39 p.m. EST on November 9, 2021, Agent shifted the Loan Approval responsibility (and blame) from FFF to Change, stating: "It's the underwriting part. When we started *last week* we registered the file. Let me call instead of waiting on the emails." (emphasis added.) This was another especially important statement, as it confirmed that (a) the Loan Approval needed to come from underwriting (which was handled by Change, not FFF, and (b) Agent had only "registered" Buyer's loan with Change approximately one week prior, despite having been engaged since early October 2021. Agent also indicated she would attempt to call Rothstein at Change instead of "waiting on emails" to determine the cause of the delay.

53.     It is unknown whether Agent actually connected with Rothstein, but at 2:43 p.m. EST on November 9, 2021, Agent sent Rothstein a text message that read: "Hey buddy, realistically what is the soonest I can get a commitment," referring to the Loan Approval Buyer

required *that day* (now only two hours and seventeen minutes from the Buyer's contractual deadline). Rothstein replied: "15 business days from the date submitted to [underwriting] which with this Thursday and turkey day and the day after being closed, brings you to 1st week of Dec." Translated, Rothstein/Change is confirming that Belese/FFF had failed to register the file with Change in time to meet the Loan Approval deadline. Recognizing that Change could not provide Buyer an approval on time, Agent responded: "Yikes. Any faster ???" Rothstein replied: "Most likely not. In the meantime, can get in appraisal, we will order appraisal review, etc. Soon I will get a pre review of things we need so we will send that as well. ..." And Agent/FFF attested under oath that appraisal is a condition precedent to Loan Approval.

54.     At 2:45 p.m. EST on November 9, 2021, Buyer sent another message: "I just got an email that it was JUST submitted." (emphasis in original). With only one hour and forty-five minutes remaining before the contractual deadline, the loan was "JUST" being submitted to Change's underwriter, an unmistakable sign of the Lenders' lack of due care. Agent responded, "I know. I'm on with [Rothstein] now."

55.     The extremely late submission to the Underwriter was the epitome of lack of diligence. The Lender and Agent had over a month to process the file and timely deliver the Loan Approval, yet waiting until the final hours merely to submit it was mind-blowingly inexcusable. Such conduct fell far below industry standards and demonstrated a lack of reasonable care and supervision.

56.     At 4:17 p.m. EST on November 9, 2021, Agent emailed Buyer and Buyer's Realtor:

21



57.     Notably, this email expressly acknowledged that "this" (*i.e.,* the Loan Approval, precisely what Buyer had been urgently seeking) was "important to the seller," confirming that the attached "Prelim Mortgage Commitment" labeled "FYK Loan Commitment" was, in fact, intended to serve as the official Loan Approval required under the Contract (which was "important to the Seller"). At 4:18 p.m. EST on November 9, 2021, Agent texted a single word: "Sent." This indicated that the Loan Approval had, in fact, been issued to Buyer.



## "Let Our Family Help Yours"

### Preliminary Loan Approval

DATE: 11/9/2021

LOAN #: 81037176598

BORROWERS:        Jason Michael Fyk

SUBJECT PROPERTY ADDRESS:  2752 NE 3rd St, Pompano Beach, FL  33062

PURCHASE PRICE: $1,310,000.00
MORTGAGE LOAN AMOUNT: $982,500.00
INTEREST RATE: 3.600
TERM OF LOAN: 360 / 360
LTV: 75.000 / CLTV: 75.000
LOAN PROGRAM: 1099 Only
COMMITMENT EXPIRATION DATE: 1/9/22

**INTEREST RATE HAS NOT BEEN LOCKED UNLESS NOTED BELOW**

LOCK EXPIRATION DATE: FLOATING RATE
LOAN ORIGINATION FEE: $14,737.50
LOAN COMMITMENT FEE: $1295.00
LOAN APPLICATION FEE:
LOAN PROCESSING FEE:
LOAN DISCOUNT FEE:

Unless otherwise stated these figures are for illustrative purposes only. They reflect the rate now in effect, not necessarily the rate you will receive which will be determined and established as indicated in the commitment.

FEES:
Appraisal: 1,000.00
Credit Report: 150.00
Tax Service Fee: 70.00
Final Inspection: TBD
Flood Certification Fee: 19.00

Your commitment fee is non-refundable, except under the following circumstances:
In the event that a lock-in agreement has not been executed and a commitment has been issued, and the loan does not close before the expiration date of the commitment through no substantial fault of the borrower, the borrower may: (a) terminate the commitment, whereupon the lender shall promptly refund to the borrower and commitment fee paid by the borrower; or (b) have the commitment extended for a reasonable period of time, not to exceed 14 calendar days, to permit the closing of the loan.

In the event that a lock-in agreement has been executed, and the loan does not close before the expiration date of either the lock-in or the commitment through no substantial fault of the borrower, the borrower may: (a) withdraw the application or reject or terminate any commitment, whereupon the lender must promptly refund any lock-in and commitment fee paid by the borrower or (b) have the lock-in extended for an additional 14 days, with the refund then determined under state or federal law.

The person(s) identified as BORROWER(S) must sign the note and mortgage.
The interest rate charged on the mortgage loan is shown above. The interest rate will be established by Family First Funding LLC at its discretion at the prevailing rate 5 days prior to closing unless previously locked.

This loan may require MORTGAGE INSURANCE. Your loan must be approved by a private mortgage insurance company of our choice. Your monthly mortgage payment will include Private Mortgage Insurance if applicable for your loan.

The following is a list of items that are required prior to issuance of a commitment.

58.     Regarding preparation of the document (Loan Approval) shown above, Agent Belese attested under oath (deposition):

David Levine, Esq. (Seller's counsel):  Now, you swore under oath multiple times that this was your loan commitment; is that right?

Belese: Yes.

23

Levine:  You also testified that you prepare these; is that right?

Belese:  No.

Levine:  Who prepares these?

Belese:  Underwriters.

Levine:  Do you know who in underwriting prepared this?

Belese:  Not at the moment, no. I would have to look.

Levine:  How many people [*i.e.,* underwriters] were there in Family First Funding in November of last year that could prepare letters like this?

Belese:  I wouldn't know the answer to that.

Levine:  Do you know how many underwriters there are?

Belese:  I could say approximately.

Levine:  Approximately, how many are there?

Belese:  Twenty.

Levine:  Okay. And is there any way for you to determine who prepared this one?

Belese:  Sure.

Levine:  And how would you find that out?

Belese:  I would have to go back into the file.

59.     This testimony unambiguously attributes authorship of the November 9, 2021, "Loan Approval" to FFF's underwriting department. Yet, in Belese's subsequent trial testimony, discussed below, Agent Belese reversed course, claiming that her "boss," David Stein ("Stein"), prepared the document and that it was "typical practice" for such approvals to be issued unsigned (even when coming from the wrong bank).

60.     The stark inconsistency of Belese's sworn testimony suggests an attempt to obscure the document's true origin. Even assuming arguendo that Stein (FFF Branch Manager) personally

prepared the document in an underwriting capacity, neither he nor FFF possessed lawful authority to issue a "loan approval" on behalf of Change, the actual lending bank. Under both federal and state lending regulations, a mortgage banker's authority to issue loan approvals extends only to loans it originates and funds under its own credit line.

61.     Here, it is undisputable that FFF acted purely as a broker for Change, evidenced by, for example, contemporaneous messages showing that the file had only just been "submitted" with Change and Rothstein's statement that he would do a "pre-review of things" (confirming the underwriter at Change had not yet even looked at the file).

62.     Indeed, Agent confirmed the relationship between FFF and Change during her trial testimony in the Buyer / Seller Dispute:

Levine:  And were those underwriters that worked with your company?

Belese:  So again, we acted as a broker in this situation, and we brokered this loan to Change Wholesale. Change Wholesale took on the responsibility of the underwriting of the loan.

63.     Stein accordingly lacked any delegated or statutory authority to approve or commit Change's funds, rendering the November 9, 2021, Loan Approval an unauthorized and false representation of lender approval in direct violation of standard underwriting protocol and 12 C.F.R. § 1026.19(e)–(f).

64.     Furthermore, this improper substitution of a broker-issued "approval" for an actual lender-issued commitment directly led the Court (in the Seller and Buyer proceedings) to determine:  "[a]fter determining they would not be able to obtain the Corporate Certificate in time for the Closing, the Lender and Buyer began trying to qualify the Buyer for a completely different loan product ("New Loan") with a different lender, at a different interest rate, with a higher amount of the purchase price financed."

65.     Based on the contemporaneous messages between Agent and Rothstein above, however, Buyer has since learned and confirmed that the loan had not actually been officially approved by anyone or even reviewed by the Change underwriter at the time the November 9, 2021, so-called "Loan Approval" was issued. Instead (and as later confirmed directly by Agent), Agent had informed her supervisor, Stein, that the Buyer's contractual approval deadline was imminent. In response, Stein, without receiving any actual underwriter approval from Change, unilaterally issued a falsified "Preliminary Loan Approval" under FFF letterhead (*i.e.,* "a different lender," as the Court in the Seller/Buyer dispute later found), in lieu of a legitimate approval from the true underwriting bank, Change. The true underwriting approval from Change did not occur until December 10, 2021 (more than a full month later), as discussed further below.

66.     In fact, and as later confirmed by Agent in her deposition, the "loan approval" issued by FFF expired on January 9, 2022, meaning it was no longer even in force when the loan product changed and the loan failed to close on January 18, 2022. Had the Court been told the truth (that the November 9, 2021, approval was not real and that the December 10, 2021, approval was the first legitimate approval from the true lender), its conclusion that the Buyer "switched lenders" could not have been rendered. Under the Contract, the financing contingency would have simply been "deemed waived," and performance would have continued as though loan approval had been obtained, eliminating any basis for finding Buyer in breach. At most, the "issues" before the Court in the Seller/Buyer dispute would have been confined to whether the Seller was kept informed of the loan's approval status; although, the Buyer himself was unaware of that status, as the Agent's misrepresentations confused/misled both him and the Court. Agent Belese's false assurances and concealment of the loan's true approval chronology distorted the entire record, leading to a fundamentally erroneous determination of fault and causation.

26

67.     In contrast to her deposition testimony above, during trial in the Seller/Buyer dispute, Agent Belese offered materially inconsistent statements regarding the origin and authenticity of the purported November 9, 2021, "Loan Approval." When questioned by David Levine, Esq., the following exchange occurred:

Levine: I'm going to pull up what you looked at previously, it's in evidence as Plaintiffs' Exhibit 6. This is the document that's called a preliminary loan approval.

Belese: Okay.

Levine: And do you recognize this document?

Belese: I do.

Levine: And do you know who prepared this?

Agent: My boss prepared this.

Levine: And who is that?

Agent: David Stein, at the time. He is not my boss now, but he was at the time.

Levine: Okay. And is that why the second page says, 'If you have questions, please contact David Stein?'

Agent: Correct.

Levine: And was it typical for these things to go out without being signed?

Agent: Yes.

68.     Agent's testimony unequivocally confirmed that Stein at FFF, not the underwriter at Change, prepared what was represented to the Buyer as the official Loan Approval required to meet the contractual November 9, 2021, deadline. Levine inquired: "And the preliminary approval that we saw, was that prepared by your company?" And Agent responded: "It was. That's normal practice."

69.     While Agent attempted to characterize the issuance of an unsigned "loan approval" by a broker as "typical" or "normal practice," that assertion is contradicted by established underwriting and regulatory standards. A formal Loan Approval must be reviewed, signed, and authorized by *the underwriting lender* (not the broker) before it can be represented to a borrower or third party as an officially approved or binding commitment. The issuance of an unsigned, broker-generated "Loan Approval" not only deviates from industry protocol but also constitutes a material misrepresentation of the loan's approval status, especially where, as here, the underwriting lender (Change) had issued no corresponding approval at all.

70.     We submit that Stein intentionally omitted his signature because he knew the "Preliminary Loan Approval" was to be fraudulently represented to the Buyer (and subsequently Seller) as a true "Loan Approval," a document fabricated solely to satisfy Buyer's contractual deadline after FFF had failed to act diligently and timely register the loan with Change. At the time Stein issued the document, no corresponding approval from the lending bank (Change) existed. By circulating an unsigned, unauthorized, and fake "Loan Approval," Stein and FFF knowingly misrepresented the status of the Buyer's financing, deceiving the Buyer into believing the loan had been legitimately approved when, in truth, it had not. As a result, the Buyer continued performance under the agreement in reliance on a material misrepresentation – that his financing had been formally approved when it had not.

71.     Later, in her testimony, Agent Belese blurred any meaningful distinctions between "Loan Commitment," "Preliminary Loan Approval," and "Loan Approval," asserting that they were effectively interchangeable within the lending industry. When questioned by Buyer's counsel, David Beckerman, Esq., the following exchange occurred:

> Beckerman:  Okay. Can you explain, is there a difference between a commitment and a loan approval or how it's used in residential lending?

28

Belese:  So some states require a commitment, which is also a conditional loan approval, and a conditional loan approval is also considered to be a commitment if you can fulfill these conditions. So in certain states, a commitment is needed, so the dates for that in the purchase contracts are usually towards the closing date, not at the beginning. In the state of New Jersey, they require commitments. We can issue commitments, but we can only do that once the file is clear to close. Conditional loan approvals, loan approvals, it's all very common language to use for loan approval.

72.     Later in her testimony, again referring to the November 9, 2021, approval, Agent stated: "Sure. It's saying that this is a preliminary loan approval or a conditional loan approval or a loan approval, and that it is not a commitment to lend or a promise to lend until he fulfills those bullet points up top."

73.     Later, Seller's counsel (Levine) elicited the following exchange, which reinforced this same interchangeability:

Levine:  Okay. Now, on the -- I guess this is page 2 out of 3, there is a list of outstanding conditions needed prior to commitment?

Belese:  Yes.

Levine:  What does …

Belese:  Prior -- I'm sorry, prior to clear to close.

Levine:  But does it say needed prior to commitment?

Belese:  So I'm going to reiterate that. Okay. Because *a conditional loan approval and a loan commitment and conditional approval and loan approval are all different ways of saying the same thing. (emphasis added).*

Levine: Okay. My question is only if that says outstanding conditions needed prior to commitment?

Belese:  Yes, it does say that.

***

Levine:  Okay. And I believe you already touched on this, so I apologize. Are conditional approval and preliminary approval the same thing?

29

Belese:  Yes.

Levine:   Is there a difference between a loan commitment and a mortgage commitment?

Belese:  So they're all different words used for basically the same things. There are certain states that call them mortgage commitments and loan commitments, and there are some states that call them conditional loan approvals or loan approvals. The only thing that's different is preapproval versus conditional loan approval, loan approval, loan commitment, mortgage commitment.

Levine:  Okay. All of …

74.     The court (in the Buyer/Seller dispute), confused by the Agent's conflation, asked: "So what's different? Wait. I'm -- now explain. Preapproval is different than what?" Agent responded:

Than a conditional loan approval, loan approval, loan commitment, or mortgage commitment. Preapproval is done by the loan officer using very limited documentation just to say, hey, you qualify for this. No underwriter has looked at anything at that point. Or a prequalification, it's also called a preapproval or a prequalification.

75.     This testimony demonstrates that even the Agent herself acknowledged the interchangeable use of the terms *Loan Commitment, Preliminary Loan Approval, and Loan Approval* within her own professional practice. As such, any suggestion that the Buyer should have recognized a substantive difference between a "Preliminary Loan Approval" (as stated on FFF's November 9, 2021, document) and a genuine "Loan Approval" (as required under the Contract and Addendum 2) is unfounded. The Agent's own sworn statements confirm that, within the lending industry (and certainly within her own conduct), the terms were/are used synonymously. The Buyer, therefore, could not reasonably have been expected to discern any technical or semantic distinction that even the Lender's own representative did not observe.

76.     Moreover, while Agent attempted to characterize the issuance of unsigned approvals as "normal practice," standard underwriting procedure requires that a formal loan approval must be reviewed, signed, and authorized by the underwriting lender (not merely by a broker) before it can be represented to a borrower or third party as an approved commitment. The absence of Stein's signature accordingly indicates that he knew the November 9, 2021, document was not a true Loan Approval, further confirming Fyk's assertion that the document was fabricated solely to meet the contractual deadline and mislead him (the Buyer) into believing his financing was complete.

77.     In short, Stein's issuance of an unsigned and falsified Loan Approval was not a mere oversight, it was an act of egregious negligence and reckless disregard for both industry standards and the Buyer's legal rights and overall wellbeing. This conduct violated standard lending practice, regulatory expectations, and Stein's fiduciary duties (*e.g.*, candor). Both he and FFF bear direct responsibility for the deception that misled all parties (including the Buyer, the Seller, and the Title Agent) into believing the loan had been legitimately approved when, in fact, it had not. Not to mention, court confusion around the issue. Relying on that false Loan Approval, the Buyer proceeded in good faith under the belief that his financing had been secured and that he was ready, willing, and able to close. In reality, the loan had never been properly approved by the underwriting bank on November 9, 2021, and, as a direct result of continued misconduct, the transaction failed to close on two (not one, but two) Closing Dates thirteen days apart.

78.     Furthermore, according to publicly available licensing information and Agent's testimony, FFF describes itself as a "Licensed Mortgage Banker, NMLS 810371." Despite that designation, the record clearly establishes that Change (not FFF) was the entity responsible for

31

underwriting the loan and issuing the real loan approval. FFF merely "registered the file" with Change and acted as an intermediary Broker.

79.      As described above, on November 9, 2021, at 2:39 p.m. EST, Agent had texted Rothstein of Change: "It's the underwriting part. When we started last week we registered the file. Let me call instead of waiting on the emails." This contemporaneous message admits that underwriting had either not begun or had only just begun; *i.e.,* the file had merely been "registered" with the underwriter, not reviewed or approved. FFF, however, issued the so-called "Preliminary Loan Approval" that same day, not from the underwriting bank but from FFF itself as though it were acting as the Mortgage Banker, not just a Broker.

80.      Again, two minutes later, at 2:43 p.m. EST, Agent Belese asked Rothstein: "Hey buddy, realistically what is the soonest I can get a commitment." Rothstein replied: "15 business days from the date submitted to [underwriter] which with the Thursday and turkey day and the day after being closed, brings you to 1st week of Dec."

81.      Rothstein's admission again confirms that an underwriter review had not yet been completed on November 9, 2021, in regard to the "Loan Commitment" (also referred to as a "Preliminary Loan Approval" or "Loan Approval"), since those terms were admittedly used interchangeably in the industry, as Agent Belese testified. Indeed, real underwriting clearance was estimated to occur in early December 2021 (certainly not a few hours later on November 9, 2021) and not by FFF.

82.      At 2:45 p.m. EST on November 9, 2021, the Buyer texted the Agent: "I just got an email that it was JUST submitted." Upon information and belief, this text message exchange earlier in the day prompted the actual *submission* of the file to the underwriter. On November 9, 2021, therefore, it is highly unlikely that the file was reviewed at all (much less reviewed, approved, and

Loan Approval conveyed to the Agent or Stein) in the remaining two hours before the contractual deadline elapsed.

83.     Thus, the November 9, 2021, "approval" preceded any actual underwriting review by the lending bank and was clearly not a bona fide lender-issued loan commitment letter.

84.     In contrast, during trial, Agent Belese was asked by Seller's counsel, David Levine: "So the preliminary approval that we looked at from November 9th of 2021, was that after underwriting had looked at this?" Agent stated plainly: "Yes."

85.     These statements are irreconcilable with the contemporaneous messages, which show that Change's underwriting had not even begun its review. The testimony that underwriting "had looked at this" and approved it is patently false. Regulatory and industry standards affirm that only a lender (or a mortgage banker when operating as the institution making or funding the loan) may issue a valid "Loan Approval" or "Commitment to Lend."[6] "A mortgage banker reviews and accepts (or denies) your home loan application directly … a broker can't."[7] Similarly, the Consumer Financial Protection Bureau distinguishes plainly: "A lender is a financial institution that makes direct loans. A broker does not lend money."[8]

86.     These articles make clear that a broker or intermediary (such as FFF in its relationship with Change) cannot lawfully issue a binding Loan Approval that obligates *another* lender to fund. Although FFF represented itself as a "Mortgage Banker," the record shows that

---

[6] If FFF were to somehow claim that it was acting as the mortgage banker and contending it was going to fund the loan (absolutely not the case), the loan approval was still not signed and invalid regardless.

[7]      https://mortgageone.com/the-difference-between-mortgage-bankers-loan-officers-and-mortgage-brokers/

[8] https://www.consumerfinance.gov/ask-cfpb/what-is-the-difference-between-a-mortgage-lender-and-a-mortgage-broker-en-130/

underwriting was handled entirely by Change, while FFF issued the fraudulent "approval" as a Broker without any signature from the underwriting lender or authorized officer of FFF or Change.

87.     By issuing an unsigned and unauthorized "Loan Approval," FFF flagrantly violated standard practice, regulatory expectations, and its fiduciary duties (*e.g.*, candor). By presenting that document as the valid approval, FFF and Agent Belese misled the Buyer (and the Seller, and the court in the Buyer/Seller dispute, for that matter) into believing financing was secured on November 9, 2021, when it really was not.

88.     The Buyer, acting in good faith, reasonably relied on that false representation, proceeded under the belief that his financing contingency had been satisfied on November 9, 2021, and prepared for closing accordingly. At that time, the Buyer had no knowledge of Change's involvement. FFF was the lender per his immediate understanding, confirmed by Agent Belese's testimony that the borrower "would not really know about Change Wholesale until the day of closing."

89.     With the falsified FFF Loan Approval also came a "non-refundable commitment fee" in the amount of $1,295.00, a standard fee that is typically due and payable upon issuance of a valid loan commitment. Here, however, the Buyer was never charged that fee. At trial, Agent testified that the fee was not actually assessed or collected.

90.     During examination, David Beckerman, Esq. asked: "Okay. And if you look under the fees, it says, 'Your commitment fee is non-refundable.' What does that mean?" Agent replied: "So in this particular case, there isn't a commitment fee. So that's like — a commitment fee can be an underwriting fee. We did not charge one. If we had …" Beckerman interjected: "Okay." Agent continued: "… if we were refunding any of his fees, that would not be."

91. This testimony confirms that the Lender never actually charged the Buyer the "non-refundable commitment fee" stated on the falsified Loan Approval. The likely reason the fee was not charged is simple – the Loan Approval itself was *not real*. Because it was never authorized or issued by the underwriting lender, Change, no legitimate commitment existed and, therefore, no lawful basis to assess or collect a commitment fee.

92. This further corroborates that the November 9, 2021, "Loan Approval" was fabricated solely to appear valid for contractual purposes while omitting the very financial obligations that would ordinarily accompany a genuine loan commitment. Put differently, FFF and Stein intentionally created a document that looked like a binding loan approval but bore none of the characteristics, authorizations, or financial indicia of a legitimate one, further proving its fraudulent nature and evidencing intent to mislead.

93. Importantly, Buyer was completely unaware of this fraudulent substitution until just a few weeks prior to commencement of this action. At the time, Buyer was simply relieved to have received what he truly believed to be a valid Loan Approval and responded, "It's a miracle," genuinely believing the approval to be authentic. In reality, however, FFF was not the actual lending bank and possessed no authority to issue such a Loan Approval for funds originating from Change. Buyer reasonably relied on this falsified "Loan Approval" in proceeding with the Contract, thereby placing his deposit (*and substantially more*) at risk based on the Lender's misrepresentation, reliance which ultimately proved demonstrably detrimental when financing was never actually obtained on time (twice).

94. At 4:23 p.m. EST on November 9, 2021, Buyer confirmed Agent's email with a reply, stating: "Thanks Susan. The closing date is Jan 1st through Jan 5th. Jan 5th is the deadline." Buyer made it unmistakably clear that closing was required to occur between January 1, 2022, and

January 5, 2022. Because January 1 was a holiday and January 2 fell on a Sunday, this left January 3rd, 4th, and 5th as the practical window for closing with January 5, 2022, serving as the absolute contractual deadline.

95.     This sequence of communications leading up to the Loan Approval deadline on November 9, 2021, clearly demonstrates that Buyer fulfilled every request in a timely and diligent manner, while the Lender and its Agent failed to act with reasonable care, proper coordination, or urgency in advancing the loan toward approval. To compensate for their own delays, as described above, FFF falsified the Loan Approval in order to meet Buyer's deadline, a deadline that had been expressly communicated to Agent back in October 2021.

96.     The following day, on November 10, 2021, Buyer messaged Agent again, inquiring as to whether the rates had been locked. Agent responded: "Not yet I'll do tomorrow." Buyer replied: "Ok please do. The rates are expected to start rising in 2022." Agent acknowledged: "Yes. I know. Ugh. Of course." This exchange confirmed that the rate was still not locked even after the so-called Loan Approval had been issued, and that Agent was aware Buyer faced imminent rate increases.

97.     Moreover, when Buyer's counsel (Beckerman) asked the Agent during trial, "And what would it have taken to lock [the rate] in?" The Agent testified: "Jason telling me to lock it in." This testimony is contradicted by the record. Buyer repeatedly instructed the Agent to lock the rate, but the Agent failed to do so, leaving the rate floating. At the time of the purported Loan Approval, the rate was approximately 3.6%, which later increased to 3.7% under the 1099 loan program and ultimately 4.75% after the forced loan product change. Had the Agent timely locked the interest rate when first instructed, and had the Lender timely cleared all conditions necessary to close by the January 5, 2022, deadline, the Buyer would have secured a rate approximately

1.15% lower and avoided the additional origination points and substantial long-term financial harm directly caused by the Lender's misconduct.

98.     Notably, the November 9, 2021, "Loan Approval" issued by FFF falsely represented that the Buyer's interest rate had, in fact, been locked at approximately 3.6%, even though the record proves that no rate lock had occurred yet. As confirmed in the November 10, 2021, text exchange, the rate was still not locked. In response, Buyer instructed: "Ok please do," reiterating that rates were expected to rise. The Agent acknowledged this risk. Thus, the fake approval not only misrepresented that FFF had issued a legitimate underwriting approval but compounded the deception by including a fabricated locked interest rate *that did not exist*. The inclusion of a "locked" rate on the FFF-issued form (directly contradicted by contemporaneous communications confirming no lock had occurred) further proves the so-called Loan Approval was not a genuine lender decision but an unauthorized document fabricated to meet the November 9, 2021, deadline, complete with a falsely stated locked rate.

99.     The misrepresentations continued. On November 18, 2021 (nine days after the false approval) Buyer again asked whether the rate had been locked. The Agent replied: "No appraisal back yet and the rate is not locked yet but the rate is being done as exception so it doesn't need to be locked yet. Lol." This statement was false and misleading. There is no concept in mortgage lending of a "rate-lock exception" that holds a rate fixed without an actual lock. A rate is either locked or it is floating; lenders cannot "hold" an interest rate by exception, and certainly cannot treat an unlocked rate (much less a fake locked rate) as if it were binding. The Agent's statement therefore confirmed that: (a) no rate had been locked despite the fake approval claiming otherwise; (b) the loan remained unapproved and incomplete; and (c) the November 9, 2021, document was fabricated to create the false appearance of lender commitment and rate certainty when neither

existed. This nine-days-later admission further establishes that the November 9, 2021, "Loan Approval" was not (and could not have been) a legitimate underwriting approval from Change.

100.    On November 22, 2021, Agent texted Buyer asking about his insurance quote and then stated that "a bunch of judgments came up" on Buyer's record. This communication is significant because a public records or judgment search is a standard pre-approval requirement in every mortgage transaction. Such searches are conducted either by the underwriting lender (here, Change) or by the title company at the lender's direction (not the case here) to identify any unsatisfied liens, judgments, or encumbrances that could affect creditworthiness or title. The discovery of purported judgments after the alleged Loan Approval again demonstrates that the underwriting process had not, in fact, been completed when FFF issued its "approval." For context, the judgments referenced by Agent were part of an old bankruptcy that had been fully discharged in March 2013, a fact easily verifiable through standard underwriting diligence. The judgment, therefore, played no material role in Buyer's loan eligibility but is relevant because it appeared on a credit report that was only being first reviewed in late-November 2021 (two weeks after the supposed Loan Approval was purportedly issued). This timing underscores that a required credit and public-records review, an essential precondition to any legitimate underwriting approval, had not yet occurred as of November 9, 2021. Astonishingly, the events of November 9, 2021, did not serve as a wake-up call to the Lender to expedite the loan process … two weeks after the purported approval, the underwriter was only just beginning the real process of evaluating the loan file.

101.    On December 2, 2021, concerned by the lack of recent updates, Buyer proactively messaged Agent asking: "Are we on track for everything?" Agent responded, "Hiya yes. We will have update today." At the same time, Buyer noted that he was continuing to work on obtaining a better insurance quote.

102.   On December 6, 2021, Rothstein messaged Agent asking, "Anything?" Upon information and belief, this was a reference to missing documentation. Buyer had initially planned to structure the purchase as a 1031 exchange with his Penthouse but had later decided against it. Upon information and belief, this message was prompted in part by that change in funding source and the need to adjust documentation accordingly. Rothstein followed up: "Susan, we had also spoken in the beginning about the CPA letter with no expenses. Where is that letter?" Agent responded, "OMG. We sent it." Rothstein replied, "I don't see it in the file anywhere." Agent then stated, "Ok, I just got to AC [Atlantic City], so I won't be able to get to you until tomorrow."

103.   At 4:23 p.m. EST on December 7, 2021, nearing close of business, Rothstein again messaged: "Anything? Anything?" The duplication suggested urgency and frustration over the delay in receiving the requested documentation from the Agent. Agent responded, "No babe. We requested but nothing," referring to the missing CPA letter. In other words, although Agent had previously represented that the document was already "in the file," it had not yet even been "requested." This exchange indicates that Agent had not timely requested the required CPA letter and had even misrepresented its existence in the loan file. Thus, its absence and the delay was, again, attributable to the Agent, not the Buyer. Shortly thereafter, Agent stated that she had "just got it." Rothstein then asked, "CPA letter with expense ratios?" And Agent replied that she would ask. Rothstein responded, "Please, need asap. Ty," further underscoring the Lender's growing impatience over the Agent's lack of diligence in timely securing required documents.

104.   On December 9, 2021, at 10:39 a.m. EST, Agent messaged Buyer: "Hiya. Please ask your accountant to send us a letter stating you have 0% expense ratio on letterhead please." This was particularly concerning because, as of December 9, 2021 (three days after Rothstein had raised the issue and well after it had been originally requested "in the beginning" of the process),

Agent was only then reaching out to Buyer for that document. Buyer immediately responded: "Ok. Also I had the house inspection for insurance." He then added: "I need to jump on a call with you and Todd" (referring to the Accountant). Agent agreed, replying: "Ok. Let's do it." This call was intended to clarify precisely what was required from the Accountant (Marrazzo) to ensure there were no Buyer delays in delivering the needed documentation from Buyer's side.

105.   The following day, December 10, 2021, at 11:03 a.m. EST, Buyer messaged Agent: "We are ready to go right? Getting insurance numbers by Monday but otherwise ***I won't get an extension***." (emphasis added). This message, again, reflected Buyer's growing concern about the approaching contractual deadline, which, although still twenty-six days away (January 5, 2022), was rapidly closing in given the Lender's persistent delays. This message also emphasizes that Buyer explicitly informed Agent that the Seller would not grant any extensions. This concern was well-founded – since the contract's effective date of June 10, 2021, Florida property values had been soaring as a direct result of the COVID-19 migration surge. Buyers from heavily restricted states (*e.g.*, New York) were flooding into Florida, driving up demand and prices especially on waterfront properties.

106.   The subject Property was uniquely valuable, not because of the home itself, but because it sat on one of the few deep-water, wide-canal waterfront lots available in the area, a combination exceptionally scarce and highly sought-after.



107.    The subject Property sat just four houses from the Intracoastal Waterway, offering eight-minute ocean access by boat (path shown in red below) with no fixed bridges and situated on a double-wide canal that would allow a one-hundred-foot yacht to turn around comfortably. The property's desirability was further enhanced by its location just north of the Atlantic Boulevard Bridge, where property values traditionally remained higher than those south of the bridge. Its proximity to Atlantic Boulevard also allowed Buyer to avoid Federal Highway when heading to the beach, which was particularly important to him given his frequent use of a golf cart to travel locally (golf carts being prohibited on Federal Highway, path shown in blue below).





43







108.     Properties like the subject Property were, by late 2021, selling for upwards of two million dollars. A subsequent appraisal, conducted by certified appraiser Arnoldo Avelar ("Avelar") on January 18, 2023 (exactly two years after the original Closing Date), confirmed this

dramatic appreciation. According to Avelar's report, the Property's estimated value as of the January 18, 2022, Closing Date was approximately $1,800,000,00, while its market value as of January 18, 2023, had risen to roughly $2,300,000.00 — one million dollars more than Buyer had contracted to pay. Current estimates place the Property's value in the ballpark of $2,500,000.00, underscoring both its exceptional desirability and the significant financial loss Buyer suffered when the transaction failed to close due to the Lender's malfeasance.

109.    At 1:27 p.m. EST on December 10, 2021, Agent responded: "I thought closing in January?" Buyer responded: "Yeah. Jan 2nd to 5th. But I want to be sure everything is done and ready to go asap." Buyer again informed Agent of the strict deadline. And, although it was still well in advance, Buyer was seeking confirmation that the Lender was prepared to close the loan in advance of the upcoming holidays. Agent responded: "Me too let's finalize Monday." Monday was December 13, 2021. Buyer then stated: "I got an email tonight that said *I'm approved*" (emphasis added) to which Agent responded "lol. Um ok" as though it was a surprise. Buyer then took a picture of the email he had received from Stein (Agent's boss):

Dear Jason Fyk,

We are pleased to inform you that your application for your home located at 2752 NE 3rd St has been Approved.

A member from our team will contact you within the next few days to go over any outstanding conditions as well as provide you with a copy of the approval.

In an effort to close your loan on time, upon receipt of the approval please review it immediately and provide us with the outstanding conditions required within 7 days.

If there is anything else we can do to assist you or if you forsee any issue in being able to satisfy any condition on the approval, please do not hesitate to contact us.

We appreciate your business and look forward to a smooth closing of your home loan.

Thank you for your business and have a great day!

P.S.   *Should you know anyone with a real estate or mortgage need, please contact a member of our team. Referrals are greatly appreciated*

Best regards,
David Paul Stein

110.    On Friday December 10, 2021 (one month and one day after the contractual Loan Approval deadline), Buyer finally received what appears to have been the legitimate Loan Approval from the actual underwriting bank, Change. This email is profoundly revealing. Even during the early preparation of this Complaint, the Buyer still did not know that the "Loan Approval" Stein issued on November 9, 2021, was not a valid loan approval. Only upon re-reviewing this particular email did it finally become clear to the Buyer that the November 9, 2021, approval was fake. Until that moment (including throughout trial) the Buyer had been operating entirely under the Lender's false representations.

111.    Notably, the communication appears to have been auto-generated when Change issued its real underwriting approval on December 10, 2021. The message stated: "A member from our team will contact you within the next few days to go over any outstanding conditions as well as *provide you with a copy of the approval*" (emphasis added), which immediately conflicted with what the Buyer had genuinely believed — he thought he had already received his Loan Approval a month earlier on November 9, 2021. Upon re-reviewing this particular email, the Buyer realized for the first time that the November 9, 2021, "approval" was fake. The genuine December 10, 2021, Loan Approval was never delivered to him (the only indication that there was a second Loan Approval was this email); instead, FFF merely copied-and-pasted selected conditions into a follow-up email. This inconsistency confirms that FFF fabricated the November 9, 2021, approval to meet the contractual deadline and then intentionally withheld the real Change approval to conceal its misconduct.

112.    Agent's reaction further underscored the irregularity. She responded, "So weird. But ok" suggesting confusion as to how a "Loan Approval" could be issued a month after an approval had supposedly already been delivered. This raises two plausible interpretations: either

46

Agent was genuinely unaware that Stein had falsified the November 9, 2021, Loan Approval (not likely), or she knew and was attempting to conceal her awareness that it was fake (more likely). Agent followed up with another evasive message: "*They must have approved something in the file. I'll look tomorrow. Was at a funeral tonight. Ugh*" (emphasis added).

113.    Buyer, while confused by the new "approval" timing, remained optimistic and replied, "At least it's good news," to which Agent responded, "Yeah 100." No further discussion of this "second" Loan Approval ever occurred. At that stage, Buyer had no reason to suspect deliberate deception and was focused solely on completing the transaction. With the deal ultimately collapsing due to delayed financing, however, this sequence of events (and the revelation that the first Loan Approval Buyer relied on was intentionally falsified) became critically important evidence of the Lender's misconduct and misrepresentations.

114.    On Monday, December 14, 2021, at 9:23 a.m. EST, Buyer messaged Agent stating: "Since the loan is approved I want to confirm a few things. Rate / point. Also want to be sure there is no prepayment penalty." This confirms that Buyer had not actually received the real Loan Approval itself. Agent replied a minute later: "Yes sir. I'm at the hospital with my dad. So I'll call you later. Plus I need you to sign a bunch of items." Buyer responded: "Ok. It doesn't have to be today. I'm flying home today but I'm just confirming things. Hope your dad is OK." Agent replied: "Thank you [praying hands]." Recognizing that Agent was tending to a family emergency, Buyer refrained from pressing further that day, demonstrating patience, professionalism, and humanity while continuing to ensure that all outstanding matters were properly addressed.

115.    The following day, December 15, 2021, at 10:28 a.m. EST, now just two and a half weeks before the Closing deadline, Buyer received an email from the Agent listing over a dozen new requirements and attaching several PDFs.



Wed 12/15/2021 10:28 AM

Susan Belese <sbelese@fam1fund.com>

FW: Fyk purchase mortgage approval

To    Jason Fyk (SMFF)

Cc    Lisa Wood; Juli Hilliker

ⓘ You replied to this message on 12/15/2021 1:03 PM.
This message was sent with High importance.

| 📄 4506C.pdf 50 KB ⌄ | 📄 HVCC.pdf 185 KB ⌄ |
| 📄 Investor disclosures.pdf 935 KB ⌄ | 📄 Flood.pdf 312 KB ⌄ |
| 📄 1003 to be signed.pdf ⌄ | 📄 Fyk Corrected Profit and Loss.pdf ⌄ |

Hello,

Per your instructions below are the required conditions for the Fyk file.

Please provide the following:

1. Please sign and date the disclosures required from the investor—Occupancy affidavit, contact consent, & ability to repay. *see attached*
2. Please sign and date appraisal HVCC form  *see attached*
3. Request for IRS transcript 4506C form to be signed & dated *see attached* (need to order 1099 transcript for 2020)
4. Please sign & date the flood certification confirming the property is located in a flood zone.*see attached*
5. Please sign & date the 1003 (loan application *see attached*
6. Please provide all pages of your current bank statement (s) evidencing sufficient assets for closing & reserves of approximately $426,977. (last statement in the file is Fulton Bank #9823 through 10/25).
7. Provide a signed letter of explanation & the source of the large deposit to Fulton #9823 on 8/25 for $505,349.40. *see attached*
8. Provide a signed letter from Emily confirm you have 100% access to all funds in the joint Fulton account ending #9823. *see attached*
9. Provide the final settlement statement or closing disclosure for the sale of 111 Briny Ave evidencing sale of property.
10. Donor to provide all pages of the Capital One bank statement evidencing the wire transfer out for $25,000.
11. Provide all pages of 2 months most recent business bank accounts for WTF Magazine.
12. Verification of active business requires...
    A)  Evidence of current work (executed contracts or signed invoices that indicate business is currently operational within7 days of loan closing)

48

12. Verification of active business requires...
   A) Evidence of current work (executed contracts or signed invoices that indicate business is currently operational within7 days of loan closing)
   B) Evidence of current business receipts with 20 days or note date OR
   C) Business website demonstrating activity supporting current business operation (timely appointments for estimates or services can be scheduled).
13. Provide a year to date profit & loss and Balance sheet for WTF Magazine, LLC signed and dated by Jason. *see attached*
14. Provide a CPA letter confirming start date of the business and the % of ownership. CPA or tax preparer to also state the business, WTF magazine LLC's expense ratio based on the most recent 2020 tax return. I am handling
15. Jason to provide a detailed signed letter of motivation for the move from PA to FL and confirm intent to occupy the subject property *see attached*
16. Provide a copy of the lease agreement for your departing residence evidencing rent for $5400 along with proof the tenant has paid 1st months rent & security deposit via copies of checks or deposit receipt.
17. Provide supporting documentation evidencing no open judgments or liens for the following—Barbara& Michael Blew $586, Stone's Throw Owners Assoc., Greenpoint Mtg, PNC Bank, & Chris Slaymaker by evidencing included in BK, evidencing paid or are closed. *see attached judgement list and lets review*
18. Please provide acceptable Home Owners Insurance AND Flood Insurance, with paid in full receipt or invoice, please give your agent the below information: Flood insurance must be paid prior to closing & homeowners can be collected at closing or paid in advance.
   Change Home Mortgage
   ISAOA/ATIMA
   C/O LoanCare
   PO Box 202049
   Florence, SC 29502

116.     Upon information and belief, these were the conditions that accompanied the December 10, 2021, real Loan Approval issued by Change, which were cut-and-pasted by Agent, adding her own dialog in red. Had the November 9, 2021, Loan Approval deadline been legitimately met, these conditions would have been disclosed more than a month earlier, including a critically overlooked requirement, a Notice of Good Standing for the Buyer's business. That specific requirement fell somewhere within the broad and ambiguous subset of conditions listed as item 12(A–C), which stated:

Verification of active business requires…

A) Evidence of current work (executed contracts or signed invoices that indicate business is currently operational within 7 days of closing).

B) Evidence of current business receipts within 20 days of note date; OR

C) Business website demonstrating activity supporting current business operation (timely appointments for estimates or services can be scheduled).

117.    Critically, condition 12(A)'s "executed contracts or signed invoices" are not the same as a "Notice of Good Standing" from the State of Delaware, a pivotal closing issue discussed in more detail below (*see* January 6, 2022). Buyer's business, *Where's The Fun* ("WTF") Magazine, was primarily an online social media marketing company that operated as a subcontractor under companies like RBM, making condition 12(B) less relevant to Buyer. In compliance with condition 12(C), Buyer provided evidence of his active business website demonstrating current operations and engagement consistent with the Lender's stated requirements.

118.    Additionally, under item 14, Agent (in red) indicated that she was "handling" matters with the Accountant directly. Regarding item 16, Buyer had planned to rent his primary residence to his in-laws while occupying and renovating the subject Property, and a formal one-year lease agreement was executed, including first month's rent and a security deposit. Fortunately, because the lease was with family, Buyer was later released from the agreement when the transaction failed to close (otherwise, he would have been left without a residence to live in).

119.    As to item 17, this too, again, was easily verified through the bankruptcy discharge records. Importantly, Buyer either timely satisfied or ensured that Agent handled every condition listed in this email. Once again, the "Notice of Good Standing" was *never referenced* anywhere in the Lender's condition list. In subsequent litigation between Buyer and Seller, the court also found Seller's argument (that condition 12 required a Notice of Good Standing) to be unpersuasive, noting that the condition text contained no reference whatsoever to such a "notice" or to the State of Delaware where Buyer's business was registered.

50

120.     Had the Buyer actually been informed on December 15, 2021, that a Notice of Good Standing was *specifically* required to close, he may still have been able to obtain it in time for the January 5, 2022, deadline. Had he been informed of that requirement on or about November 9, 2021 (*as he should have been*) he unquestionably could have done so. And, just as the court later found the Seller's argument unpersuasive that this email somehow constituted notice of such a specific requirement, the Buyer was entirely unaware that a Notice of Good Standing was needed at all. Conditions 12(A–C) did not mention any such "notice." The failure to timely communicate this requirement accordingly created an unnecessary and entirely preventable obstacle to closing. Moreover, had the Loan Approval been legitimate and timely, this list of conditions would have undoubtedly been provided to the Buyer during the week following November 9, 2021, giving him ample time to identify and satisfy all final requirements (including the Notice of Good Standing) well before the scheduled closing date.

121.     At 12:06 p.m. EST on December 15, 2021, Buyer messaged Agent: "Would assets work? Planning on selling my boat which is 100k and possibly my Firebird which is 60k." Twenty minutes later, Buyer followed up with: "Is the name of the lawyer or law firm on the bankruptcy filing? Trying to track this down." Agent replied: "It should be, or maybe if you tell me where you filed, I can get them from the public records." Buyer responded: "Chester County Courthouse. I can't remember the attorney's name. I don't have any paperwork on it." The bankruptcy was roughly nine years old at this point, and the related documents were not readily available at the time. Those documents were later located and timely provided, however, and they played no material part in delaying the closing. Buyer then asked Agent to call regarding the "occupancy cert" and inquired about the "acquired on" date.

51

122.     The following day, on Thursday, December 16, 2021, Buyer attempted to call Agent at approximately 11:30 a.m. EST. Agent responded *via* text: "I'll call you right back." Buyer replied: "The insurance quote came back worse with the 4-point and wind mitigation. Don't worry about calling me back." Insurance in Florida is notoriously difficult and expensive, largely due to hurricane risk and strict underwriting requirements. Buyer was diligently working to obtain affordable coverage and remained proactive throughout this insurance process. The remaining messages from that day pertained solely to securing cost-effective insurance and played no material role in the eventual closing delays.

123.     On December 17, 2021, at 8:13 a.m. EST, Buyer messaged Agent stating: "I'm still waiting on the document from [Red] Blue Media, but remember I do need to go to the bank and set up the wire today." Agent responded, "Yes sir." Buyer then added, "Haha, the renter still trying to talk me out of it," to which Agent replied, "Wtf. Ppl are crazy [laughing emoji]."

124.     Notably, the subject Property was occupied by a renter who had previously made an offer to purchase the Property for a lower amount than Buyer which the Seller declined to accept. Alternatively, the renter held a right of first refusal, but when presented with Buyer's higher offer, he refused to match it, leading Seller to proceed with Buyer instead. Throughout the transaction, however, the renter repeatedly attempted to interfere with and undermine the sale, recognizing, like Buyer, that property values were rapidly soaring. Upon information and belief, the renter even offered Seller as much as $200,000.00 above Buyer's contract price if Seller could find a way to cancel the agreement. This created significant risk for Buyer, as any setback in financing could provide Seller an excuse to terminate the deal. Buyer's remark that the renter was "still trying to talk me out of it" reflected both his awareness of this external pressure and his

determination to ensure the transaction closed on time despite the renter's ongoing attempts to derail it.

125.    Buyer also informed Agent that he was at the bank preparing to set up the wire in person. Agent replied, "It looks like you need approx. 270k, but I don't have the flood insurance or adjustments. Did you speak to Katie for flood?" Buyer responded, "Not yet. I'm setting it up as like a preemptive wire. I'm all set to do the wire remotely if need be, but I'd like to get it initiated today if possible." Agent acknowledged, "Kk."

126.    Buyer was leaving Pennsylvania for Florida, where he would temporarily stay in the Penthouse that Tony had leased back to him through January 4, 2022. Buyer banked with Fulton Bank, which had no Florida branches, and because an outgoing wire of that size required an in-person wet signature, he sought to pre-arrange it before traveling. Although Buyer was unable to obtain the exact final wire amount before departure, he executed a pre-authorization form permitting the bank manager to fill in the precise figure once it became available, thereby resolving the wire transfer logistics well in advance of closing.

127.    Buyer then advised Agent that the flood insurance documentation was inbound *via* email. Agent initially indicated she had not yet received it, but Buyer responded, "It's coming," to which Agent replied, "Just got it." This completed the flood insurance quote process and finalized the insurance figures.

128.    Buyer next informed Agent, "The company that pays me [*i.e.,* RBM] said it shouldn't be a problem to get a 1099. I haven't gotten it yet but I'm working on it." Agent replied, "Ok love." Buyer asked whether his December pay stub would suffice instead, noting that the 2021 Form 1099 sought by the Lender would not typically be issued until early 2022. Buyer also explained that RBM had provided pay stubs for October, November, and December, which

53

reflected his current 90-day income and demonstrated that his business remained fully operational and profitable.

129.    Later that same day, on December 17, 2021, at 12:53 p.m. EST, Agent advised Buyer of the updated loan figures, noting that they would adjust again once the final insurance and flood numbers were factored in. She also asked about the December paycheck but then confirmed receipt of it. At 2:22 p.m., Buyer followed up again regarding the wire information, and Agent replied that she did not yet have it. This continued to illustrate Buyer's diligence and consistent communication in ensuring every component of the transaction was completed as timely as possible and well ahead of closing.

130.    On Saturday, December 18, 2021, Buyer messaged Agent: "G[oo]d Morning. Where do things stand?" Although it was the weekend, Buyer continued to follow up to ensure that the loan process remained on track and to avoid any further delays. Buyer did not, to his knowledge, receive a response from Agent that day; however, given that it was a weekend, he was not overly concerned about the lack of immediate communication.

131.    On Monday December 20, 2021, at 8:23 a.m. EST, Buyer messaged Agent: "Good morning Susan. I really would like to have the loan done and in place so I don't have to stress about it over Xmas. Can you please update me on where we stand. You should have everything you need at this point?" At this point, with the holidays looming, which always slows things down, Buyer was beginning to become increasingly concerned about the impending closing deadline. He understandably wanted to put the "stress" of providing the documents behind him to enjoy his holiday. Agent then responded: "Yes sir I'll get you answers today but this is with an outside bank [Change] so I have to wait on their answers. Later today my friend." Buyer replied: "Thank you lots."

132.     Then, at 12:25 p.m. EST on December 20, 2021, Buyer sent Agent the following message: "The title company requested something from you last week. Closing needs to be between Jan 3rd and 5th. Please see my forwarded email." Buyer attached to this message a screenshot of a communication from Joanne Kretzschmer ("Title Agent," "Kretzschmer) of Aces Title Agency (below), which he also forwarded to Agent by email. The correspondence served as a reminder that the title company was awaiting certain information from the Lender and reaffirmed that the closing was required to occur within the January 3rd–5th window, consistent with the contractual deadline. Moreover, the Title Agents message also indicated that the Lender was not supplying the necessary documentation in a timely manner to the Title Agent to effectuate her duties on time.



133. Agent then explained: "We didn't have 1/15. Insurance did. And we had it changed we know it's closing by 1/5 or sooner." The confusion may have arisen from reading "Jan 1–5" or "1/5" as "1/15." Here, however, the Title Agent's email indicated the Lender (not the insurer) had the date wrong. Regardless, Agent reaffirmed that the lending bank (Change) understood the hard January 5 closing deadline "or sooner."

134. Buyer then pointed Agent to his forwarded email chain with Wood. Agent indicated Wood was on vacation, but noted she and Wood "always cc" each other and "are a team," meaning any failure to respond was attributable to FFF. Buyer again directed Agent to review the email. Agent stated she would call the Title Agent. Buyer asked: "Lmk how that goes." Agent responded: "All good Joanne will order survey." Buyer replied: "Ok." Agent then added: "Even tho I responded to the email last week and said ready to order please do so. But Joanne and I are on same page." Buyer asked: "Is that the elevation survey?" Agent replied: "Property survey not elevation certificate." Buyer: "Ok." It remains unknown to Buyer whether Agent had, in fact, responded to the Title Agent the prior week.

135. Agent next asked: "Hey who can give me the closing disclosure from the sale of Briny? [*i.e.,* the Penthouse] Closing title co[mpany] number of realtor who represented you?" Buyer replied: "Have I not put you in contact with Maria Duval?" Agent: "I don't think so. Is she same realtor on this one?" Buyer: "I did. Just text you both again." Agent "liked" that message. Although a minor oversight, this again shows Buyer's diligence and that the Lender had "again" overlooked information Buyer had already provided.

136. Roughly an hour later, Buyer attempted to call Agent, then texted and asked for a call back. After they spoke, Buyer messaged: "So long as I'm good with my in-laws renting my home I'm good," confirming whether the Lender had any issue with his in-laws as tenants under

the lease. Buyer then asked: "Does the check have to be endorsed as if deposited?" Buyer was in Florida and did not have the check in hand, and it had not been deposited yet. He clarified: "Deposit on rental agreement will be on Thursday at the earliest," indicating his in-laws could not get to his bank (Fulton) until Thursday at the earliest.

137.    At 5:04 p.m. EST on December 20, 2021, Buyer again asked Agent to call him and noted he was "putting out more fires." Agent replied, "lol. Ok," and said she was on a call but would return his call when free. Buyer responded: "Yup." At 5:11 p.m. EST that same day, Agent sent Buyer an email with a new list of requested documents.



138. All the above document requirements were subsequently delivered by Buyer in a timely fashion.

139. On Tuesday, December 21, 2021, having not heard anything from Agent, Buyer messaged at 3:36 p.m. EST: "Any updates that you hear I'd like to kn[o]w. I've extended my stay in Florida till the 4th so try to close on the 4th. Also everything is setup from Thursday to get the lease and deposit." Agent responded at 4:03 p.m. EST: "Hello my friend! I have no new updates for you at this time. Hopefully we'll hear something tomorrow and I'll just be that we need at least a security deposit. I'll keep you posted as they come on now."

140. The following day, Wednesday, December 22, 2021, at 3:28 p.m. EST, Buyer sent Agent a picture of the rent check. Agent responded: "Great. Thank you!" Buyer then explained: "She [*i.e.,* Buyer's mother-in-law] signed the lease but didn't get the scan [of the lease with her signature]." He continued: "Depositing the check tomorrow." Agent replied: "Ok. Thank you one day early." This exchange is particularly noteworthy because Agent herself acknowledged that Buyer was acting "early" and with diligence, consistently staying ahead of schedule. At 3:40 p.m. EST, Buyer informed Agent that he had just sent the signed lease and followed up by asking: "Can you clarify what this is?" Buyer sent the following image to the Agent:



141.     Agent did not respond again that day, but the following morning, on December 23, 2021, at 6:18 a.m. EST, Agent messaged Buyer: "Change Mortgage is verifying your account. Follow link." At 7:16 a.m. EST, upon waking, Buyer replied: "What's the purpose of everything else if I have to digitally connect my account?" Agent responded:

> The[y] verify everything these days to make sure no fraud. Some banks go overboard, which I feel [C]hange is being a bit much, but they make the rules not me. You are taking a million-dollar loan so it's not like it['s] 10k. It's frustrating yes, but necessary to close—I wish it was easier trust me. On a good note, that means they are in your file. [Thumbs up emoji].

Buyer replied: "Ok…lol. I got weird news yesterday too. The tenant realized I'm actually buying it [*i.e.,* the Property], got annoyed, said he'd just pay me [the rest of the rent] and vacate (he said

he's going to talk to his wife today). I'm like uhhh ok pay me and leave. I'm good with that."
Agent responded: "Omg. I need your luck. That's amazing."

142.    Nine minutes later, Buyer texted: "Ok done," indicating that he had completed the digital account verification. Agent responded: "Thank you. I'm out after 2 [PM] today but will follow up throughout the day to see any updates. I sen[t] the lease and security deposit to the processing department [at Change] yesterday so they will upload today. Rounding the bend now." This statement (that they were "rounding the bend") signaled to Buyer that the loan process was nearing completion.

143.    Buyer then explained: "They [Change] should be able to verify the deposit for the rent from the account access." He continued: "If this guy [renter] vacates, it gives me use immediately. I would then renovate the place and get it setup for AirBnB which could net between 11k and 14k a month. This may play out perfectly." Because the Renter's lease extended through April (and the Lender knew Buyer could not fully occupy the property until then), Buyer intended to move his belongings (tools and personal effects) into the attic or garage until the tenant vacated, at which point he would immediately begin renovations. Buyer's long-term plan was to renovate and convert the property into an AirBnB short term rental to maximize income while maintaining personal access during vacancies.

144.    Agent replied: "Wow. That's incredible." This confirmed that Agent was fully aware of the temporary occupancy arrangement and Buyer's future plan to rent the Property as an AirBnB after he renovated. Buyer then sent an image of the deposited rent check from his in-laws.

145.    On Monday December 27, 2021, Buyer again messaged Agent, checking in on the status of the loan (even the day after Christmas) and asking Agent to call him regarding several questions he had.

146. On Tuesday, December 28, 2021, at 11:09 a.m. EST, Buyer promptly messaged Agent: "Anything from the underwriter yet?" Agent responded: "Nope. Ohhh," then corrected herself: "Ugh." Buyer, now increasingly concerned, replied: "We are running [o]ut of days." Agent attempted to reassure him: "Not yet. I'm not panicking yet. Lol. Today prolly hear [] tomorrow at the latest."

147. Contrary to Agent's casual tone, Buyer was understandably alarmed that, with only days remaining before the hard January 5, 2022, closing deadline, he still had not received a clear-to-close. Buyer replied, "Ok. I'm panicking until I know it's done." Rather than acknowledge the seriousness of Buyer's concern, Agent brushed it off, replying: "Don't. This shit happens all the time. And the holidays don't help and Covid running ramped here and everyone sick it's crazy I know at least 15 ppl with it."

148. Trying to stay composed despite his growing anxiety, Buyer joked, "People get sick in winter…lol," indicating the foreseeability of staffing issues. This statement underscored Buyer's true underlying frustration that both holidays and seasonal illness were entirely predictable annual events (not unforeseeable emergencies excusing the Lender's continued delays). Importantly, the Court later held that COVID-related illness and the holiday season were foreseeable and preventable delay circumstances for which the Buyer could have reasonably prepared, classifying such events as "acts of nature," rather than "acts of God" protected under the Contract's Section 5(b) force majeure clause. While Change could have reasonably anticipated and mitigated staffing shortages within its own organization (particularly given the Agent's admission that such delays "happen[] all the time"), the Buyer could not possibly foresee, control, or prepare for delays arising from the Bank's internal operations, yet he was ultimately held accountable for Change's staffing failure delays. Buyer's early efforts to secure financing, his constant responsiveness, and his

61

meticulous communication were all examples of his diligence and preparation. In hindsight, the only effective precaution Buyer could have taken to avoid these Lender-caused delays would have been to avoid working with FFF and Change altogether and to engage a more competent and responsible Lender.

149.    In the vein of force majeure, this testimony was elicited at trial of the Buyer / Seller dispute:

> Levine: And do you see where it says, 'If an event constituting force majeure causes services essential for closing to be unavailable,' do you see that?
>
> Fyk:  Yes.
>
> Levine:  And what do you contend were the services that were unavailable for closing due to a force majeure?
>
> Fyk:  The underwriter services were clearly unavailable.
>
> Levine:  And what specific part of the underwriter services, to your understanding, were not available due to COVID?
>
> Fyk:  I was told – well, I mean, it's hearsay, but I was told by Susan that the underwriter was sick and was unable to actually pick up the loan until very last minute, and then that's when everything was thrown off in terms of timeframe, but that's a service that was unavailable to do with COVID.

Translated, Fyk was "told" by Agent that Change's underwriters were unable to "pickup the loan," which centers responsibly on the lenders (including Change); but, in reality, everything was last minute because of late submissions to the underwriter and the lack of urgency.

150.    Buyer's "stress" (previously described by Agent as "pain") was now escalating because the Lender's lack of due diligence had forced him into a last-minute crisis. By this point, it was far too late for Buyer to switch to another lender. Buyer concluded the exchange by stating, "Thursday though I'll be losing my mind…lol," making very clear that if no clear-to-close was received by Thursday December 30, 2021, he would be under extreme distress during the holiday.

62

In other words, the Lender's repeated failures to timely process and prepare the loan for clear to close caused Plaintiff substantial, foreseeable, and acknowledged pain and suffering.

151. On Wednesday, December 29, 2021, at 5:35 p.m. EST, again, having heard nothing from Agent throughout the day, Buyer messaged Agent: "Anything yet?" Buyer received no text response. Agent did not reply at all that day.

152. On Thursday, December 30, 2021, at 9:26 a.m. EST, Buyer called Agent and immediately received an automated unavailable text response. Buyer then messaged: "Ok seller is making moves. Please call asap." Ten minutes later, Buyer sent another message: "I sent David [Stein] a message for an update on the mortgage as well." Agent replied: "David? Stein? He has same updates as me. Should have today." Buyer confirmed: "Yeah. I figured it would be better to ask him directly." Agent responded: "Ok no problem."

153. At this point, Buyer was increasingly concerned about the lack of progress and decided to escalate his inquiry by contacting David Stein, Agent's supervisor at FFF, the same supervisor that issued the falsified Loan Approval. This communication made clear that Buyer was dissatisfied with Agent's performance and perceived a lack of transparency regarding his loan status. The nature of Agent's response ("David? Stein? He has the same update as me.") also suggested an uneasiness on Agent's part that her boss was being directly contacted.

154. At 12:23 p.m. EST on December 30, 2021, Buyer again messaged: "I'm still waiting on a call back." Agent replied: "I know, I'm working on your file. Give me some time, I am tying up loose ends." Relieved to hear the file was at least being worked on, Buyer responded: "Okie dokie." Agent then replied: "Hang in there, I promise you are always my priority [praying emoji, thumbs-up emoji]." Attempting to ease the tension, Buyer responded: "When this is all over

I owe you dinner." Agent replied jokingly: "You owe me a percentage of your settlement. Lol jk. [heart emoji]."

155.    The "settlement" comment referred to Buyer's unrelated, ongoing lawsuit against Facebook. Buyer had inadvertently sent a screenshot of that case to Agent by mistake, prompting her to research him online and learn of his ongoing litigation.

156.    Shortly thereafter, Buyer messaged: "We pulled the tax record [for the Property] again and the seller changed the tax status from Homestead to secondary for 2021, so he knows that I had that as an ace in the hole, which says that he's prepared to back out if I don't come through for some reason." Upon information and belief, Seller had delayed closing till 2022 to unlawfully take advantage of capital-gains tax exemptions for a primary residence held and lived in for at least two years, but, by late-December, Buyer recognized the change to secondary property and viewed that change as a strategic maneuver to remove his underlying leverage over Seller. Buyer communicated this to Agent to emphasize that Seller was positioning to terminate the contract at the first opportunity, reinforcing the urgency of closing sans delay.

157.    At 12:36 p.m. EST on December 30, 2021, Agent messaged Rothstein: "You can't lock Fyk; we have to do on our end. Send me your rate sheet. Call Dave Stein asap." This message confirmed that, over two months after Buyer had first requested a rate lock, the interest rate *still had not been locked*, even with less than a week remaining before the contractual closing deadline. Agent acknowledged that Change Mortgage could not lock the rate directly and that the lock had to be initiated through FFF in real time (not *via* "exemption" as had been previously represented to the Buyer).

158.    At 3:31 p.m. EST on December 30, 2021, Buyer again messaged Agent: "Any news?" No response followed. At 4:59 p.m. EST that same day, notably, one minute before the

end of the business day, Buyer sent another message: "???" At 5:07 p.m. EST, Buyer indicated: "Just seeing the DocuSign stuff." A minute later, Agent replied: "Just sign the stuff cuz they [will] fix after but starting the clock." Buyer immediately responded: "Starting what clock?" then emphatically added: "I have no idea what's going on. I did not change the docs 12/30."

159.    It was apparent that substantive document revisions had been made requiring re-execution. Buyer then messaged, "Oh I see," after recognizing what had changed, and confirmed he had signed a minute later. Agent thanked Buyer. Buyer followed up: "Is it past the underwriter?" Agent responded: "It is with them. She is reviewing today." This prompted Buyer to reply: "I thought she was already reviewing? Closing needs to be late afternoon on the 4th so they can't claim I missed the 5th deadline." The Buyer was so concerned that the Seller might look for any excuse to terminate the Contract that he actively pushed to close a day early, ensuring the Seller would have no basis to cancel the agreement. Agent had previously represented that the file was already in underwriting, yet was now stating that it had just been reviewed. As a result, Buyer expressed confusion and frustration, writing that he had "no idea what's going on." As of that Thursday, December 30, 2021, the loan still had not received clear-to-close status … just six days before the contractual deadline.

160.    On Friday, December 31, 2021, at 9:54 a.m. EST, Buyer messaged Agent: "I really need some answers today. Please find out what the underwriter is doing." Recognizing his own tone was overly firm, Buyer quickly softened the message by adding, "Happy New Year." Three minutes later, Agent replied: "Happy new year," followed by a longer message stating:

> Happy new year. I just uploaded the updated title to my processing dept. Underwriting won't clear until all docs are correct, so we are working hand and hand with them. The judgments are not coming up on any title docs so that is on the desk of the underwriting manager for waiving.

So that exception is pending. Unfortunately, the bank is closed but the underwriter is working with me directly today. We are doing everything. Breathe, drink, breathe again and let's see what we can accomplish today. [two heart emojis].

Buyer responded, "Ok thanks." Agent then followed up with an unexpected request: "Hey. I need [you] to pay insurance can you do that today now that we are closing? They want it paid prior to closing. So stupid."

161.    This was the first time Buyer had ever been asked to *prepay* a full year of the insurances prior to consummation of the loan. Buyer reasonably believed that title insurance, property insurance, flood insurance, and other related premiums would all be paid out of the closing proceeds through the title company, as is standard practice. Even Agent acknowledged the request was "stupid."

162.    Buyer replied: "Why on Earth would [the closing] not just pay it out of the funding rather than me paying for something that I don't even have yet?" Agent responded: "It's their policy. I said same thing." This exchange raises a critical question: was this truly the Bank's policy, or was it the result of the Lender's failure to timely deliver the required insurance figures to the title company in preparation for closing?

163.    Because it was both a holiday and after business hours, Buyer was unable to make the insurance payments immediately and explained he would pay it first thing Monday, January 3, 2022, when both the bank and insurers reopened. He reiterated, "They're not even open today." Agent acknowledged: "Kk."

164.    Again, questioning the legitimacy of the request, Buyer continued: "That can't be a contingency of the underwriter. I literally never ever heard of such a thing as paying insurance before you own something." Agent replied: "It's on the approval and it's their condition to have it paid prior to closing. Don't know why." This exchange confirms that the prepayment requirement was listed "on the approval" as a condition of clear-to-close. Buyer was being asked to satisfy that

66

condition on December 31, 2021, when the insurers and banks were closed, making timely compliance extremely difficult.

165.    This, again, confirmed that the so-called "Loan Approval" issued by Stein of FFF on November 9, 2021, was, in fact, fraudulent. The real Loan Approval came from Change Mortgage in December 2021 (the approval that Agent was now clearly working from) with additional conditions like prepayment of the insurance that Buyer was not privy to since that Loan Approval was never delivered to the Buyer. Yet, despite that approval (and its conditions) having been issued on December 10, 2021, Buyer was only now being asked to satisfy a condition tied to it (more than three weeks later, on a holiday weekend), leaving him with no practical ability to comply immediately.

166.    Frustrated, Buyer responded: "It's literally part of the mortgage to pay it. Like it doesn't even make sense. Pay for something you don't even own." Buyer's frustration reflected the recurring theme of last-minute demands, conditions that could have been easily satisfied weeks earlier had the Lender and Agent been diligent in delivering all conditions to Buyer.

167.    Agent replied: "I know, we don't require it but this bank does." This statement again confirmed that the operative loan at issue was not under FFF's prior "Loan Approval," but under Change Mortgage's later (hidden) Loan Approval. Buyer and Agent exchanged no further text messages that day, as Agent had indicated she was working "hand and hand" with Change despite the bank being closed for the holiday.

168.    On Monday, January 3, 2022, at 8:48 a.m. EST, Agent messaged Buyer: "Good morning. [sun emoji] I already have a call out to the lender to get updates and hopefully end this roller coaster. Lol. As soon as I hear, I'll call you. I'm on it!! [heart emoji, thumbs up emoji]." Buyer responded, "Ok cool, because the title company really needs the docs today." Agent replied,

67

"Yup." Buyer then instructed, "Make them [Change] aware there are no extensions." Agent promised, "I will triple stress it. [crossed fingers emojis, praying emoji]." Buyer thanked her and asked to be kept posted. Agent confirmed, "You got it." This marked the third acknowledgment that the Buyer was experiencing emotional distress (describing the process as a "roller coaster") as a direct result of the Lender's lack of due diligence. Once again, the Buyer stressed that "there are no extensions."

169.    At 9:56 a.m. EST on January 3, 2022, Buyer messaged, "Just paid my homeowner's insurance for the year. Will have confirmation shortly." Agent replied, "Great stuff." At 11:33 a.m. EST, Buyer added, "Flood is getting done now," to which Agent acknowledged, "Kk." Notably, Buyer then sent a screenshot of a message from Katie, the insurance agent, who asked: "Did you double-check with your mortgage broker that the bill for flood and homeowner's insurance is not included in your closing costs?" Both Buyer and the insurance agent found it unusual that Buyer was being required to prepay insurance in full on a property he did not yet own, further suggesting the request was irregular and possibly the result of Lender or procedural error rather than standard practice.

170.    Upon information and belief, this task was shifted to Buyer because the insurance figures he had been provided weeks earlier were not timely delivered by Agent to Change or to the Title Company. As a result, those costs were excluded from the Closing Disclosure and now had to be paid separately. Buyer then messaged: "I need to set up the wire ASAP." Despite having first requested wire figures more than a week earlier, Buyer still had no idea how much he was actually supposed to send.

171.    At 1:44 p.m. EST on January 3, 2022, Agent wrote: "I didn't get receipt on the flood and really need it." Two minutes later, Buyer responded: "It's coming. I have the

confirmation number but waiting on the email." He then sent a screenshot of his exchange with the insurance agent showing the confirmation number, followed by the actual receipt from TypTap, the flood insurer. At 2:08 p.m. EST, Buyer forwarded the full flood insurance documentation that Agent needed.

172.    Once again, Buyer was demonstrating extreme diligence, acting immediately on every request made of him. At 3:49 p.m. EST, he asked Agent, "Where are we at?" and received no reply. Later that day, at 6:10 p.m. EST, now past the close of business, he followed up again: "I really need an update." Recognizing that Buyer's patience was understandably wearing thin, Agent replied: "We [FFF] sent [Change] the insurances and I'm waiting as well. Grr. All friggin day. Hang in there please."

173.    Naturally, Buyer was in no mood to "hang in there." He replied: "**This could cost me a ton. This should have been done a while ago**." Indeed, it should have been; hence, this lawsuit. As Buyer noted, everything being handled in the final hours before closing should have been completed well before the holidays.

174.    Agent then made the Lender's first tacit admission of fault, responding: "I agree, but I can't control the clear to close when we just received the paid receipts this afternoon. I'm trying." This message was particularly infuriating to Buyer. The Agent was now subtly attempting to shift some blame to Buyer for the "late" arrival of paid insurance receipts, despite the fact that Buyer had been untimely told (and inconsistent with standard practice) to pay the insurance in full on December 31, 2021, a recognized bank and insurance holiday, and had done so immediately upon the reopening of the bank the next business day.

175.    Again, upon information and belief, it was, in fact, the Agent's failure to timely deliver the insurance quotes (previously obtained by the Buyer and provided to the Agent weeks

earlier) to Change or the Title Company that caused the last-minute request and the unusual requirement that the Buyer prepay a full year of insurance before closing. Yet Agent's response implied that Buyer's prompt payment was somehow the reason the loan remained incomplete. Agent then added: "I have my boss [David Stein] calling them [Change]."

176.     Frustrated by the misplaced blame, Buyer replied pointedly: "I was told to pay it on a holiday weekend, Susan." The use of Agent's name here underscored his anger and exhaustion. Agent, recognizing this, simply replied twice – "I know." And again, in a separate message: "I know." This was another acknowledgment of the Lender's failures.

177.     At 8:37 p.m. EST that evening, Buyer informed his Realtor: "I am going to another [L]ender tomorrow. If I don't hear anything from Susan, I'm going to try to set up another lender. I'm pissed." Buyer was so concerned about the Lender's continued delays that he reached out to an alternative lender that very same night. Maria confirmed that "Glenn" (the alternate lender) had already received the complete information package. After speaking with Glenn, Buyer reported back: "This guy is pretty smart… we can force up to a 10-day extension." Glenn had explained that Buyer was automatically entitled to a ten-day extension under Section 5(a) of the Contract if the lender required additional time to comply with the CFPB's disclosure requirements. This provision functions as a built-in consumer protection designed to safeguard borrowers when lenders fail to timely deliver the final, accurate Closing Disclosure (the one requiring the consumer's acknowledgment) in time for closing. Under federal law, that final *accurate* Closing Disclosure must be delivered at least "three business days" before "consummation."

178.     To lawfully consummate on the scheduled Closing Date of Wednesday, January 5, 2022, therefore, the final Closing Disclosure had to be delivered no later than Wednesday, December 29, 2021. Under the CFPB's "three-business-day" rule, the three days before

consummation must be *full business days*, excluding weekends and legal public holidays. Because December 31, 2021, was a federal banking holiday and January 1–2, 2022, were weekend days, the only full "business" days preceding the Closing were Thursday, December 30, 2021 (Day 1), Monday, January 3, 2022 (Day 2), and Tuesday, January 4, 2022 (Day 3). The Closing Disclosure issuance date, as well as the Closing Day itself (January 5, 2022), do not count toward the three (full) business day rule. Counting backward from the scheduled Closing Date, the third business day before consummation, therefore, fell on Wednesday, December 29, 2021, making that the latest permissible date for the Borrower's receipt of the final Closing Disclosure under federal law.

179. Buyer then sent the Realtor a screenshot of Section 5 of the Contract (shown below). The Realtor replied, "10 days?" and Buyer asked whether she had seen the image. The Realtor responded, "We might need to use this [*i.e.,* Section 5] if they [the Seller] start with stupidity." The Realtor, whose first language is Spanish, likely meant that if the Seller began acting unreasonably or refused to allow even a short extension, "we"—meaning the Buyer and Realtor— might need to rely on the ten-day automatic extension under Section 5(a), which Glenn had explained would automatically apply if the Lender could not close on January 5, 2022. Notably, that provision is self-executing, meaning it "shall be extended" automatically at 5:00 p.m. (local time) on the scheduled Closing Date if the Lender's funds were unavailable due to compliance with CFPB timing requirements, namely, the three-business-date delivery requirement before consummation.

5. **EXTENSION OF CLOSING DATE:**
   (a) If Paragraph 8(b) is checked and Closing funds from Buyer's lender(s) are not available on Closing Date due to Consumer Financial Protection Bureau Closing Disclosure delivery requirements ("CFPB Requirements"), then Closing Date shall be extended for such period necessary to satisfy CFPB Requirements, provided such period shall not exceed 10 days.
   (b) If an event constituting "Force Majeure" causes services essential for Closing to be unavailable, including the unavailability of utilities or issuance of hazard, wind, flood or homeowners' insurance, Closing Date shall be extended as provided in STANDARD G.

180.   On January 4, 2022, at 8:04 a.m. EST, Agent texted Rothstein (Change): "Does your bank allow waiving of [the] closing disclosure rule? Cuz buyer FYK needs to close and I need clear [to close] help." By this point, the Lender had already missed the three-business-day window required before the scheduled Closing Date and would have needed a formal written waiver of that waiting period to close on January 5. Rothstein replied, "What is [the] 3 closing disclosure rule[?] Don't understand your question." Agent clarified, "Ya know how you have to wait 3 days after [the] CD to close? The rule is [that] the buyer can write a letter stating he wants to waive that period. Do you guys accept that[?]" Rothstein responded, "Never heard of it and doubtful. The loan is not clear either."

181.   Rothstein (Change's representative) was unaware of both the CFPB's Closing Disclosure timing requirements prior to consummation and the limited circumstances under which a borrower may waive those federal requirements. Under federal regulation, such a waiver is permitted only through a specifically worded written statement describing a "bona fide personal financial emergency." It remains unclear whether the Buyer's urgency to close would have qualified as such an emergency; but, any urgency that did exist arose solely from the Lender's repeated delays, none of which were attributable to the Buyer.

> **Official interpretation of 19(f)(1)(iii) Receipt of disclosures.**                                ⊕
>
> **(iv) Consumer's waiver of waiting period before consummation.** If the consumer determines that the extension of credit is needed to meet a bona fide personal financial emergency, the consumer may modify or waive the three-business-day waiting period under paragraph (f)(1)(ii)(A) or (f)(2)(ii) of this section, after receiving the disclosures required under paragraph (f)(1)(i) of this section. To modify or waive the waiting period, the consumer shall give the creditor a dated written statement that describes the emergency, specifically modifies or waives the waiting period, and bears the signature of all consumers who are primarily liable on the legal obligation. Printed forms for this purpose are prohibited.

182.    Agent then asked: "When can underwriter review docs cuz I am desperate." A moment later, acknowledging her own tone, she added: "Good morning btw. Sorry early morning headache." Rothstein pushed back: "**The conditions were just uploaded yesterday** at 4:39 pm. I know you are trying to close for Friday, however that is very unlikely. Outlook turn times for conditional review is 4 days." (Emphasis Added). He further indicated: "They are working on CD [*i.e.,* Closing Disclosure] now."

183.    These exchanges are particularly revealing. On January 4, 2022, the day before the contractual Closing Date, Rothstein stated, "The conditions were just uploaded yesterday [January 3, 2022] at 4:39 p.m.," which, upon information and belief, referred to the "conditions" tied to the genuine Change Loan Approval issued on December 10, 2021. Accordingly, those conditions were known to the Agent as of at least December 10, 2021, yet were not fully communicated to the Buyer until the last minute and "just" submitted to the Lender on January 3, 2022. The failure to timely deliver Change's conditions to the Buyer delayed his ability to satisfy those requirements, which in turn delayed the Agent's transmission of the necessary documentation to the underwriting

bank. As a result, Change was unable to generate a timely Closing Disclosure ("CD"), which was required by December 29, 2021, to meet the January 5, 2022, closing.

184.    And, as a result of the Agent's late satisfaction of Change's conditions and its subsequent late preparation and delivery of the final, accurate CD (combined with the CFPB's mandatory three-business-day waiting period before consummation), the Buyer was inevitably prevented from meeting the original scheduled Closing Date deadline, placing the entire agreement in jeopardy.

185.    "In jeopardy" because, although Section 5(a) of the Contract provides for an automatic ("self-executing") ten-day extension when lender funds are unavailable due to compliance with CFPB requirements, invoking it technically places the Buyer in a temporary but curable *default* until the loan consummates assuming it does so within that extension period. Thus, if the Seller refused to voluntarily extend the Closing Date, the Buyer would be forced to rely on (*i.e.,* use or exhaust) this protective mechanism to preserve his right to consummate after the Closing Date.

186.    Compounding matters, Rothstein then wrote, "I know you are trying to close for Friday, however that is very unlikely," despite the Contract expressly requiring closing "on or before January 5, 2022." Change's communications reflected a timeline entirely untethered to the controlling Contract, which they independently possessed apart from FFF. Even if the Agent had informally suggested an intent to close on Friday, January 7, 2022, Change was independently aware of the contractual Closing Date and corresponding deadline pursuant to the very Contract they were operating under.

187.    Rothstein then texted the Agent: "They are working on CD now," indicating that Change was in the process of revising the final CD to meet federal accuracy requirements. The

Agent's response was stunningly cavalier given the circumstances: "So this loan probably be dead just so ya know. I know they always say that but I am just telling you that this guy and seller are unreasonable. And we will lose this one but *good learning experience*." (Emphasis added).

188. Wow – this statement exposes the complete lack of professional diligence, care, and loyalty that Buyer was entitled to expect from a licensed mortgage professional. The Agent, tasked with safeguarding the Buyer's financial interests, openly admitted she anticipated the deal's collapse and flippantly characterized the impending loss of a multi-million-dollar property as a *"good learning experience."*

189. At that moment, the Buyer was fighting to save a transaction he had invested months, substantial funds, and personal effort into closing, while his own Agent treated the situation as a teachable moment rather than a professional duty. Such conduct demonstrates a reckless disregard for the Buyer's rights and interests, and such cannot be rightly classified as anything other than professional malpractice. A licensed mortgage originator is bound by fiduciary and statutory obligations under both federal and Florida law, including, for example, duties of competency, honesty, and fair dealing. Here, the Agent's admission that she viewed the Buyer's near-certain financial loss as a "learning experience" is a clear acknowledgment of her awareness of the harm being caused and her conscious indifference to preventing it.

190. At 8:57 a.m. EST on January 4, 2022, Agent emailed Realtor (but notably *NOT* Buyer):

> Hello Maria, good morning … The file is with underwriting and we are awaiting the clear to close. **We will not be able to close today or tomorrow and we are requesting an extension for closing date as per the contract provision regarding the CFPB rules.** Once the file is cleared from underwriting we can schedule the date for closing accordingly. (emphasis added).

191.    Here, the Agent clearly indicated to the Realtor (independent of any correspondence with the Buyer since early the prior day) that the Lender would undoubtably miss the contractual Closing deadline and that the Lenders (Change and FFF, collectively) were "requesting an extension for closing per the contract provision regarding the CFPB rules." This email later played a pivotal role in the outcome of the Buyer's subsequent lawsuit against the Seller for failing to close. Because the Realtor had both suggested and forwarded both the Lender's "request" to comply with the "CFPB rules" and the Buyer's independent request for extension (and because the Buyer was simply aware that the Realtor had done so) the court in the Buyer/Seller dispute ultimately concluded that the Buyer's and Seller's purpose in executing what would become known as Addendum 3's extension was the Lender's one time "use" of Section 5(a) of the Contract.

192.    In fact, the Buyer had been traveling that day and did not receive the original communication when it was sent by the Realtor. The Agent's request to the Realtor and the Realtor's decision to forward it to the Seller occurred independent of Buyer, while the Buyer was still on a flight from Florida to Pennsylvania and entirely unaware of the exchange. At 10:48 p.m. EST on January 4, 2022, shortly after the Buyer landed, the Realtor forwarded the Agent's message to him, stating, "[…] I will send this to Franchesca [the Seller's Realtor] with the extension. You will receive the extension to sign just after this email."



193.    At that point, the Buyer had already informed his Realtor that he independently intended to seek an extension to hopefully cover the time necessary for the Lender to close (*i.e.*, try to mitigate the Lender's delays), expressly clarifying that he did not wish to rely on Section 5 (*i.e.,* "use" contractually imposed extensions). The Buyer's basic objective was to avoid any technical default entirely by securing a *voluntary* extension of the Closing Date for the same short period of time that he would already be legally entitled to had the CFPB been triggered on the Closing Date when the lender's funds were not available. Acting on this basic understanding, the Buyer instructed his Realtor to begin preparing Addendum 3, intending only to formalize his independent request for a brief, mutually agreed extension, not to adopt, ratify, or in any way invoke the Lender's separate (and premature) request for an extension under Section 5(a) or to specifically waive or modify his federally protected CFPB timing rights.

194.    Importantly, at the time Addendum 3 was signed by the Buyer, the Buyer had no knowledge that the Lender had separately requested an extension to meet "CFPB rules." While the Lender's Agent and the Realtor exchanged emails, the Buyer was mid-flight from Florida to

Pennsylvania with no access to those communications. By the time the plane landed, the Realtor (without first consulting the Buyer) had already received and reviewed the Agent's "CFPB extension" email and had decided on her own to forward that message to the Seller's Realtor, along with the forthcoming Addendum (3) Buyer planned to request regardless.

195.   Distracted, having only just deboarded his flight and knowing the transaction remained in imminent jeopardy, the Buyer reasonably assumed that the "extension" email his Realtor referenced in her text (stating that she wanted him to "see this first") referred to the DocuSign extension email for Addendum 3, not to the earlier email chain concerning the Lender's CFPB-related extension request.

196.   When the Buyer opened and electronically signed Addendum 3 that day, he did so while walking through the airport, still unaware that his Lender had separately requested an extension under the CFPB provision. At that time, he had *not yet read* the Realtor's earlier forwarded email containing the Agent's message to the Realtor. The Addendum (together with the Buyer's subsequent text message to Belese) confirms that the Buyer had not yet reviewed the Realtor's earlier emails that contained the Agent's message. More specifically, the DocuSign record shows that the Buyer executed Addendum 3 at precisely **9:56:01 a.m. EST** on January 4, 2022 (see below).



197.   Seventeen minutes later, Buyer texted the Agent, asking, "Will this close tomorrow?"—a message that clearly demonstrates he was still operating under the belief that

closing might proceed as scheduled. This message confirms that the Buyer had not yet read the Realtor's earlier emails attaching the Agent's 8:57 a.m. EST message, which unambiguously stated, "We will not be able to close today or tomorrow."

198.   The Buyer's understanding at that time was straightforward – he believed he was formalizing his own independent, voluntary request for a brief extension (Addendum 3), not adopting or somehow ratifying the Lender's separate "CFPB extension" request or waiving his federally protected disclosure rights. The Buyer naturally relied on the Defendants' expertise and professional representations to navigate this federally regulated process. Nevertheless, the court in the Buyer/Seller dispute ultimately attributed their procedural mistakes and premature actions to him, as though he had knowingly waived his right to the CFPB's consumer protections (pursuant to executing Addendum 3) simply because he was aware of the fact that Realtor was attaching the Lender's premature CFPB extension request to his Addendum 3 extension request.

199.   The court in the Buyer/Seller dispute construed the Buyer's "constructive" awareness that the Lender had made such a request (and that his Realtor had transmitted that same request together with his signed Addendum 3; again, executed before he even knew of the Lender's email) as his own one time "use" of the CFPB extension. Although this conclusion was, in the Buyer's view, *patently erroneous*, it nonetheless became the court's operative finding. In doing so, the court punished the Buyer for the procedural and professional missteps of the very licensed parties upon whom he was entitled to rely.

200.   Addendum 3 was simple and straightforward. It read in full: "Extension for closing to ON OR BEFORE January 17th, 2022, 5:00 p.m. The rest of the terms of this contract reminds [sic] the same."

Authentisign ID: F46EF853-FA32-46D4-82D8-99596D9409A9

**Addendum to Contract**                              Florida Realtors®

Addendum No. _____ to the Contract with the Effective Date of ____06/10/2021____ between

_____A & P HOME INVESTMENT LLC_____ (Seller)

and _____JASON FYK_____ (Buyer)

concerning the property described as: ___2752   NE 3 ST      POMPANO BEACH      FL 33062_____

(the "Contract").  Seller and Buyer make the following terms and conditions part of the Contract:

Extension for closing to  ON OR BEFORE January 17th 2022, 5:00pm

The rest of the terms in this contract reminds the same

Buyer: _____ *Jason M Fyk* _____   Date: ____01/04/2022____

Buyer: _____   Date: _____

Seller: _____ An NGUYEN _____   Date: ___01/04 2022___

Seller: _____   Date: _____

ACSP-4   Rev 6/17                                      © 2017 Florida \Realtors®

201.    It is undisputed among all parties, including the prior court, that the word "reminds" was intended to read "remains the same." The clerical error arose from a minor language barrier involving the Realtor and was missed/compounded by the fact that the Buyer was traveling that day. Again, the Buyer was distracted and, so, he inadvertently overlooked the clerical mistake before hurriedly signing the Addendum.

80

202.    At 12:16 p.m. EST on January 4, 2022, as she had previously indicated, the Realtor forwarded the Agent's email to the Seller's Realtor (see below), attaching both relevant contract provisions (Section 5 including subsections 5(a) and 5(b), and subsection G defining Force Majeure) along with the Buyer's executed Addendum 3:

---

**Joanne Kretzschmar**

| | |
|---|---|
| From: | Maria Duval <mariaduvalhomes@gmail.com> |
| Sent: | Tuesday, January 4, 2022 12:16 PM |
| To: | Francesca McFeely |
| Cc: | Joanne Kretzschmar |
| Subject: | Fwd: Fyk |
| Attachments: | addemdum extension.pdf; 01.PNG; 2.PNG |
| | |
| Follow Up Flag: | Follow up |
| Flag Status: | Completed |

Francesca ,

see bellow in yellow what Lender says and the 3 attachments I included for the seller to better understant the course of action.

Pursuant to Section 5 of the contract, the lender has requested an CFPB extension while the underwriter does the final sign off on the mortgage.

Unfortunately, the holidays delayed this because the banks have been closed. Several people involved have had Covid and the lender notified the Buyer the insurances had to be paid by the buyer on Friday evening December 31st. The Buyer was unable to pay the insurance until Monday the 3rd. The disclosures were made as of today but we are requesting an extension till the 17th of January (with the intention to close by Friday of this week). Note January 15th (10 days) falls on a Saturday and the next business day in Monday the 17th.

Please provide this extension addendum to the seller to sign. I would like to submit this to the Lender ASAP (because this extension will need to be on file).

As part of the extension buyer agrees to set aside the matter of the boat dock.

Maria

1

---------- Forwarded message ---------
From: **Susan Belese** <sbelese@fam1fund.com>
Date: Tue, Jan 4, 2022 at 8:57 AM
Subject: Fyk
To: Maria Duval <mariaduvalhomes@gmail.com>

---

81

203.    Of particular note in the above email, is the inclusion of the dock waiver. At that time, there remained an outstanding "Property Condition" issue – the dock was no longer in the same condition as when the Buyer had entered into the Agreement. Specifically, several deck boards were lifting (a defect the Buyer, through his Realtor, had already brought to the Seller's attention). The Seller, however, refused to make the repair, indicating through his Realtor that he could simply relist the property for $200,000.00 more. Like the Buyer, the Seller was also clearly aware that the Property's value had increased significantly since the original contract date.

204.    The Buyer and his Realtor (Duval) did not initially agree on whether to include a waiver of the dock issue in the email (what Duval referred to as "the dock issue"). The Realtor viewed it as the Buyer's "silver bullet" should the Seller refuse to grant an extension. When Duval presented the draft email she proposed to send to the Seller's Realtor, however, the Buyer ultimately decided to include the dock waiver as part of Seller agreeing to signing Buyer's Addendum 3 extension. He reasoned that because he was independently requesting the same period of time that the CFPB regulations would have automatically afforded him (what the Lender was prematurely requesting); thus, he was not actually conceding anything of value to the Seller. In his view, the inclusion of the dock issue waiver merely balanced the exchange, waiving the dock issue in return for preserving all terms of the Contract (*i.e.,* "the terms *remained* the same"). The Buyer expressly included the dock waiver because he was *not* invoking the CFPB extension; rather, he was seeking the exact opposite (to avoid reliance on that provision altogether).

205.    The court in the Buyer/Seller dispute, however, did not see it that way. Because the Lender had made the request, and because the Realtor suggested and forwarded that request and because the Buyer was aware that she had done so (*i.e.,* because the Buyer followed the Realtor's advice to attach the Lender's request rather than focus on the mutual consideration of the dock

issue waiver), the court concluded that the Buyer had "used" the CFPB provision in entering into Addendum 3. By finding that the Lender's request constituted invocation of the CFPB extension pursuant to Addendum 3, the court extinguished the Buyer's right (and the Lender's ability) to rely on those consumer protections when they were most needed later, even though the subsequent delays that caused the Buyer to miss the second Closing Date were also and again attributable entirely to the Lender (not the Buyer).

206.    At 4:19 p.m. EST on January 4, 2022, Duval informed Buyer that the Seller had not yet returned Addendum 3 signed. At 4:27 p.m. EST, Buyer remarked to Duval: "Bets says he doesn't sign it till tomorrow." In response, Duval sent Buyer a screenshot of her message to Franchesca (Seller's Realtor) confirming her own follow-up efforts. By 5:57 p.m. EST, Buyer again checked in with Duval: "So nothing from anyone?" A minute later, at 5:58 p.m. EST, Buyer messaged Belese/Agent to update her that the Seller still had not returned the signed Addendum. At 6:00 p.m. EST, Duval replied simply, "Nope." Buyer immediately responded: "The mortgage can continue to move forward, I guess, but if he doesn't agree I suspect this will go to the lawyers. He may just sign tomorrow. **I am so pissed at Susan**" (emphasis added).

207.    At 6:04 p.m. EST, Buyer emphasized to Duval: "We need to be ready to close ASAP regardless." This statement reaffirmed Buyer's diligence and readiness to close whether or not the Seller signed Addendum 3. Buyer understood that if the Seller refused to sign (which he was legally free to do in his mind), the dock issue and also a separate countertop Property condition issue would remain unresolved, but, in not signing, the Seller could then have forced Buyer to actually "use" the CFPB extension at 5:00 p.m. on January 5, 2022. Once the Seller voluntarily signed and delivered Addendum 3, the Lender's need for the CFPB extension should have been rendered moot, while still remaining available to the Buyer if lender-side delays later persisted.

That is the only interpretation consistent with the Contract and federal TRID timing rules. But the prior court did not view it that way. Because the Lender had prematurely requested the extension, and because the Buyer knew the request originated from the Lender (even though it was not yet the actual Closing Date), the court concluded that the Buyer was not permitted to "use" the CFPB extension again on January 18, 2022, when it was actually needed. Fundamentally, the Buyer would never have been placed in this position at all had it not been for the Lender's failures. Thus, whether the Buyer did or did not know is irrelevant; the underlying fault still originates entirely with the Lender.

208.    At 6:42 p.m. EST, Agent responded to the Buyer, asking, "Why not?" The Buyer replied, "Because, as I have said … they [the Seller's side] don't want to have to sell it." The Buyer had repeatedly warned Agent that the Seller was looking for any pretext to cancel the contract once it became apparent that the Property's value was increasing. Agent then replied, "He doesn't really have to. Contract has it stated there—no extension is really needed. As the contract states it in there." The Buyer responded, "So the lender won't require the addendum. If that's the case, then we are OK still. But going to talk to the lawyer tomorrow." This exchange confirms that the Buyer was relying entirely on the Lender's understanding of how the CFPB extension operated. In the Buyer's mind, the reasoning was simple – if the Seller agreed to the extension, all the better; but, if not, as long as the Lender did not require a signed addendum extension to close, the transaction could still proceed under the existing contract terms.

209.    A minute later, at 6:43 p.m. EST, Agent texted again: "We shouldn't. As it's stated there as CFPB EXTENSION. Addendum would be if the 10 days lapse. Ok. I'm calling my lawyer now too." Buyer then asked Agent to call him "real quick."

210.    On the morning of the original Closing Date (January 5, 2022) at 10:41 a.m. EST, the Buyer texted the Agent: "Good morning Susan. Today we need to get the clear to close and I need wiring instructions and a close date so please. Please update me on everything today." Two minutes later, the Agent replied, "Yes sir. Again we will know more by 3 pm." The Buyer responded, "That's pretty late in the day. I'm dealing with the fight from the Seller on my side now."

211.    This exchange is particularly poignant. By that point, all the delays caused entirely by the Lender had now spilled over into the Buyer's relationship with the Seller, forcing the Buyer into a defensive posture and escalated a dispute that was not of his making. The Lender's lack of diligence and timeliness had effectively shifted the burden (and ultimately the responsibility) onto the Buyer, converting what should have been a straightforward financing process into a prolonged multi-year legal conflict. This single text exchange illustrates the pivotal moment when the Defendants' failures began to morph into the Buyer's legal and financial fight, culminating in years of litigation (the "fight") that followed this transaction.

212.    At 10:44 a.m. EST on January 5, 2022, Agent indicated that she would be calling "them in ½ hour." Upon information and belief, "them" in this case was the Seller's attorney. At the same time, and *unbeknownst to Buyer*, Duval sent the following text message to the Seller's Realtor, which stated:

> … We spoke to an attorney yesterday and the Contract allows for up to a 10-day extension pursuant to the CFPB. The lender has requested the extension and the Buyer is entitled to it. We may not need the addendum specifically or it may be a condition of the closing, but either way, we'd like to get it to the lender asap so as not to slow this down. Please contact the Seller and let us know whether he is willing to comply with the contract. We will let you know the closing date.

213.    The court in the Buyer/Seller dispute later relied heavily on this particular text message in determining that Addendum 3 was executed pursuant to the CFPB extension referenced

in Section 5(a) of the Contract. Although the message was intended merely to facilitate communication between the Lender and the Seller's side, its ambiguous language further blurred the distinction between Lender's procedural request under federal CFPB requirements and the Buyer's independent request for a voluntary contractual extension pursuant to Addendum 3. The Realtor's phrasing (particularly the use of "the Buyer is entitled to it" and "we spoke to an attorney") created the misleading impression that the Buyer (not just the Lender) had personally invoked Section 5(a)'s CFPB extension.

214.    A minute later, at 10:45 a.m. EST, the Buyer texted the Agent again, explaining that if he was going to be able to wire funds that day, it needed to occur before 3:30 p.m. The Buyer had been kept so completely in the dark about the status of his own loan that he still mistakenly held out hope he might somehow be able to close on time on January 5, 2022. In reality, he had no idea how far behind the Agent and the underwriting bank truly were in meeting the required conditions for closing. Seeking clarity, the Buyer asked whether the Agent had spoken directly with the underwriter. Receiving no immediate response, and out of sheer desperation, he attempted to go around his Agent and contact Change Mortgage himself, prompting the Agent to text, "Please don't call the company. I just spoke to them. I just got chewed out. Please breathe."

215.    The Buyer's frustration and lack of information were evident. At 12:52 p.m., he texted the Agent again: "It's the closing date and I have **no answers**" (emphasis added). That statement encapsulates the entire problem – at nearly 1:00 p.m. on the scheduled Closing Date, the Buyer still had "no answers" … none. He did not know the amount to wire. He did not know whether closing would occur or even whether the Lender had all the necessary documentation (because requests continued to arrive piecemeal, all of which could have been completed long before had the Lender acted diligently in October, November, or even December of 2021.

216. A minute later, the Agent messaged: "Yeah. I know but calling them is not going to help you. Russel [Rothstein] my contact is handling this. Don't call there. It doesn't push you to the top nor does it get what you need. Be patient." This response appears to have possibly been an attempt to cover for the Agent's own failure to timely convey the Buyer's loan information or communicate the urgency of the deadlines to Change. By that time, Rothstein was, at the very least, operating under the wrong closing date and referencing conditions that had not even been requested of the Buyer yet (as the Buyer would later discover).

217. Notably, the Buyer's tone reflected his growing frustration, he replied: "That might have been an argument a week ago, not on the deadline." The Agent responded: "Deadline is 10 days from today. Please let me do my job," as though the Buyer's attempt to contact the lending bank for real information was somehow impeding her work. The Buyer sharply corrected her: "The deadline was today. Ten days from now is an **exception** that is now creating more of a conflict for me because **you didn't hit the deadline**" (emphasis added).

218. This exchange encapsulates precisely why this case now exists – the Lender failed to meet the clearly established deadline (one that had been in place for more than ninety days) and was still attempting to satisfy basic loan conditions on or *after* the closing date. Having no adequate response, the Agent replied simply: "I get it."

219. By this point, the Buyer's patience had run out. He texted: "When you've known about this for months. And to tell me to breathe and not call the company **to find out what you're not telling me** is not cool" (emphasis added). The Agent answered, "I'm telling you what I know and what they tell me. I know that you are on edge. Please, I get it." Again, an acknowledgement of how emotionally strung out ("I know that you are on edge") Buyer had become due to Defendants' consistent blunders.

220.    At 1:01 p.m. EST, the Buyer texted again: "I have a $250k loss on my hands at the mercy of people that missed the deadline already, and now I'm supposed to rely on a new deadline (that I cannot possibly extend) that's causing a conflict with the seller. The question is whether or not I come up with a plan B [*e.g.,* another lender]. I need clear to close and a closing date today."

221.    Importantly, when this message was sent, the Buyer had still not received the fully executed Addendum 3 back from the Seller (signed the prior day). Consequently, at 5:00 p.m. EST that day, the CFPB extension provision under Section 5(a) was set to self-execute automatically, leaving the Buyer with absolutely no remaining mechanism to seek an additional extension if the Lender failed to meet the new CFPB-driven deadline. With past being prologue, Lender would inevitably fail to meet that second deadline due to its own overlooked condition – its belated request for the Notice of Good Standing for the Buyer's business entity, a requirement it failed to timely disclose or obtain.

222.    By this point, the Buyer was completely fed up with the endless excuses and hollow reassurances. He faced the real prospect of losing a Property that had already appreciated by at least $250,000,000 at the time … through no fault of his own, but solely because the Lender had consistently failed to meet its obligations, leaving him to bear the consequences of their negligence.

223.    As if by a true miracle, at 2:19 p.m. EST the Buyer messaged the Agent stating: "The seller's attorney just notified the title company the addendum is getting signed and we are good to go. The seller is doing a 1031 exchange. Now I can breathe." The Agent replied: "Great. Did you see my email?" The Buyer responded: "I did. The big thing is the seller has a 1031 exchange being set up, meaning he [now needs] the sale for another property."

224.    It appeared, for the moment, that the Buyer had caught a rare break, the Seller had agreed to extend the closing until January 17, 2022. The Agent replied, "Perfect take [sic] fine. Also Todd [the accountant]. My God!!!! He's so rude […] to me." The Buyer responded, "I don't know why he does that."

225.    Apparently, "Todd" (the Buyer's accountant Marrazzo, who had, again, introduced the Agent to the Buyer) had become angry with the Agent over her persistent failure to meet Buyer's deadlines. Marrazzo was known to be blunt, but his frustration was not unwarranted. The Buyer continued, "I told him that I got the addendum and the 1031, and he said don't breathe yet. We are good otherwise, right?" The Buyer understood this to mean that, despite the signed addendum, he still could not rely on the Agent to get the loan finalized. He then added, "Telling Todd **you're going to decline me** is not exactly a good idea" (emphasis added).

226.    During their conversation, Marrazzo informed the Buyer that, during his earlier call with the Agent (during which he admittedly had been abrupt with her), the Agent stated that if the Buyer gave her "any more problems," she would "just deny the loan" and cost him the deal. This was a shocking admission, underscoring not only the Agent's lack of professionalism (behind the Buyer's back) but also the instability of the transaction at that point (problems that were entirely within the Lender's control, not the Buyer's).

227.    Moreover, it was delusional (put mildly) to say "any more problems" from the Buyer (*e.g.,* expressing his frustration) when the Buyer had been nothing but promptly compliant and all "problems" had flowed entirely from Defendants. The Loan Approval represented a fiduciary commitment by the Lender to the Buyer, contingent upon certain conditions not something that can be arbitrarily "declined" out of inconvenience or expressed accountability. Those conditions, however, were not being delayed or neglected by the Buyer, they were being

mishandled by the Agent's own negligence. Instead of working to correct her mistakes, the Agent, now facing accountability for her repeated failures, threatened to inflict further harm on the Buyer by denying the loan outright if he continued to press for answers.

228.   At 2:20 p.m. EST (one minute after receiving the Buyer's text that the Seller had signed the extension Addendum), the Agent sent an email to the title agent, the Buyer, the Accountant, the Buyer's Realtor, and Stein:

> **From:** Susan Belese [mailto:sbelese@fam1fund.com]
> **Sent:** Wednesday, January 5, 2022 2:20 PM
> **To:** Joanne Kretzschmar <Jkretzschmar@acestitleagency.com>
> **Cc:** Jason Fyk (SMFF) <jason@jasonfyk.com>; todd.marrazzo@tax-shield.com; 'Maria Duval' <mariaduvalhomes@gmail.com>; David Stein <dstein@fam1fund.com>
> **Subject:** FYK
> **Importance:** High
>
> Hello ALL,  Happy New Year!!!
>
> I wanted to update everyone on the file:  We have a tentative closing date for January 7, 2022 which is the earliest date to close per the CFPB rules for closing disclosure.  The closing disclosure has been sent and received as of yesterday 01/04/2022.  The Bank involved in clearing the loan file is aware of the urgency of the clearing of the file and they are working diligently to accommodate our request.
>
> I would like to pencil the closing date for Friday 01/07/2022 and shoot for this for closing.  Please keep in mind that we will need the official clear to close before confirming Friday.  I hope to have this clear to close no later than tomorrow.  Everyone is working on hard on getting this done for buyer and seller.
>
> If you have any questions please call me 908-763-1189

229.   This email became the central piece of evidence upon which the court in the Buyer/Seller dispute incorrectly relied to conclude that the Lender was "relying on" the Buyer's extension to comply with the CFPB's disclosure-timing requirements **"on"** the Closing Date itself. The Buyer had argued that the Closing Date effectively moved on January 4, 2022, the moment the Seller executed Addendum 3, because the act of signing constituted a mutually agreed modification of the performance deadline. The court, however, was not persuaded, instead misconstruing this internal Lender email (sent the following afternoon) as evidence of the Lender actively exercising the CFPB extension contemporaneously with the Closing Date pursuant to Addendum 3. This makes no sense; but, alas, that is what the court decided.

230. On Thursday, January 6, 2022, at 10:42 a.m. EST, the Agent emailed the Buyer requesting three additional items (all new conditions never previously raised by the Lender):



231. The Buyer, once again, responded promptly, attaching the requested letter, confirming he had messaged the owner of RBM, Chris Rosiak ("Rosiak") for the pay stub, and provided Rosiak's contact information, adding that Rosiak was in California and accordingly three hours behind.

232. At 12:28 p.m. EST on January 6, 2022, the Agent texted Rothstein: "2pm, sending invite," referring to a scheduled meeting with the underwriter. At 1:25 p.m. EST, the Buyer texted the Agent, "I haven't heard from Chris yet," explaining that Rosiak had not responded. The Agent replied at 2:09 p.m. EST, "[fingers crossed fingers crossed] try him again jumping on with underwriter." At 3:04 p.m. EST, the Buyer messaged, "Done what I can. He's not always available," to which the Agent replied at 3:40 p.m. EST, "Ok. Me too, let's regroup." The Buyer

responded, "I got the invoice and Chris is aware that the bank is going to call," and the Agent replied, "I need his number." The Buyer promptly supplied it, noting that he had already done so.

233.    Shortly after, at 3:55 p.m. EST, the Agent texted, "Can you chat?" The Buyer asked her to wait ten minutes, and she responded, "Kk. Call me." The Buyer called, then followed up with, "[Let me know] what you find out." At 4:22 p.m. EST, for the very first time during this entire process, the Agent informed the Buyer: "**You are not in good standing because you didn't file a registered agent**. So I'm trying to think what else I can give them" (emphasis added). This notice of good standing would ultimately be the one sticking point that derailed the entire first loan product. The first notification that it was even needed as a condition of the loan was the day *after* the original scheduled Closing Date.

234.    The Buyer, confused by what even constituted good standing, replied: "Letter from the accountant? Can't they [Change] reach out to Chris?" The Agent then called the Buyer, and together they placed a three-way call with the State of Delaware. During that call, the parties learned that the Buyer's registered agent had released the business due to unpaid renewal fees. The State official explained that, to restore the company's good standing, the Buyer would need to pay approximately $1,600.00 in back fees, after which the registered agent would refile the necessary paperwork with the State. The State representative further clarified that, although the correction was administratively simple (and relatively inexpensive), the official record would not reflect the registered agent's reinstatement until the filing was formally recorded, a process that could take up to 30 days, with expedited processing deemed "highly unlikely."

235.    Once the State representative disconnected, the conversation between the Buyer and the Agent continued. The Agent explained that her loan processor, Lisa Wood, had discovered the issue during an online check, which was how it first came to their (FFF's) attention. The Buyer

92

then asked whether simply paying the overdue fees and providing proof of payment would be sufficient to satisfy the Lender's condition. In response, the Agent made an improper suggestion/request: she stated that she might alter the image her processor had obtained from the State's website to make it appear current, believing that Rothstein might just accept it if payment had already been made. The Agent then tasked the Buyer with performing that alteration himself, indicating she would forward the original image to him for that purpose.

236. Following that call, at 4:38 p.m. EST, the Agent emailed the Title Agent stating: "We are stuck [o]n one item. But I'm working on it. […] So not yet." This indicated that this notice of good standing was the only item left that was now holding up closing. At 4:53 p.m. EST, Agent forwarded Wood's 4:14 p.m. EST email to Buyer which is how the Agent, herself, had learned of the good standing notice issue she conveyed to Buyer at 4:22 p.m. EST.



237.   At 5:25 p.m. EST, the Buyer texted the Agent again: "Are you sure the other information like State etc … has to be in there?" A minute later, at 5:26 p.m. EST, he asked the Agent to call him, then followed up with: "Yeah, just need to be sure these other fields are not filled in." The Agent responded: "No they are not." This exchange confirms that the directive to modify the image originated from the Agent (the professional), who continued to instruct and guide the Buyer's (the layman's) actions.

238.   Because the Buyer had no firsthand knowledge of what information was normally displayed on the official State certificate, he sought clarification: "Like no address and or state etc…?" After making the edits as instructed, he sent the altered version to the Agent and texted –

"Take a look at what I sent you." The Agent replied: "Looking at my other one hang on." Upon information and belief, she was comparing the Buyer's altered version to an unaltered image of what the business status should show if it were actually in Good Standing. Shortly thereafter, she texted: "Just fix the date. Everything else looks good."

239.    At 5:47 p.m. EST, Buyer continued with consecutive texts: "What is wrong with the date?" - "12/4/2022" - "I also made the numbers match the font perfectly I think." Agent digitally "Liked" the Buyer's response, again confirming, Agent was *fully aware* of the alterations Buyer was making at her behest.

240.    During her later testimony, however, when confronted with these very messages, Agent Belese attempted to distance herself from her own involvement, feigning confusion and selective memory regarding the exchange she, herself, had orchestrated. Despite the contemporaneous texts showing that she explicitly instructed the Buyer to alter the document and later approved those edits for submission to at least Rothstein, she attempted to downplay her role, suggesting that she "did not recall" the conversation. The following testimony illustrates this evasiveness:

> David Levine, Esq.: And at some point, do you recall discussing with Mr. Fyk potentially creating a document to submit to underwriting to show that his company was in good standing in the state of Delaware?
>
> Agent Belese: I'm not sure what you mean.
>
> Levine: Give me one moment, please. I'm going to share with you a document that's been admitted into evidence as Defendants' [Exhibit] 79. This is a series of text messages [shown above]. And as you look at this, do you recall these messages?
>
> Belese: I'm trying to. I mean, I don't know what happened before that, so it's, like, hard for me to kind of — "Me, too. Let's regroup." I would assume I'm in the white.
>
> Levine: I believe that is the case.

Belese: Okay.

Levine: And when you're done reading what I have up now, let me know and I'll continue scrolling.

Belese: Okay.

Levine: Do you recall having this back and forth?

Belese: *I mean, reading it, it maybe triggers something, but I don't recall. I mean, I do and I don't. I can tell you that, yes, this sounds like a conversation.* (emphasis added).

Levine: Do you know what Mr. Fyk is referring to when he refers to making the numbers match the font perfectly on that message at 5:47 p.m.?

Belese: *No. I know that — I know that we tried a couple of different documents to show good standing. I just don't really remember what those documents were.* (emphasis added).

Levine:  I'm now moving to Exhibit 80, which has also been entered into evidence. I want to do the same thing with that one. And when you're done reading what's on the screen, let me know and I'll scroll down for you.

Belese:  Okay.

Levine: And go—okay. So what I have up now will take you all the way to the bottom. There we go.

Belese: Okay.

Levine:  Now, referring to the message that I have toward the top, from 3:53 p.m., where Mr. Fyk asked, "*Any word from the underwriter," do you see where you responded, "Not yet. I sent it to him, though. He wanted it not in file, though, just to my guy [Rothstein]."* (emphasis added).

Belese:  I don't—I don't see that.

Levine: I'll try and move it directly to the top of the page, so it will be the top one you can see.

Belese: Oh, "I sent it to him, though. He wanted it not in the file." Right. So that would—I would be referring to Russell. Hey, Russell, will they accept this?

Levine:  Okay. So it would have been something that you showed to Russell, who is at the loan company or the mortgage company, but not something he would have taken to the underwriters?

Belese: *Right. That's what account reps do. They will, like, review things to see if it will pass through the underwriter.* (emphasis added).

Levine: And do you remember what it was that you were showing to Russell?

Belese: I really don't. (Coughs.) Excuse me.

241.    Agent Belese's evasive testimony stands in stark contrast to the written record. Her purported lack of memory regarding the very exchange *she orchestrated* is implausible and indicative of an intentional effort to obscure her role in directing the Buyer's conduct. Her professed confusion was not genuine but a deliberate attempt to minimize her culpability and distance herself from what she knew to be an improper instruction, one that directly contributed to the trial court's later mischaracterization of the Buyer's conduct as deceptive despite his transparency to the Lender. The documentary record leaves no doubt that it was the Agent, not the Buyer, who conceived and supervised the modification, fully aware of its nature and purpose.

242.    This exchange provides direct evidence, however, that the Agent personally orchestrated and supervised the alteration, confirming that the Buyer acted in reliance upon her direction, not through any independent or deceptive intent toward either the Lender or the Seller. The Buyer's actions were entirely guided by the Agent's professional instructions, under the belief that she intended to present the modified image to Rothstein at Change (*i.e.*, the lending bank) for review (as knowingly modified) to determine whether it would temporarily satisfy underwriting requirements. The Buyer's belief was further guided by the fact that he would have already performed reinstatement measures with the State of Delaware (*i.e.,* paid it) and that the 30-day wait period was then just a procedural formality.

243.    Still January 6, 2022, the Buyer clearly asked, "Any word from the underwriter," and the Agent responded, "Not yet. I sent it to him, though. He wanted it not in file, though, just to [Russell Rothstein]." As Agent testified, "That's what account reps do. They will, like, review things to see if it will pass through the underwriter." This exchange confirms that the Buyer was *not deceiving anyone*; he had done precisely what the Agent instructed. The Agent personally sent the *knowingly* altered image to the lending bank, which (by her own admission) kept it "out of the file." It was the Buyer's understanding that Rothstein would review it with the underwriter to determine whether the *known* workaround would be acceptable before formal submission. Everyone involved (the Agent, the account representative, and even the underwriting lender) knew exactly what was being done. Yet, despite the Buyer's complete transparency, the court's Final Order improperly characterized the Buyer's conduct as deceptive, when, in reality, it was the direct result of the Lender's guidance and mishandling.

244.    *The Buyer had absolutely no intent to deceive or misrepresent his business status*; *he was following the explicit guidance of a licensed loan officer*. In other words, if Change's representative was fully aware that the document had been altered and accepted it as such, there was no Buyer deception at all. It would be analogous to informing one's opponent in a game of the intent to "cheat," receiving their consent, and then having that opponent later claim foul play. Agent was directly involved in, approved, and personally submitted the altered document to Change's representative who also had full knowledge of its altered nature, deliberately keeping it out of the file to present to underwriter informally. Importantly, and again, the Buyer had already agreed to pay the $1,600.00 reinstatement fee to return his company to good standing, which would have rendered the documentation entirely accurate in due course. Moreover, this situation was

immaterial to the Seller. This sequence of communications demonstrates that the Notice of Good Standing issue was not the result of any deception or lack of diligence by the Buyer.

245. Had the Agent or Lender exercised even minimal professional diligence and identified this requirement earlier, the issue could have been easily resolved well before January 5, 2022. Several months had elapsed with Defendants asleep at the wheel; had the "good standing" "requirement" been brought to Buyer's attention earlier in the process, the 30-day period for State of Delaware reinstatement processing would have been a non-issue. Instead, the Buyer was improperly induced by the Lender's Agent to alter a document to resolve the Lender's mistakes and then that was held against him in court as deceptive behavior. In reality, the Buyer's actions were entirely transparent and merely reactive to the emergency created by the Lender's own negligence.

246. Agent Belese's later testimony also confirmed that Change was entirely at fault for the last-minute Notice of Good Standing request. During trial, the following exchange occurred between Seller's counsel, David Levine, Esq., and Belese. Levine asked: "Was Change Wholesale the lender on the original loan in this case?" Agent: "Yes." Levine: "So the closing disclosure that went out on January 4th was after underwriting?" Agent: "I'm sorry, repeat that." Levine: "The closing disclosure that went out on January 4th was after underwriting?" Agent: "Yes." Levine: "And are you aware of why the issue of the certificate of good standing came up after underwriting and after the CD went out?" Agent: "It was just *a missed condition by the original underwriter*, and then the underwriter who picked the ·file up that was assisting us in getting it cleared, had noticed that it was not asked for" (emphasis added). Levine: "And the underwriter that was assisting you, this is a person with Change, so you didn't know specifically who they are?" Agent: "Correct." Levine: "And is it your opinion that this requirement should have been and the

99

conditional -- strike that. Is this -- is it your opinion that this requirement for the certificate should have been in the preliminary loan approval?" Agent: "Yes."

247.   This testimony establishes beyond dispute that the Notice of Good Standing condition was neither caused nor delayed by the Buyer in any way. It was a "missed" condition by Change's original underwriter, as expressly acknowledged by Agent Belese. The responsibility for the delay (and the resulting collapse of the transaction, as well as the Buyer's induced alteration of the Notice) rests squarely with the Lender's failure to identify and communicate essential underwriting conditions in a timely manner. The Buyer, by contrast, remained at all times ready, willing, and able to perform, and acted diligently and transparently in following every instruction provided to him by the Agent.

248.   The following day (Friday, January 7, 2022), the previously proposed consummation date, the Buyer texted the Agent at 11:22 a.m. EST: "Checking in." At 11:37 a.m. EST, the Agent replied: "Waiting for my rep to call me to tell me if they are going to check up on the good standing before I send it as I'm not 1000% comfortable with it. So I want to make sure it won't blow up in our face. Ugh." The Buyer immediately responded, "Yeah, I hear ya there," to which the Agent digitally "liked" his reply. A minute later, uneasy about even presenting the altered image to Change, the Buyer texted: "There is no way to fix that [*i.e.,* the notice of good standing] quickly." The Agent misunderstood, believing the Buyer meant fixing the altered image rather than the underlying business registration. She responded: "I know but it could be a deal killer if they catch it which makes me sweat." This, again, confirmed that the Agent knew the alteration existed and recognized the risk, yet continued to direct the process.

249.   Ten minutes later, the Buyer replied, "Agreed," then pivoted toward more legitimate solutions: "If the screenshot won't work, what if we see if they [Change] will clear it if

I show I've paid the fee to reinstate it? And explain that it's literally irrelevant to the status of the business." The Agent responded: "Yeah, he [Rothstein] is going to call at 1 so we will spitball it."

250.    At 1:01 p.m. EST, the Agent emailed the Title Company: "No update as of yet. We are trying." Hours later, at 3:53 p.m. EST, the Buyer again asked, "Any word from the underwriter?" The Agent replied: "Not yet. Ugh. I sent it to him tho[ugh]. He wanted it not in the file tho[ugh], just to my guy." This message confirmed that the altered image, directed by the Agent, was shared internally at Change, that Rothstein knew it was altered, and that he requested it not be placed in the official underwriting file. Thus, both FFF and Change Mortgage were fully aware of and complicit in the document's modification.

251.    At 4:05 p.m. EST on January 7, 2022, the Buyer asked: "Was everything else cleared except that last thing?" The Agent replied at 4:45 p.m. EST: "Yes. Thank God." This confirmed that the Notice of Good Standing was the *sole remaining condition* holding up closing, an issue that, again, could have been avoided entirely had the Lender or its Agent exercised basic due diligence months earlier. The Buyer's entanglement in the Agent's scheme to alter the notice was not born of any deception, but of desperation created by the Lender's prior negligence.

252.    At 5:50 p.m. EST, the Buyer texted: "I don't understand why they can't give you the answer to one thing in a full day." Twenty minutes later, he followed up: "Wasn't he [Rothstein] supposed to get right back to you?" There were no further communications that evening … another day lost entirely to the Lender's disorganization and lack of urgency.

253.    The following morning, Saturday, January 8, 2022, with the bank closed, the Buyer reached out again at 11:04 a.m. EST, texting: "If the bank isn't willing to accept the business status could we get something from RBM to supplement or have them contact RBM?" The Buyer was still proactively seeking a more legitimate workaround to satisfy the good standing condition, and

his text again confirms that he understood the "bank" to already be aware that the business-status documentation had been altered. Three minutes later, the Agent replied: "I [am] hoping either will satisfy. We suggested to get something from RBM. Just have to see. I think I'm overthinking it but will find out Monday. I'm sure [of] it."

254.    The Buyer then reasoned: "Because it's straight contractual payment wouldn't it matter more if RBM was in good standing? Run their EIN." Since Buyer's income came directly from RBM under contract/1099, he correctly noted that RBM's status, not WTF Magazine's, was the relevant measure of financial stability. The Agent dismissed the idea, replying: "That's not really how it works. But I have a feeling we will be ok." The Buyer replied: "I more than hope so."

255.    Ultimately, things were not "ok." This exchange again illustrates that the Buyer was doing far "more" than merely hoping. He consistently and proactively offered logical, ethical, and compliant solutions at every turn.

256.    On Monday, January 10, 2022, at 9:03 a.m. EST, the Buyer texted the Agent: "Good morning Susan. Today is the day." Agent replied cheerfully, "Good morning [sunshine emoji] yes it is," to which the Buyer responded, "Make magic happen. Lol." The Agent replied with a magic-wand emoji.

257.    At 10:59 a.m. EST, Rothstein (Change) texted the Agent: "Response was 'not sure if there is a solution, I will send an email and ask.'" Upon information and belief, this referred to the unresolved Notice of Good Standing issue and the earlier altered image. Rothstein added, "Keep you in loop as I hear." Moments later, he sent a follow-up: "And, she's [the underwriter] got covid [face palm emoji]." The Agent replied simply: "FML" ("F" my life). Rothstein urged: "Call me," then again, more urgently: "You need to call me." Notably, this exchange contains the first and only known written reference to any Covid-related illness.

258.    At 12:23 p.m. EST, having heard nothing further, the Buyer texted the Agent: "When are you supposed to know?" At 1:02 p.m. EST, he followed up with a single question mark ("?"). The Agent finally replied: "I am on the line with them now. Ugh. I'll call when done." Buyer responded: "Ok." Moments later, the Agent texted Buyer: "Looks like they are not accepting the screenshot of the good standing, and we cannot retrieve the transcript for your 1099, so we are battling over that." Again, this admission confirms that the bank reviewed the screenshot, understood it had been altered, and refused to accept the document as proof of Good Standing.

259.    This exchange, however, also raised another major issue. Buyer immediately replied to Agent: "What do you mean about the 1099? The 1099 is legit." His response was entirely reasonable – the 1099 had been provided more than two months earlier, and this was the first time the Lender had raised any issue with it. Notably, the reason the Agent provided was that the bank was unable to "retrieve the transcript for [Buyer's] 1099."

260.    At 1:24 p.m. EST, the Agent messaged Rothstein: "Is there any other way to verify the 1099 for FYK OR no-ratio? Can we switch and NOT start over?" Rothstein responded: "Not that I am aware to verify 1099. **1099 should be issued in the borrower's name,** as that is who we are lending the money to. **Has to start over—total new loan**. I can probably rush it and literally you do nothing but work on it to get submitted, locked, LE go out, CD go out, etc., and then ask the same underwriter as we have most everything aside from income docs, etc" (emphasis added). The Agent immediately responded: "Tried [sic] 7-day rule screws me." She then corrected herself: "TRID."

261.    This exchange, again, exposes the full magnitude of the Lender's mismanagement. The Buyer's 1099 had been issued to WTF Magazine, *his business*, rather than to him personally – a fact the Agent had known since November 2, 2021, when she received it and transitioned the

loan into the "1099 program." Change, too, had the same 1099 in its possession for months. Yet just as Change overlooked the contractual Closing Date despite having the fully executed contract, and just as it overlooked the Notice of Good Standing condition, it likewise failed to notice that the 1099 was issued in the *wrong name*. Only now (two months after submission and five days after missing the original Closing Date) did Change finally recognize and raise the issue of the 1099 being issued in the wrong name. And as the Agent acknowledged, the "TRID" "7-day rule screws [her]," and, more importantly, it is the Buyer who was ultimately "screwed" by these lender-created delays.

262.    To put this in context – on January 10, 2022, the Lender simultaneously confronted two problems of its own making. First, it refused to accept the altered Notice, an issue caused entirely by its earlier oversight. Second, it *just* discovered that the 1099 was issued in the business's name rather than the individual borrower's name, a fact available to the Lender since early November 2021. Overnight, the Buyer went from facing one final hurdle to confronting two separate and insurmountable, lender-created barriers. With the Notice problem already impossible to resolve *in time* and now the 1099 problem legally impossible to cure *at all*, the Buyer was forced to abandon the original loan entirely and "start over" with a "total new [less advantageous] loan" product just *eight days* before the extended Closing deadline. It is indisputable that the Lender's failures caused the collapse of the first loan and made timely closing under the second loan impossible.

263.    The Agent's reference to the "7-day rule" reflected a misunderstanding of the technical terminology, but her underlying point was substantively correct – once the Lender forced a "total new loan" on January 10, TRID's mandatory waiting periods made timely consummation physically *impossible*. Although the seven-day rule under 12 C.F.R. § 1026.19(e)(1)(iii)(B) applies

only to the initial Loan Estimate ("LE") and does not re-apply to subsequent disclosures, restarting the loan still triggered the separate and unavoidable requirements of issuing a "total new" Loan Estimate (LE), completing new (but not totally new) underwriting, preparing a "total new" Closing Disclosure, and then observing a "total new" mandatory three-business-day waiting period under § 1026.19(f)(1)(ii)(A). Even under the most optimistic timing assumptions—treating January 10, 2022, as the restart date, issuing the new  LE that same day, rushing underwriting to permit issuance of a compliant (*i.e.,* accurate) CD no earlier than Friday, January 14, 2022 (the earliest permissible consummation date would still be Wednesday, January 19, 2022, one full day after the extended January 18, 2022, Closing Date).

264.    In short, while the Agent misstated the specific "seven-day rule," her sentiment that TRID "screws" the closing was accurate –the Lender's own oversight in forcing a "total" restart on January 10, 2022, made meeting the second Closing Date legally impossible without relying on the Contract's CFPB extension provision. These federal disclosure-timing requirements(combined with months of lender inaction and overlooked documents) caused the original loan to collapse and compelled the Buyer to pursue an inferior loan product through no fault of his own. And because TRID pushed the earliest lawful closing to at least January 19, 2022, the Lender would necessarily have been forced to rely on the same CFPB extension it had already requested to extend the first Closing Date (a critical issue in the Buyer/Seller legal dispute),thereby underscoring that both the failure to close on time and the need to "use" the CFPB extension again were entirely lender-caused.

265.    At 3:13 p.m. EST, the Buyer attempted to call the Agent but received an automated message stating she was assisting another client. Sometime afterward, the Agent returned the call and relayed what Rothstein had just conveyed – that there was no way to complete the original

loan in time (or at all) and that the only remaining option was to start an entirely new stated-income loan, which would increase the Buyer's APR by another 1% and add points to the loan.

266.    Critically, however, the Agent omitted any mention of the newly discovered 1099 problem; namely, that the 1099 had been issued in the wrong name and that this lender oversight alone made the original loan impossible to close. Instead, she focused solely on the Notice of Good Standing issue, likely because that was the only problem the Buyer already knew about and the only issue with even a remote argument that the Buyer might bear some responsibility for (*e.g.*, perhaps he did not independently know the business was not in Good Standing). The Buyer did not learn of the 1099-issuance mistake until the preparation of this Complaint. By withholding that information, the Agent concealed the Lender's plain error and left the Buyer to believe that the Notice of Good Standing was the sole barrier to closing.

267.    Belese promised to rush the new loan through, conveying Rothstein's indication that he too would rush it through. The Buyer had no other choice but to agree to and proceed with the new stated-income loan product, hoping that the Contract's mandatory extensions would protect him (because the Seller would certainly not agree to another extension). Ultimately, they did not, because, as the court in the Buyer/Seller dispute determined, the Lender had already "used" those extensions to push the original Closing Date. Again, while the Buyer does not agree with the Court's interpretation of the Contract's extension provisions, the decision was what it was.

268.    At 4:12 p.m. EST, the Agent attempted to call Rothstein but received an automated unavailable message. She then texted: "Call me on fyk when you can. Of course *I'm being screamed at*" (emphasis added). The Agent was referring to the Buyer's understandable frustration after learning that the original loan could not close in time (or at all) and that he would now be forced to accept a higher-cost stated-income loan product solely because of the Lender's mistakes

and delays. Rothstein replied simply: "Ugh." The Agent immediately attempted to call Rothstein again but received the same "unavailable" message. Rothstein likewise tried to return the call and reached an automated response from the Agent. Although the record does not clearly establish whether they ultimately connected by phone, it is reasonable to infer that they did, and that during that conversation the Agent conveyed the Buyer's reluctant agreement to proceed with the new loan product.

269.    At 5:35 p.m. EST, the Agent emailed the Buyer and his Realtor with a status update memorializing the intended switch to a new loan "product" and requesting *another* extension. The email stated that "we" (the Lender) "hit a road block on 1 condition." That statement was not true. The Lender had, in fact, hit a roadblock on *two* conditions. The first wasthe Notice of Good Standing, which was known to the Buyer and, although problematic, was at least theoretically curable because the Lender could have accepted the State of Delaware fee as a requirement of closing and waived the formal notice if necessary. The second roadblock wasthe discovery that the 1099 had been issued in the wrong name, and thatwas not mentioned in the email because it had already been omitted from the Agent's earlier call with the Buyer. Unlike the Notice issue, this defect was not waivable and made closing under the original loan program impossible. This sequence establishes that the forced change in loan "product," and the higher costs associated with it, was compelled entirely by Lender-side failures and not by any lack of diligence or fault by the Buyer.



270.    The Agent's email misled the Buyer and Realtor into believing that the only condition preventing closing was the Notice of Good Standing. What the Agent failed to disclose (both in the email and in her call) was the truly fatal condition – the Buyer's 1099 had been issued in his business's name rather than his personal name, a lender oversight that made approval under the original loan program impossible even if the Notice issue had been resolved. Both the Buyer and the Agent later testified in the Buyer/Seller litigation consistent with the Agent's original representation that there was only "one condition." Only through later discovery of the Agent's text messages with Rothstein did it become clear that the actual, insurmountable barrier to closing was the 1099 discrepancy, a document the Lender had possessed for more than two months.

271.    This email also raises an additional issue. The 5:35 p.m. email update was sent not only to the Buyer but also to the Buyer's real estate agent, Duval, and it expressly disclosed the

switch to a new loan "product." Upon information and belief, Duval never conveyed this critical information to the Seller's side. Under standard Florida real-estate practice and the statutory duties imposed by § 475.278, a buyer's agent has an affirmative obligation to communicate all material financing updates (especially a loan-product change that directly affects closing feasibility) without needing instruction from the Buyer. Yet the record reflects that Duval did not forward this critical update at all. This omission later became significant, as the court in the Buyer/Seller dispute found that neither the Buyer nor the Agent informed the Seller of the loan-product change, even though that responsibility fell squarely on Duval. This issue is addressed in more detail later in this Complaint.

272.    Although the Buyer had already agreed to transition to a stated-income loan product (again, because he had no remaining choice), this email served to further conceal the Lender's internal error and misrepresent the real reason the loan collapsed, attempting to shift responsibility away from the Lender's major oversight to the Buyer's good standing deficiency.

273.    At 6:19 p.m. EST, Buyer texted Agent: "I'm putting my final faith in you." It was his "final faith" because the Lender's delays had pushed the transaction to a point where no viable alternatives remained … *none*. Securing a new lender, reapplying, and restarting the process this late in the timeline was impossible, and obtaining cash financing on such short notice was equally unrealistic. The Buyer's only hope was that the existing Lender could somehow complete the loan in time. The Agent responded: "I know." Attempting to remain optimistic, the Buyer replied: "Please get this done so we can laugh about this some day," to which the Agent answered: "That would be great. I can't wait." By then, the Buyer had everything riding on the Lender's actions and could only place his trust and faith in the Agent while the transaction was spiraling beyond his control. This lawsuit, like the Agent's admission that this ordeal was a "learning experience,"

109

should also serve as a "learning experience" for the Defendants as well; the imposition of significant damages is the only meaningful deterrent to prevent similar misconduct in the future.

274.    On Tuesday, January 11, 2022, at 9:30 a.m. EST, as was Buyer's diligent routine, he messaged Agent: "Please update me on everything as it gets done so I know we are moving forward." Twenty minutes later, Agent replied:

> Ok. We have prepped the new file and you will re esign two sets of disclosures. Ours and change wholesale for new stated program. We switch all docs over to new file and submit to underwriting so this will be out to you today. Then once we lock it tomorrow under the new parameters you will get closing disclosure next day. So this will move fast. My boss [David Stein] is in it right now.

A few minutes later she added: "First set of disclosures are out. To you." At 12:29 p.m. EST, Buyer replied: "On it." Buyer then tried calling Agent, because he was having trouble accessing the document. He then e-signed the document soon thereafter.

275.    At 2:15 p.m. EST, Agent text messaged Rothstein: "Hiya. Looks like we are registering fyk again and his disclosures are signed on our side. Let [me] know if you need anything." Rothstein replied: "I will get a notification when it is registered and advise. Are they able to download everything pertinent to attach to file?" Agent responded: "Yes."

276.    At 5:27 p.m. EST, having received no updates, the Buyer texted the Agent: "Did not get anything yet." The Buyer remained on standby, ready to fulfill any request immediately to avoid further delay. The Agent replied: "They registered and locking at same time and reviewing all at once so let's see if they send out tonight. We have all hands on deck." While that statement suggested urgency and effort, the need for an "all hands on deck" scramble was itself the product of months of the Lender's negligence and failure to act diligently when time still allowed. In other words, everyone now understood the urgency … but it was too little, too late.

277.    At 6:19 p.m. EST, the Buyer again asked the Agent to call him regarding the new loan application he had just received and needed to e-sign. The Agent replied that she would call in five minutes. At 6:30 p.m. EST, the Buyer e-signed the new loan application. The application identified Stein as the loan originator, formalizing the transition to the stated-income loan product that had become necessary only because of the Lender's own repeated errors and delays.



## Section 6: Acknowledgements and Agreements. This section tells you about your legal obligations when you sign this application.

### Acknowledgments and Agreements

**Definitions:**

- "Lender" includes the Lender's agents, service providers, and any of their successors and assigns.
- "Other Loan Participants" includes (i) any actual or potential owners of a loan resulting from this application (the "Loan"), (ii) acquirers of any beneficial or other interest in the Loan, (iii) any mortgage insurer, (iv) any guarantor, (v) any servicer of the Loan, and (vi) any of these parties' service providers, successors or assigns.

**I agree to, acknowledge, and represent the following:**

**(1) The Complete Information for this Application**

- The information I have provided in this application is true, accurate, and complete as of the date I signed this application.
- If the information I submitted changes or I have new information before closing of the Loan, I must change and supplement this application, including providing any updated/supplemented real estate sales contract.
- For purchase transactions: The terms and conditions of any real estate sales contract signed by me in connection with this application are true, accurate, and complete to the best of my knowledge and belief. I have not entered into any other agreement, written or oral, in connection with this real estate transaction.
- The Lender and Other Loan Participants may rely on the information contained in the application before and after closing of the Loan.
- Any intentional or negligent misrepresentation of information may result in the imposition of:
  - (a) civil liability on me, including monetary damages, if a person suffers any loss because the person relied on any misrepresentation that I have made on this application, and/or
  - (b) criminal penalties on me including, but not limited to, fine or imprisonment or both under the provisions of Federal law (18 U.S.C. §§ 1001 et seq.).

**(2) The Property's Security**
The Loan I have applied for in this application will be secured by a mortgage or deed of trust which provides the Lender a security interest in the property described in this application.

**(3) The Property's Appraisal, Value, and Condition**

- Any appraisal or value of the property obtained by the Lender is for use by the Lender and Other Loan Participants.
- The Lender and Other Loan Participants have not made any representation or warranty, express or implied, to me about the property, its condition, or its value.

**(4) Electronic Records and Signatures**

- The Lender and Other Loan Participants may keep any paper record and/or electronic record of this application, whether or not the Loan is approved.

- If this application is created as (or converted into) an "electronic application", I consent to the use of "electronic records" and "electronic signatures" as the terms are defined in and governed by applicable Federal and/or state electronic transactions laws.
- I intend to sign and have signed this application either using my:
  - (a) electronic signature; or
  - (b) a written signature and agree that if a paper version of this application is converted into an electronic application, the application will be an electronic record, and the representation of my written signature on this application will be my binding electronic signature.
- I agree that the application, if delivered or transmitted to the Lender or Other Loan Participants as an electronic record with my electronic signature, will be as effective and enforceable as a paper application signed by me in writing.

**(5) Delinquency**

- The Lender and Other Loan Participants may report information about my account to credit bureaus. Late payments, missed payments, or other defaults on my account may be reflected in my credit report and will likely affect my credit score.
- If I have trouble making my payments I understand that I may contact a HUD-approved housing counseling organization for advice about actions I can take to meet my mortgage obligations.

**(6) Authorization for Use and Sharing of Information**
By signing below, in addition to the representations and agreements made above, I expressly authorize the Lender and Other Loan Participants to obtain, use, and share with each other (i) the loan application and related loan information and documentation, (ii) a consumer credit report on me, and (iii) my tax return information, as necessary to perform the actions listed below, for so long as they have an interest in my loan or its servicing:
- (a) process and underwrite my loan;
- (b) verify any data contained in my consumer credit report, my loan application and other information supporting my loan application;
- (c) inform credit and investment decisions by the Lender and Other Loan Participants;
- (d) perform audit, quality control, and legal compliance analysis and reviews;
- (e) perform analysis and modeling for risk assessments;
- (f) monitor the account for this loan for potential delinquencies and determine any assistance that may be available to me; and
- (g) other actions permissible under applicable law.

**Borrower Signature** _DocuSigned by:_ Jason Michael Fyk _____ **Date** (mm/dd/yyyy) 1/11/2022 | 15:30:23 PST

---

## Section 9: Loan Originator Information. To be completed by your Loan Originator.

### Loan Originator Information

Loan Originator Organization Name Family First Funding LLC

Address 44 Washington St., Suite 200 141 & 151, Toms River, NJ 08753

Loan Originator Organization NMLSR ID# 810371          State License ID# MLD835

Loan Originator Name David Paul Stein

Loan Originator NMLSR ID# 36150          State License ID# LO7147

Email teamstein@fam1fund.com          Phone 732-505-4600

Signature _____          Date (mm/dd/yyyy) 01/11/2022

278.    Agent's later testimony was also inconsistent with the documented facts shown above. When questioned by David Levine, "[…] Do you know if a new loan application was submitted as part of the change to the second loan product?" Agent responded: "It was not [a new loan application]. We just removed the income based off the original documents." That statement is facially false. A new loan application (originated by David Stein) was, in fact, issued and signed by the Buyer on January 11, 2022, at 3:20:23 p.m. PST.

279.    This led to a follow-up line of questioning a few minutes later, during which Levine asked: "[…] I understand. I just want to confirm that a new application was submitted and signed on January 11th, 2022?" Agent replied: "Okay." Levine continued: "And do you see Mr. Fyk's signature there? [referring to the document shown above]" Agent: "I do." Levine: "And do you see the date of January 1st, 2022?" Agent: "That says 1-11." Levine: "Oh, I'm sorry. It's clearly 5:00 o'clock. I apologize. January 11th, 2022."

280.    By misstating the date and prompting Agent's correction, Levine cleverly trapped the Agent into admitting that a new loan application was, in fact, submitted and signed by the Buyer on January 11, 2022. When a borrower changes loan products, a new loan application must, by law and industry standard, be completed and signed. As shown above, on January 11, 2022, at 6:30 p.m. EST, that is precisely what occurred.

281.    These direct contradictions between the Agent's testimony and the contemporaneous record undermine her credibility. Although the Agent may have attempted to frame the transaction as something other than a "new loan" to support the Buyer's claims against the Seller, the documents make clear it was a "total new loan." Her inaccurate testimony likely weakened her credibility before the court in the Buyer/Seller dispute, a consequence that ultimately worked to the Buyer's detriment in the Final Order.

282.    On Wednesday, January 12, 2022, at 9:51 a.m. EST, the Agent messaged Rothstein: "Call me when you['re] ready. I'm ready." Rothstein replied: "11 a.m. our time." The Agent responded: "Kk. Just want [to] make sure he [David Stein] did disclosures right and you are set." Upon information and belief, the "disclosures" referenced were the preliminary loan disclosures that has just recently been issued to the Buyer.

283.    At 11:44 a.m. EST, Rothstein sent a lock sheet to Stein, Belese, and Michael Flanagelly (also with FFF). The updated terms reflected an increased interest rate of 4.725% and included an origination fee of $10,480.00, representing one percentage point (1%) of the total loan amount, commonly referred to as a "point." During trial, Belese confirmed this change, testifying: "The new interest rate is 4.725 at a price of… which means that this program is not only a higher interest rate at 4.725, but it's also going to cost him an additional 1 percent in origination to Change Wholesale." When asked, "And his original loan rate that he was quoted was 3.6, correct?" Agent responded, "Correct."

284.    Because of the Lender's delays and its failure to lock the interest rate when the original Loan Approval was purportedly issued on November 9, 2021, coupled with the subsequent delays that forced a loan-product change, the Buyer's rate increased from 3.6% with no points to 4.725% with one point.

285.    Based on that original "Loan Approval" from FFF for $982,500 at 3.6% versus the forced stated-income loan of $1,048,000 at 4.725%, the Lender-caused change in loan product increased the total cost of financing by approximately $354,309.28 over the life of the 30-year loan, plus a $10,480.00 origination point, for a total increased cost of **$364,789.28** –  all directly attributable to the Lender's failures.

114

**From:** Russell Rothstein <Russell.Rothstein@ChangeWholesale.com>
**Sent:** Wednesday, January 12, 2022 11:44 AM
**To:** David Stein <dstein@fam1fund.com>; Susan Belese <sbelese@fam1fund.com>; Michael Flannelly <mflannelly@fam1fund.com>
**Subject:** Lock Requested and Confirmed for Loan #6000028382, Borrower Jason Michael Fyk

1

**CAUTION:** This email originated from outside of Family First Funding. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Your Lock Request is Confirmed for Loan #6000028382, Borrower Jason Michael Fyk.

Lock Details:
Interest Rate: 4.725%
Price: 99.000 %
Current Concession (included in price above):

Lock Date: 1/12/2022 12:00:00 AM
Lock Expiration date: 2/11/2022 12:00:00 AM
Investor:  Change Lending, LLC.
Loan Program: CHM Wholesale Community Mortgage 30 Yr Fixed
Loan Type: Conventional
Loan Type: Best Efforts
Amortization Type: Fixed
Term: 360 months
Impounds Waived: Not Waived
Impound Type: Taxes and Insurance

Lender Paid MI?: N
Lender Paid MI Points:  %
Lender Paid MI $: $

ARM Product Info (if applicable):
Margin:
Index:
Initial Cap:
Subsequent Cap:
Life Cap:
Floor:
This loan May_not be assumed.
Origination: $ 10480.00
Origination(pts): 1.000
Total Lender Credits Not To Exceed: $0.000

Lock Loan Terms:
Total Loan amount: $1048000.00
Base Loan Amount: $1048000.00 or $1048000.00
Second Loan Amount (if any):  $
Additional Lien Loan Amount (if any):  $
HELOC Credit Limit (if any):   $
Property Value/Purchase Price:  $1330000.00/$1310000.00
Property Type: Detached
Number of Units: 1
FICO: 714
LTV: 80.000
CLTV: 80.000

2

286.   Furthermore, because the transaction failed to close as a direct result of the Lender's mismanagement, the Buyer has now *permanently* lost access to the favorable interest rate he was initially approved for. As Agent Belese herself testified: "As we know, the interest rates are higher. He doesn't qualify, I wouldn't think, for a full doc loan in either scenario. We would still be in the 1099 profit and loss or investment property rental income to qualify. And those rates can be anywhere from 7-and-a-quarter to 9-and-an-eighth percent on any one of those programs."

287.   Essentially, even if the Buyer were now to attempt to obtain the same 1099 loan product he would have qualified for (but for the Lender's late request for the Notice of Good Standing), the applicable rates have since risen dramatically, to between 7.25% and 9.125%. Using a conservative midpoint of 8%, the cost differential is *staggering*. On a principal balance of $1,048,000.00, a 30-year fixed-rate loan at 3.6% would yield a monthly principal and interest payment of approximately $4,765.00. At 8%, that same loan would require a monthly payment of approximately $7,690.00 (an increase of $2,925 per month). Over the 30-year term, this represents an additional **$1,053,000.00** in total payments.

288.   This massive financial disparity underscores the material and lasting harm caused by the Lender's failure to perform competently and diligently. The Buyer not only lost the subject Property but was also permanently deprived of historically low interest rates that can never be recaptured (at least not anytime soon), a direct and quantifiable consequence of the Lender's negligence.

289.   At 12:00 p.m. EST on January 12, 2022, the Agent emailed a synopsis of the revised terms, notably omitting any mention of the origination fee (addition of the 1% point) that Change was now charging on the new stated-income loan.



290.     At 12:07 p.m. EST, the Buyer texted the Agent: "Looks like one more step done." The Agent replied: "I'm trying to push them all." At 4:27 p.m. EST, the Buyer attempted to call the Agent but received an automated "unavailable" message. He immediately followed with a text: "Just trying to follow these docs." The Buyer was diligently ensuring that he understood and completed all required paperwork correctly so as not to cause any delay. The Agent replied that she would call him back and informed him that the file was back in underwriting review.

291.     During this exchange, the Buyer asked about duplicate charges (including appraisal and other fees) that appeared on the new disclosures even though those costs had already been paid under the original loan. He also sought clarification on whether the required reserves were included in the cash-to-close figure. At 3:30 p.m. EST, in response to a status request from the Title Agent, Agent Belese emailed that the Lender was working toward clear-to-close and targeting January 18, 2022, for closing, noting that January 17, 2022, was a federal holiday and banks would be

closed. Given the extension and time-is-of-the-essence clause, January 18, 2022, was the operative Closing Date.

292. On Thursday, January 13, 2022, at 11:32 a.m. EST, the Buyer texted the Agent: "I heard Joanne set closing for the 18th … lol." The "lol" reflected the Buyer's nervous humor under mounting tension. Two hours later, the Agent replied: "Um. Ok. Lol. I told her we're shooting for it. No pressure." The Buyer responded: "She noticed the 17th and the attorney has been hammering her for the date. Let's pray we can hit it." The Agent acknowledged with a brief "Kk." At 4:41 p.m. EST, the Buyer followed up: "Any update from today?" He received no text response, and it is unknown whether any further communication occurred that day.

293. At 3:03 p.m. EST on Friday, January 14, 2022 (the last business day before the extended Closing Date), Buyer messaged Agent: "Did you see the email from Joanne?" Three minutes later, he followed with: "Wire info?" Upon information and belief, the Title Agent had sent an inquiry about the clear to close,  wiring instructions, and amounts, which had still not yet been determined.

294. Agent responded: "I did. I just got [t]o SC. I don't have the closing disclosure yet. Let me Call I spoke to them earlier and they were getting back to me on the file but haven't yet." Buyer, unsure what "SC" referred to, asked: "SC needs to be filed?" Then asked: "Signed?" Agent replied: "No honey. Sorry just got my ass t[o] South Carolina. So let me follow up." Buyer replied: "Ohh," and Agent digitally "Liked" that response. Buyer was so singularly focused on meeting any documentation need as soon as it occurred that he mistook "SC" to mean some type of document that either needed to be filed or signed by him. He then asked: "Lmk asap. Joanne is seeking confirmation of the clear to close." Agent replied: "I know."

118

295.   At 3:12 p.m. EST, Agent messaged Rothstein: "Hey bud Checking in. Anything from Noreen[?]" Rothstein replied simply: "No." Noreen, upon information and belief, was the name of the underwriter. Agent acknowledged Rothstein with: "Okay." Rothstein then continued: "Noreen said she should be able to look at [it] on Tuesday. Will keep you in [the] loop." The underwriter's lack of urgency, particularly given the delays that the Lender had already imposed on the Buyer, was the direct reason the final CD was not delivered until January 19, 2022, one day *after* the extended Closing Date.

296.   The court in the Buyer/Seller dispute later held:

Third, both the Lender and KEN ZOROVICH, the Seller's mortgage lending expert ("Mortgage Expert") testified as to the purpose of CFPB extensions, and how they were added to the FAR/BAR contract to enable lenders to comply with mandatory closing disclosure requirements. **The evidence is uncontroverted that the closing disclosure for the New Loan was not sent until January 19, 2022, the day after the extended closing date.** The testimony of the Mortgage Expert was that such closing disclosures are to be issued at or prior to closing, and not after the day of closing, since at that time the parties would be out of contract. Because the closing disclosure of the New Loan was not issued until after the extended closing date, the Seller was not obligated to agree to extend the closing date again. (emphasis added).

297.   In other words, because the final (accurate) CD was not delivered until *after* the Closing Date, the court concluded that the Seller was no longer contractually obligated to extend (*i.e.,* the CFPB extension did not apply). Change's lack of urgency in underwriting and timely issuing the required disclosures (after already having first missed closing on January 5, 2022) was the central reason why the transaction failed and why the court ultimately found against the Buyer.

298.   A minute or two later, the Agent responded to Rothstein: "Shit. That probably won't make this deal happen. I appreciate your efforts but the seller will not wait or extend this could be **HUGE issue for buyer**. He is having a heart attack. I know this is no fault of yours and not placing blame but we really need to close next week and this will probably kill us with no cd out or

approval." A minute or so later, the Agent followed up: "I'm over all of this." Shortly thereafter, she added: "Ok he's calm. Lol." Rothstein replied: "Ty" (emphasis added).

299.    Throughout this process, the Buyer worked to maintain his composure despite the immense stress and repeated setbacks. As the Agent's messages acknowledge, the Buyer was "having a heart attack" because this was a "HUGE" issue for the Buyer. Although the Agent attempted to excuse Rothstein personally, the responsibility rested squarely with Change. The Lender failed to initially assign an underwriter (or backup underwriter) in a timely manner (*e.g.*, Rothstein indicated Noreen had COVID), overlooked the business-issued 1099, overlooked the Notice of Good Standing till it was too late, planned for the wrong Closing Date, and allowed the underwriter to postpone review. This combination of Change failures pushed delivery of the final CD past the contractual Closing Date, forcing the Buyer into an impossible position, attempting to rely on a CFPB extension *without a timely reissued disclosure*. Consequently, the first disclosure delivered on January 4, 2022, was treated by the court as the only operative CD, falling well outside the CFPB extension window and cementing the Buyer's loss.

300.    At 3:19 p.m. EST, Agent messaged: "So we are still awaiting on the underwriter. He [Rothstein] is staying on her. So he asked me to be patient. Lol mi [sic] said okey [sic] We are waiting." Buyer replied: "Let him know the attorney for the seller has already intimated that there will be no more extensions." Again, Buyer relayed the Seller's intent not to extend because he had already agreed to an extension. Buyer then indicated he spoke to Joanne, who had conveyed the Seller's intent not to extend. Agent acknowledged with: "ok."

301.    Twenty minutes later, at 3:41 p.m. EST, Buyer messaged: "Was there any indication that we would get the clear to close today? Also is this a CA bank because it means there are 3 more hours in the day." Recognizing that as the business day closed at 5:00 p.m. EST,

120

if Change was based in California (which it was), the bank could be working on clear to close for an additional three more hours that day. This was, again, evidence of Buyer's desperation to close on time.

302.    At 4:05 p.m. EST, Agent responded: "So my contact [Rothstein] has been trying to get this completed and so I have to let him do his job but pressure from my side." Five minutes later, Buyer replied: "Letting him do his job, doesn't help if we miss the deadline AGAIN. There is no extension this time. The docs have to go to Joanne today for her to get her job done. You basically gave me no real update today, except to be patient which you said last time and the deadline came and went."

303.    Buyer was understandably fed up with being patient and "letting the Lender do their job." Doing their job had already culminated in a missed closing deadline, necessitating Buyer to waive a roughly $10,000.00 dock issue he could have pressed to have reimbursed (another loss). A few minutes later, Agent said: "Ok. I hear you." Buyer immediately replied: "Not trying to beat a dead horse but **it's gotta be today or I'll likely lose the house**" (emphasis added). Again, recognizing the futility of getting angry at the Lender, Buyer continued to focus on pushing for constant updates. He knew, because he had spoken to the Title Agent, that if Change did not issue wiring amounts and clear to close that day, the Closing Date was automatically going to be missed and he would "likely lose the house."

304.    At 4:19 p.m. EST, Agent messaged: "I just told him same thing As his underwriter stated she would review on Tuesday which I said won't work. He is calling me in 5 minutes. So when I hang up with him I'll call you." Panicking because of the inherent timing issue and the repeated circumstances that had already caused Buyer to miss the first deadline, Buyer responded: "She [can't] review Tuesday. Like what do they not get. This is a waste of time if they don't get it

121

done today. The attorney has already said the seller will not extend. Does he want to get paid or not?" Agent replied: "Of course he does and he only has so much control too. I just told him we are out of time and really need this today." Buyer then said: "Ok lmk [let me know]."

305.    There were no further text messages between Buyer and Agent that day. Unbeknownst to Buyer, because the Lender had failed to deliver the updated CD by January 12, 2022, it was already impossible under federal CFPB TRID timing rules to consummate the transaction on January 18, 2022. In other words, the Buyer was, as the Agent herself put it, already "screwed" the moment the loan product switched, because the TRID requirements made timely closing impossible thereafter. The only remotely conceivable way the transaction could have possibly closed on January 18th would have been for the underwriter to push the file through immediately on January 10 and for the Lender (whose professional duty it was to identify TRID timing barriers and propose lawful remedies) to advise the Buyer of the narrow TRID exception allowing a borrower to submit a written statement of a bona fide financial emergency (such as losing the house) to waive the three-business-day Closing Disclosure waiting period. That limited remedial pathway was never raised by the Lender or conveyed to the Buyer.



**Official interpretation of 19(f)(1)(iii) Receipt of disclosures.**

(iv) **Consumer's waiver of waiting period before consummation.** If the consumer determines that the extension of credit is needed to meet a bona fide personal financial emergency, the consumer may modify or waive the three-business-day waiting period under paragraph (f)(1)(ii)(A) or (f)(2)(ii) of this section, after receiving the disclosures required under paragraph (f)(1)(i) of this section. To modify or waive the waiting period, the consumer shall give the creditor a dated written statement that describes the emergency, specifically modifies or waives the waiting period, and bears the signature of all consumers who are primarily liable on the legal obligation. Printed forms for this purpose are prohibited.

122

306.    On Saturday, January 15, 2022, at 11:41 a.m. EST, Buyer messaged Agent: "Can you send Joanne a good faith estimate of the closing costs so I can wire her the money on Tuesday. That way the seller knows the money is in escrow and may help our plight." Eleven minutes later, Agent confirmed: "Yes. I'll send that today." The Buyer hoped that pre-positioning his funds would help reassure the Seller that he was ready willing and able to close and buy a measure of flexibility, but the effort ultimately proved unfruitful.

307.    On Monday, January 17, 2022, at 3:34 p.m. EST, the Buyer texted the Agent: "Did you reach the seller's attorney today?" At 5:21 p.m. EST, having not received a response, he followed up: "And can you get an email together explaining stuff or is your plan to see how tomorrow morning goes?" Because it was a federal holiday and the banks were closed, it appears the Buyer received no response from the Agent that day.

308.    At 6:36 a.m. EST on Tuesday, January 18, 2022 (*the extended Closing Date*), Agent emailed Buyer: "Good Morning. You are my priority today. I will contact Russel as soon as they open. While the underwriter is working on your file, we will contact the attorney and speak about force Mej[eure]. I will call you when we are done with our call." A minute later, at 6:37 a.m. EST, Agent texted Buyer: "Sent you an email. As soon as Russel is awake, I'll call him and we will call the attorney and do what we talked about. Then I will call you [sunshine emoji]."

309.    At 7:29 a.m. EST, upon waking, Buyer replied: "Ok thanks. Have you talked to Russel yet?" At 10:25 a.m. EST, Agent responded: "Already on it." At 10:05 a.m., Agent had texted Rothstein: "Good morning [sunshine emoji]. Lol. Just [a] reminder on FYK."

310.    At 10:48 a.m. EST, Buyer texted Agent: "Please keep me updated. We have an addendum [4] out to the seller to delay closing till Friday, but it only says it's still in underwriting, and the seller could decline to invoke force mejeur[e] if we cannot close today." Agent

acknowledged: "Ok." Buyer followed: "Title agent just emailed us." Agent replied: "Yes sir." Buyer then said: "I wonder if Debra ('who is out today') is out because of covid or being sick? (See bottom of the email—it helps hold w[eight] with our reasoning.)" Agent replied: "Yes honey, on it."

311.    At 11:32 a.m. EST, Buyer messaged again: "You need to answer Joanne asap."

312.    At 1:41 p.m. EST, Joanne, the Title Agent, received an email from the Seller's attorney, Lorene Seeler ("Seeler"), stating: "The seller is not willing to extend this contract any further. The offer was signed in June and time is of the essence as to all dates, including today's closing date. Based on my conversation with the loan officer today, this file cannot close today."

313.    Upon information and belief, during that conversation, Agent Belese informed Seeler that COVID-related delays had significantly slowed the Lender's review process. Later obtained evidence shows, however, that the true cause of delay was not really COVID, but the Lender's chronic mismanagement, repeated oversights, and failure to treat the contractual deadlines as "time is of the essence," despite having possessed the full contract well before the original closing date. The only documented reference to COVID came from Rothstein (on or about January 10, 2022), noting that the underwriter, Noreen, had tested positive (a circumstance that, while unfortunate, could not reasonably account for months of cumulative delay). Agent's testimony at trial also confirmed the only person(s) with Covid were at Change, not FFF. David Levine asked: "Okay. So any of the underwriters you were referring to as having COVID were with Change Wholesale and not with Family First; is that right?" Agent replied: "That is correct."

314.    During that call, Belese also failed to assert a valid claim for a Force Majeure extension or CFPB extension, which could have preserved the Buyer's contractual rights to consummate after the Closing Date. As previously discussed, the court in the Buyer/Seller dispute

later adopted a similar stance, finding that the CFPB was already "used" pursuant to the first extension and the lender's COVID-related staffing issue did not qualify as an "act of God," but was instead a foreseeable and preventable event within the Lender's control. Fyk has no idea how he could have possibly foreseen, prevented, or even taken precautionary measures to address the Lender's internal staffing issues. Those matters were entirely outside his knowledge, authority, and control. Yet, the court's reasoning imposed on Fyk an impossible duty, to anticipate and mitigate the Lender's own operational failures despite his complete dependence on the Lender and its Agent to handle the federally regulated lending process competently, diligently, and in good faith.

315.    Attached to Seeler's email was also a "Release and Cancellation of Contract." Legally, this should have been treated as an *anticipatory repudiation* (a premature declaration of the Seller's intent not to perform) occurring *before* the Buyer's time to perform had expired. Nonetheless, the court in the Buyer/Seller dispute rejected this argument in the Buyer's rehearing motion. In other words, the Buyer argued every possible legal pathway to preserve his rights, but the court in the Buyer/Seller dispute ultimately found that the Lender's unilateral request for a CFPB extension extinguished the Seller's obligation to perform beyond January 18, 2022.

316.    At 2:05 p.m. EST on January 18, 2022, immediately after the Title Agent forwarded Seeler's email and the signed cancellation notice, the Buyer texted Agent in distress: "Call me! Like now!" and attached an image of the Seller's signed Notice of Cancellation. It was now clear that the Seller intended to proactively terminate the deal. Agent responded: "Call you right back."

317.    By 2:48 p.m. EST, still without a callback, Buyer messaged again: "I need a call." Eleven minutes later: "Wtf?"

318.    At 3:25 p.m. EST, Agent emailed Seller's counsel Lorene Seeler, copying the Buyer, Title Agent, and Buyer's Realtor, to provide a status update.



319.    At 3:26 p.m. EST, following this email, Buyer texted the Agent, stating: "W**e have the loan commitment letter dated Nov. 9th so we met the requirement**. **She [*i.e.,* Lorene Seeler] was wrong**." (emphasis added.) Unbeknownst to the Buyer at that time, Lorene was, in fact*, correct* – the Lender had not actually satisfied the November 9, 2021, Loan Approval requirement. Technically speaking, however, the Loan Approval was no longer an operative issue as to the Seller or the closing, because under the Contract, even if Loan Approval was never obtained, it was "deemed waived" and performance was to "continue as if Loan Approval had

been obtained." Thus, the Buyer's only remaining obligation was to close not to obtain the Loan Approval.

320.    This email and the Agent's subsequent trial testimony, however, reveal a far more serious problem. When questioned by Buyer's counsel, Beckerman, regarding this very email, Beckerman asked: "When you said the approval is not the issue, what were you referring to?" Agent Belese replied: "Lorene and I, on the phone, she had said that the November 9th approval that was issued was **not a real approval**." (emphasis added.) Beckerman followed up: "And what did you tell her?" Agent responded: "Exactly what I wrote there—that the approval is not the issue, we have a mortgage commitment now, right. We're just waiting for the official clear to close. I tried to call her to talk to her about it."

321.    In other words, while Seeler's observation that the November 9, 2021, Loan Approval was "not real" was, in fact, *accurate*, but it was legally irrelevant to any claim that the Buyer breached the contract – the Buyer's duty to close remained unchanged under the "deemed waived" clause. This fact, however, is entirely relevant to the Lender's diligence, honesty, and accountability. The discovery that the purported Loan Approval was fabricated or invalid (not real) underscores that the Lender (and its Agent) failed to perform their professional and fiduciary obligations to the Buyer, not that the Buyer failed to perform under the contract.

322.    Beckerman then asked: "And what was your purpose in sending this email?" Agent replied: "Just to let her know that we had the official clear to close, and that it was of ***no fault of the buyer***, that the ***lender is taking full responsibility*** for the delays on the loan." (emphasis added). In this vein, Levine later questioned Agent as follows: "And I believe your testimony earlier was that it was your understanding in this email that the lender was taking responsibility for the problems up to that point?" To which Agent responded: "Yes."

323.    This exchange establishes several critical facts. First, Seller's attorney, Lorene Seeler, had correctly identified on January 18, 2022, that the November 9, 2021, Loan Approval was not genuine, a fact now confirmed through subsequently unearthed evidence. Second, Agent Belese's sworn testimony confirms that she was, at minimum, aware that Lorene Seeler had identified this material defect, yet she continued to represent to all parties (including the Buyer) that a valid "mortgage commitment" existed and satisfied the Buyer's November 9, 2021, contractual Loan Approval requirement. Third, despite knowing (or at least learning) on January 18, 2022, that the original Loan Approval was either false or in serious question, Agent failed to disclose this material fact to the Buyer, leaving him to operate (and later testify) under the false belief that the November 9, 2021, Loan Approval remained legitimate and compliant with the financing contingency. Finally, the Agent expressly admitted that "the lender is taking full responsibility for the delays on the loan" and that "it was of no fault of the Buyer."

324.    Material misrepresentations define this entire transaction. In addition to her testimony mentioned above, and still in relation to this same email, when asked by Levine: "Okay. So when you say here that we have a *mortgage commitment*, is that different from the commitments that we were speaking about a few minutes ago?" (emphasis added). Agent answered: "So yes. So like I'm going to go back to the, in certain states, the words mortgage commitment comes at different times.· In the state of New Jersey, the mortgage commitment would come in the beginning as a conditional mortgage commitment. At the end of the loan, when you have a final clear to close, you get the mortgage commitment. I was telling her there that we were looking for the -- for the clear to close. I was waiting for the official email. So[,] it's an official email that comes and says your loan is cleared to close."

128

325.    Levine continued: "But it says you were looking for a clear to close, but that you already had the mortgage commitment?" Agent replied: "So they [*i.e.,* Change] *had signed off on all the conditions*. I was just waiting for the official clear to close, and we can see that in our computer system that they're -- that the conditions were cleared." (emphasis added).

326.    Agent's testimony represents that Change "had signed off on all the conditions" except that was not actually true. It could not even be said that all conditions had even been met because, as discussed below, the Buyer still needed to complete a credit course which he promptly did on January 19, 2022. Had "all the conditions" been "signed off on," upon information and belief, the loan would be clear to close. Clear to close was not officially issued until the following Monday, January 21, 2022.

327.    These facts and testimony demonstrate far more than negligence, they reveal a calculated pattern of affirmative misrepresentation by the Agent, seemingly designed to conceal the Lender's prior misconduct and preserve the illusion of compliance with the contractual financing contingency.

328.    Taken together, this conduct constitutes egregious negligence, material misrepresentation, breach of fiduciary duty, and fraud in some instances. The Agent and Lender owed the Buyer duties of, for example, full candor, diligence, and truthful disclosure regarding the status of his financing. Instead, they concealed material facts, issued a falsified Loan Approval, and misled all parties into believing the loan was approved and ready to close when it really was not, directly causing the Buyer's reliance, the two failed closings, and the substantial damages that followed.

329.    At 3:29 p.m. EST, Buyer then asked Agent *via* text: "Can we get the clear to close today?" Agent replied immediately: "That's why I said we have a mortgage commitment. That's

what I am looking for which is why I said that too. Just talked to my boss [Stein] too and he said same thing. Should go straight to clear and then I asked for closing disclosure and Russel is on stand[by]."

330. At 3:33 p.m. EST, Buyer wrote: "F$%* … I can't send the money today." Agent replied: "Hang on. Phone with [Agent's] att[orney]." Buyer followed: "The [Seller's] attorney is wrong. We had the loan commitment." A minute later, Agent responded: "I know. Our att[orney] is reviewing contract and extensions." Buyer then messaged: "I need wiring instructions now if I want to make today. Should I go to the bank and get ready to wire?"

331. Buyer, acting with extreme diligence and hoping to demonstrate he was ready, willing, and able to close, drove to the Oxford, Pennsylvania branch of Fulton Bank and waited in his car outside the business for thirty minutes until the bank closed, hoping the wiring instructions would somehow arrive in time to send his funds. They never did.

332. Ten minutes later, Agent texted: "Getting your voicemail. I talked to my att[orney] and he said if no time of the essence was issued then you [are ok]." But, the contract *was* expressly a time is of the essence contract, and both Change and FFF were fully aware of this fact from the copies of the executed agreement in their possession.

333. At 3:56 p.m. EST on January 18, 2022, Buyer messaged: "The mortgage [Seller's] agent let on that the seller and the renter have a backroom deal going on this." This confirmed that the Seller had ulterior motives to terminate the transaction. At 4:00 p.m. EST, Agent texted: "I'm sure they do. I just spoke to the att[orney] for seller now calling my att[orney] again. Then you." A minute later, Agent added: "Page 8 under time is [] of the essence of 1 day. That should have not been but realtors making contracts is yucky. I'll call you back."

334.     This comment shifted some blame to the Realtor for allowing the time is of the essence clause in the contract or, at minimum, for failing to at least point it out to the Buyer. Ten minutes later, the Buyer replied: "That part doesn't matter." Yet, as the court later determined, it *did matter*; indeed, it proved to be one of the most consequential provisions governing the parties' performance obligations. This exchange highlights that the Buyer, a layperson without formal training in real estate law or mortgage law, had no reason to understand the legal ramifications of such boilerplate language embedded in the contract and instead relied on the professionals (the Agent, the Lender, and the Realtor) to ensure contractual compliance and protect his interests.

335.     Starting at 4:11 p.m. EST and continuing through the end of business at 5:00 p.m. EST and into the evening, the Buyer sent a string of messages, shown below, that went unanswered till at least 7:21 p.m. EST, marking yet another instance where the Lender's silence and inaction left him desperate for information and stressed about the missed deadlines:



336. At this point in the transaction, the Seller's attorney was asserting in separate emails that the Buyer had failed to deliver the Loan Approval (commitment) by November 9, 2021, which was technically true. Buyer, believing in good faith that the Loan Approval he had received was genuine, continued to argue that it was timely and valid.

337.    Had the Seller actually known the Loan Approval was fake, he might have exercised his right to cancel within the three-day post-approval period. Likewise, had the Buyer known, he may never have proceeded with the transaction. But neither party knew. The fake approval created a false sense of security for both sides, one that ultimately unraveled later after it was discovered by the Buyer to have been fake.

338.    At 7:17 p.m. EST (past the Buyer's 5:00 p.m. EST performance window) on January 18, 2022, Agent Belese emailed the Buyer a new list of documents (*i.e.,* conditions) that needed to be completed, along with the updated *Loan Product Underwriting Conditional Approval*. This marked the formal transition to the new loan product, an event occurring ***after*** **the contractual closing date had already expired at 5:00 p.m**.





339.     This January 18, 2022, Loan Approval document indisputably confirms that the so-called "Loan Approval" the Buyer received from FFF on November 9, 2021, was not a genuine loan approval at all. A legitimate loan approval must be issued by the actual lending bank as it is here (in this case, from Change Mortgage), not by the broker facilitating the application. The November 9, 2021, document originated solely from FFF, which had no lending authority. This

Loan Approval makes clear that the Buyer was misled into believing he had a bona fide loan commitment on November 9, 2021, when, in fact, he did not … an error that tainted the entire transaction and deprived him of the opportunity to make informed decisions before the contract's Loan Approval Period expired.

340.     At 8:23 a.m. EST on Wednesday, January 19, 2022, the day after the Closing Date, the Buyer texted the Agent: "Call me when you get going. I read through the contract again and found a couple things that help us." Eight minutes later, the Agent replied: "Lol. Ok." There was, of course, nothing humorous about the situation, yet the Agent responded with "Lol" ("laugh out loud"). Sometime between 8:31 a.m. and 9:40 a.m., the Buyer and Agent spoke by phone.

341.     At 9:04 a.m. EST, the Buyer emailed the Agent two additional forms he had just signed for the Lender (more conditions that were purportedly already met per the Agent's testimony):



342.     At 9:40 a.m. EST, the Buyer texted: "Forget what I said about the dock. She [Maria Duval] didn't alter it." The Buyer's Realtor had previously advised against including the dock waiver in the email to the Seller. Initially, the Buyer believed the Realtor had removed it (trying to save his "silver bullet"), but after reviewing the delivered email, he discovered the dock waiver remained as he had instructed. The dock issue was accordingly conclusively waived and could no longer serve as leverage to compel consummation. The Agent acknowledged: "Oh ok."

343.    At 10:44 a.m. EST, the Agent emailed the Buyer: "Here is the link: **Forgot to tell you about this**—have Jason take course and get certificate. It is on all community loans [link omitted]" (emphasis added). This email, apparently copied from another message, indicated that Change (not the Buyer) had failed to notify the Agent or the Buyer (*i.e.,* "forgot" to tell them about another condition) that the Buyer was required to complete an online credit course for "community loans." The directive "have Jason take course and get certificate" reflects Change's own internal communication to the Agent, not language she would ordinarily use when addressing the Buyer directly. This shows the Lender had again overlooked a basic condition that should have been completed *before* the Closing Date.



344.    At 10:52 a.m. EST, the Buyer sent the Agent a picture of the computer screen he was viewing while beginning the required online credit course. Two minutes later, he texted: "This is going to take hours … ugh." At 11:00 a.m. EST, the Agent replied: "30 minutes Kk." The course

consisted of basic credit education, which the Buyer already understood, but it was yet another new condition imposed after the Closing Date. The Buyer commented: "I literally worked at Discover Card [for] 2 years. I understand credit … lol."

345.    An hour and thirteen minutes later, at 12:13 p.m. EST, the Buyer texted again: "This sucks. 1 hour in and I've finished 3 out of 7 sections." The Agent responded: "3 min Yikes. They said ½ hour." The Buyer then replied: "There may be some shit going on with the seller. Call asap and read Joanne's email."

346.    At 12:24 p.m. EST, the Agent answered: "I am on already. Lol. Juli correcting the loan amount. Lol." The Buyer replied: "Ok few. Joanne said underwriters aren't accepting force mejeur [sic] for covid." The Agent asked: "Who's underwriter[,] Title underwriter[?]" The Buyer responded: "She just said in general they aren't considering it. But you guys sent the incorrect amount correct?" At 12:36 p.m. EST, the Agent confirmed: "Yes she's fixing."

347.    At 1:06 p.m. EST, the Buyer texted: "Still working at this thing." He continued: "1. Did you respond to Joanne? 2. I finished the course (finally) and sent." The Agent acknowledged: "Got it yes we did." At 1:29 p.m. EST, the Buyer confirmed: "Lmk if there is anything else you need. I really hope we can get clear to close today." That hope, again, proved unrealistic. "Clear to Close" would not be issued until Friday, January 21, 2022 (three days after the contractual Closing Date).

348.    At 2:13 p.m. EST, the Agent responded simply: "Kk." Around the same time, the Buyer texted: "F*%&ing seller. See email." The Buyer had just received a "Notice of Breach of Contract and Notice of Termination" ("Breach Notice") from the Seller's attorney, Lorene Seeler, formally terminating the agreement.

137

THE LAW OFFICES OF
# LORENE  SEELER  YOUNG, P.A.

Via Email to:   Jason@wtfmagazine.com
mariaduvalhomes@gmail.com

January 19, 2022

Jason Fyk
c/o Maria Duval
Re/Max First
111 SE 8 Avenue Suite 1
Fort Lauderdale Florida 33301

### NOTICE OF BREACH OF CONTRACT and TERMINATION OF CONTRACT

| | |
|---|---|
| BUYER/MORTGAGOR: | JASON FYK |
| SELLER: | A & P HOME INVESTMENT LLC, a Florida limited liability company |
| PROPERTY: | 2752 NE 3rd Street, Pompano Beach, FL 33062 |
| OUR FILE: | 21001-114 / 21-0134 |

Dear Mr. Fyk:

Pursuant to the terms of the AS-IS Residential Contract for Sale and Purchase (Form ASIS-5x) "the Contract" between yourself as Buyer and my client, A & P Home Investment LLC, as Seller, and specifically, Addendum No. 3, you were obligated to close by January 17, 2022. January 17, 2022 was a national holiday, so your closing date rolled over to 5:00 p.m. on the next business day, which was yesterday, January 18, 2022.  Pursuant to Standard F on page 8 of the contract, **"time is of the essence"**.  No extension to the contract closing date was signed and delivered to all parties and accordingly, you were obligated to close by 5:00 p.m. yesterday and you failed to do so.

You were approved for a loan on or before November 9, 2021, the deadline for loan approval pursuant to Addendum No. 2 to the contract.  In accordance with Paragraph 8(b)(vii) **"if Loan Approval has been obtained, or deemed to have been obtained, as provided above, and Buyer fails to close this Contract, then the deposit shall be paid to Seller",** unless failure to close is due to (1) Seller's default…(2) Property related conditions of the Loan Approval have not been met…(3) appraisal of the Property obtained is insufficient to meet the terms of the Loan Approval.  To the best of my knowledge there are no property related conditions or appraisal issues.  Seller executed and left in escrow with me, all of the seller's documents, so Seller has fully performed.

9124 Griffin Road, Cooper City, Florida 33328

Phone: (954) 585-3967       Facsimile: (954) 585-3987       Email: Lorene@Lsy-Law.com

Jason Fyk                                                    January 19, 2022
Page Two

It has been approximately nine (9) weeks since your loan was approved and your lender advised me that the loan is not clear to close, which is an indication you have failed to fulfill all of your loan condition obligations in a timely manner.

Pursuant to paragraph 15(a) of the contract, you are in default by failing to perform your obligations under the contract within the time(s) specified, i.e., close yesterday.  As a consequence of your failure to close, the Seller is declaring a full breach of contract and this contract is deemed terminated and of no further force and effect.  Although the Seller has the right to demand your deposit as liquidated damages for your breach of contract, the seller is willing to refund your deposit at this time.  If you elect not to sign the release of deposit, then the Seller reserves the right to demand the deposit at a later date as liquidated damages for your failure to perform.

Copies of the pertinent pages of the contract and the release of deposit form are enclosed with this letter.

Very truly yours,

Lorene Seeler Young

/lms

Enclosures

Copies to:    An Nguyen
              Francesca McFeely via email @ francescam@bellsouth.net

9124 Griffin Road, Cooper City, Florida 33328

Phone: (954) 585-3967      Facsimile: (954) 585-3987      Email: Lorene@Lsy-Law.com

349.    As the Breach Notice stated in its first paragraph on page two: "It has been approximately **nine (9) weeks since your loan was approved** and your lender advised me that the

139

loan is not clear to close, which is an indication you have failed to fulfill all of your loan condition obligations in a timely manner." (Emphasis added.)

350.    Seller's counsel was correct that approximately nine weeks had passed since what was represented as the Buyer's loan approval. That amount of time would ordinarily be more than sufficient to close a loan. But, counsel's conclusion (that it was "an indication" the *Buyer* had failed to fulfill his loan conditions) was misplaced. The delays were entirely attributable to the Lender's repeated oversights, disorganization, and late discovery of underwriting conditions. Every failure identified in the record (whether the mishandled Notice of Good Standing, the overlooked 1099 discrepancy, or the delayed CD deliveries, *etc.*) originated with the Lender, not the Buyer.

351.    At a minimum, the Lender failed to respect or operate within the same contractual deadlines the Buyer was obligated to meet. While the Buyer's performance was bound by strict *time is of the essence* provisions, the Lender treated those deadlines as flexible, allowing critical conditions, disclosures, and underwriting reviews to lag well beyond the agreed dates. This mismatch in urgency and accountability rendered it impossible for the Buyer to perform on time, even though he remained ready, willing, and able to close at all times.

352.    The Buyer forwarded the Breach Notice to the Agent. At 2:27 p.m. EST, the Agent messaged the Buyer: "What the f*%^." The Buyer attempted to call the Agent but received her automated unavailable message. At 3:49 p.m. EST, the Buyer informed the Agent: "I have the email put together for the seller's attorney. Let me know if she contacts you." A minute later, the Agent asked: "Can you send [it] to me first[?]" The Buyer responded two minutes later: "Haven't sent it to anyone yet."

353. At 4:15 p.m. EST, the Agent messaged Rothstein: "Hiya How are we doing? CD?" Rothstein replied: "CD being worked on, got auto notification." The Agent responded: "Awesome." Despite this apparent progress, the court in the Buyer/Seller dispute ultimately found that the Lender's failure to send the final CD *before* the contractual Closing Date was a contributing factor to its decision, and that the Buyer was not entitled to rely on the CFPB's delivery-timing extension as of January 18, 2022, because there was no new CD issued. Yet, the CD's timely preparation and issuance were solely the Lender's responsibility, not the Buyer's. The Buyer had no authority to generate, modify, or transmit the disclosure, his only role was to acknowledge receipt once delivered. The Lender's failure to issue the CD before the deadline was necessarily the direct cause of the missed closing, again, not any inaction by the Buyer.

354. At 4:33 p.m. EST, the Buyer followed up: "Let me know as soon as you hear from the seller's attorney." At 6:25 p.m. EST, the Buyer messaged again: "One last good thing. Call me." The Agent replied: "Kk one sec." The Buyer responded: "Ok."

355. At 7:03 p.m. EST, the Buyer texted: "Just signed loan docs." He continued to sign and return documents as soon as they were sent, even though, by this point, the closing date had passed and the Seller had already issued a notice of breach and termination. The loan documents (ordinarily finalized before the closing date) were only being circulated and signed at 7:00 p.m. EST the day after closing. The Agent replied: "Thank you. I was about to call you. Lol." This could be somehow read as suggesting some delay on the Buyer's part (a stretch), but the timestamps show otherwise … the Buyer acted within roughly thirty minutes of receipt. He clarified immediately – "Just saw it," indicating he had signed promptly upon notice.

356. At 7:05 p.m. EST, the Agent wrote: "Now They will issue the CTC by tomorrow so all the dates are aligned for my call to Lorene. Lol." Upon information and belief, the Agent

wanted to have all final lender documents (especially the Clear to Close) aligned before calling the Seller's attorney to strengthen the Buyer's position that he remained ready, willing, and able to close. The Buyer replied: "Ok sounds good. I'd also say to [tell her] you spoke to the attorney [*i.e.*, Agent's counsel] and Buyer is planning to move ahead. Attorney agreed that covid is a force m[a]jeure. Seller is backing himself into litigation." The Buyer was asking the Agent to reinforce three points: (1) that she had consulted her own counsel, (2) that Seeler herself had acknowledged (over the phone) that COVID qualified as a force majeure event, and (3) that the Seller's refusal to close would inevitably lead to litigation (something the Buyer wished to avoid but was prepared for). The Agent confirmed: "Yes."

357.    On Thursday, January 20, 2022, at 9:41 a.m. EST, the Buyer texted the Agent asking her to call him back. At 12:57 p.m. EST, he followed up: "Anything on the CTC?" Hearing no response, the Buyer tried calling the Agent at 1:42 p.m. EST, but again received her automated unavailable message. At 2:45 p.m. EST, still having heard nothing, the Buyer messaged: "I need the CTC!" Roughly forty-five minutes later, still without a reply and now only about ninety minutes before the close of the business day, the Buyer texted again, his frustration evident: "SERIOUSLY … the whole day has gone by AGAIN."

358.    At 3:31 p.m. EST, the Agent finally messaged Rothstein: "Hiya. Checking in on eta for clear to close." Rothstein replied: "not sure, don't want to guess. I did just email her and just say I'm hoping that everything is there for CTC." The Agent responded: "Great. Thanks buddy. Remember I need extension as closing."

359.    By this point, the Buyer was already two days past his contractual Closing Date. His texts demonstrate increasing distress over the Lender's silence and repeated delays, while the tone of internal communications between the Agent and Rothstein reflected little urgency. The

Lender's continued lack of communication and failure to issue *Clear to Close* in a timely manner underscores the systemic indifference and disorganization that ultimately prevented the Buyer from performing within the contractual period.

360.    At 4:13 p.m. EST, the Buyer finally received a response from the Agent: "Hang on. On chat with change." A minute later, the Buyer replied: "If I can get CTC I can beat this." At 4:33 p.m. EST, he followed with: "Call me asap." Then, at 5:33 p.m. EST, he texted again: "Spoke to another attorney. If we get the CTC I can salvage this." The Agent replied: "I working on it honey."

361.    An hour later, at 6:38 p.m. EST (having received nothing from the Agent) the Buyer messaged once more: "Did they not get it again?"

362.    On Friday, January 21, 2022, at 8:22 a.m. EST, the Buyer messaged the Agent: "Please Susan, for the love of God, get me a clear to close today." The desperation is self-evident: no CTC the day before, few updates from the Agent, and the last business day of the week. The Buyer believed that with *Clear to Close* in hand, he could still (mistakenly as it turned out in court) force performance using his CFPB "Consumer" "Protections;" instead, each day slipped by while he waited on the Lender.

363.    At 9:32 a.m. EST, Rothstein messaged the Agent: "Got your email. Need a cost estimator on homeowners please asap. Did you send?" The Agent replied: "Sent." Rothstein acknowledged receipt. The Agent then wrote: "I'm gunna ask. Are we clearing today cuz I'm about to fire him." Buyer later confirmed with Agent, "him" referred to Buyer. Rothstein responded: "Don't call him, let me work on it." The Agent: "Kk." Rothstein then added: "Ctc coming soon, schedule for Tuesday. No earlier. Call you when off phone." Wow, Agent was poised to "fire"

143

Buyer? Rather than the other way around? Really? Or, was this a reference back to her threats to Marrazzo about declining the loan if the Buyer gave her any more problems?

364.   At 10:19 a.m. EST, having heard nothing from the Agent, the Buyer asked her to call him. Twenty-nine minutes later he texted again: "I have to deal with this TODAY! WHAT IS THE STATUS OF THE CLEAR TO CLOSE?" (emphasis in original). At 11:09 a.m. EST, now completely fed up with Agent's silence, he wrote: "I need a response immediately."

365.   At 11:12 a.m. EST, the Agent finally replied: "I have spoken to [R]ussell 3 times this morning. He said give him a few minutes he's working on it. If I report that to you it doesn't change the CTC not being here so let him complete it and we will get it to you. I told him that if not today *we will be named in [a] lawsuit[.]* Give me a few minutes[.]" (emphasis added). Quite prophetic that there was a recognition that Defendants' subpar (put mildly) conduct lent itself to being named in litigation.

366.   At 11:13 a.m. EST, the Buyer wrote: "I have an email put together [for Lorene Seeler] when you have that [CTC] I want to read you as well. Our request for extension (most recent 01/17) today so either way we have to have it [CTC]." Buyer intended to present CTC alongside the already-tendered Addendum 4 (January 17, 2022), hoping to force a firm close.

367.   At 11:24 a.m. EST, the Agent asked the Buyer to call her. On that call, she informed him the loan was finally *Clear to Close*. At 11:35 a.m. EST, the Agent drafted an email to Seeler and first sent it to the Buyer for review.



368.     Although it was admirable that the Agent ultimately took responsibility, her statement constitutes a direct party admission of liability on behalf of the Lender. The Agent's own words confirmed that "all delays on the file were outside of the buyer's control[.]" This is not an excuse, it is an acknowledgment that the failures were systemic and internal to the Lender.

369.     The Lender had a fiduciary obligation, among others, to act diligently, in good faith, and with professional competence once entrusted with the Buyer's loan file. That obligation extended not merely to processing paperwork but to ensuring the loan could close within the contractual timeframe the Buyer was legally bound to meet. Instead, the Lender repeatedly disregarded those deadlines, despite having possession of the Buyer's full file since October 2021.

145

370.     The reasons offered for delay (such as year-end holidays, staff absences, or even temporary illness) were/are neither unforeseeable nor uncontrollable. They are routine, predictable business contingencies that any competent lender must plan for. Thus, the Lender's reliance on such justifications underscores negligence (at minimum), not impossibility. These admissions confirm that every missed deadline and procedural failure originated with the Lender's own disorganization and lack of urgency, not with *any* inaction by the Buyer.

371.     At 11:47 a.m. EST, the Agent informed the Title Agent (cc'ing the Buyer): "Please be advised that we have CTC. [P]lease let me know when the closing date is confirmed[.]"

372.     At 12:26 p.m. EST, Rita Hughes of Change emailed the Title Agent and team at FFF, copying Rothstein, and attached the previously delivered and acknowledged January 19, 2022, CD along with the closing instructions. Buyer's loan was now officially moving to close.



373.    Of note, however, the estimated closing date listed in the Lender's communication was technically inaccurate. The Change documents placed the closing on Monday, January 24, 2022. When properly calculated under federal CFPB timing rules, the earliest lawful consummation date (allowing for the required three full "business-day" waiting period) was actually Tuesday, January 25, 2022 (delivery on the 19th; full day 1 – 20th, day 2 – 21st, day 3 – 24th; consummation date – 25th). Regardless of this immaterial error, the loan was set to consummate on the earliest permissible and compliant date regardless.

374.    At 1:15 p.m. EST, the Title Agent emailed the parties at Change and FFF, indicating that the CD changes she needed to make were attached. She added: "I need to know 24 hours in advance to schedule a notary for this out-of-office closing." Because the Buyer was no longer in

Florida, he could not sign the closing documents in person at the Title Agent's office. The Title Agent, therefore, needed to arrange for a notary to travel to the Buyer's home in Pennsylvania to complete the signing. This requirement for 24 hours' advance notice inadvertently delayed the signing by a day; but, in doing so, it corrected the Lender's earlier error. The 24-hour notice period shifted the closing from the technically improper date of January 24, 2022, to the proper, federally compliant consummation date of January 25, 2022. Five minutes later Rita Hughes from Change emailed back: "Should I send the doc[uments] for 1/25 instead?" Some more emails were exchanged and the closing/consummation was ultimately set for Tuesday January 25, 2022, at Buyer's home in Pennsylvania.

375.    At 1:43 p.m. EST, Agent messaged Rothstein, having now finally obtained CTC: "Are you out drinking?" Notably, the pressure the two agents felt was of their own making, but it was real pressure. They had missed every single deadline the Buyer had, but, at this point, outside of having to wait to meet the federal CFPB CD delivery timing guidelines, Buyer's loan was almost ready to consummate, Tuesday January 25, 2022, being the soonest Buyer could legally close.

376.    At 1:49 p.m. EST, Rita Hughes of Change emailed the Title Agent, "Team Stein" (FFF), and cc'd Rothstein and Karie Borodkin of Change. The message set forth the total funds needed from the Buyer ($246,644.39) and then stated: "**I'll need an extension** to the offer for closing on 1/25/22 prior to funding" (emphasis added).

From: Rita Hughes [mailto:Rita.Hughes@ChangeWholesale.com]
Sent: Friday, January 21, 2022 1:49 PM
To: Joanne Kretzschmar <Jkretzschmar@acestitleagency.com>; Team Stein <TeamStein@fam1fund.com>; Non Del <Nondel@fam1fund.com>
Cc: Russell Rothstein <Russell.Rothstein@ChangeWholesale.com>; Karie L. Borodkin <Karie.Borodkin@ChangeWholesale.com>
Subject: RE: Fyk 28382

See attached CD for 1/25/22. Adjust your prepaid interest and escrows and we should balance. Bottom line from borrower $ 246,644.39

I'll need an extension to the offer for closing on 1/25/22 prior to funding.

Congratulations!

Closing package has been released to      jkretzschmar@acestitleagency.com

**WET STATES:** Docs are date sensitive! If borrower(s) do sign on the NOTE date, please contact me ASAP for redraw.

**This loan has been selected for PreFunding QC. Turn Times for review is 48 hours. Our earliest Disbursement Date will be:1/25/22**

**In order to receive Funding approval, email me a full pdf copy of the signed closing package immediately following the signing**

**Note in addition we need the following items for funding:**

**ESCROW CONDITIONS**

- Please confirm you balance to the wire amount $ 1,029,600.97
- Please confirm Anticipated Funding date  1/25/22

**BROKER CONDITIONS**

2

Please complete and send back to me at your earliest convenience.

- Misc-Final Typed 1003 –LO to sign-date (Attached)

**NEW SHIPPING ADDRESS FOR DOCS**

**All closing packages must be overnighted within 24 hours to:**
Change Lending LLC
Post Close Department
175 N Riverview Drive
Anaheim, CA 92808

Thank you for the opportunity to assist on this and future transactions!

377. This extension requirement is pivotal. It confirms that the Lender would not fund without an "extension" in the file acknowledging a later closing date, thereby shifting responsibility back onto the Buyer to somehow obtain a voluntary extension from the Seller, which

149

was already impossible. By that point, the Seller had issued notice of termination and refused to sign any further addenda.

378.     This loan could only have proceeded under contractual obligation, either through the CFPB's self-executing disclosure-timing extension or under the contract's Force Majeure provisions. Yet rather than accepting accountability or engaging their own counsel to protect the Buyer's interests (*i.e.,* force the Seller to comply with that lender extension), the Lender left the Buyer to shoulder the impossible task of obtaining an extension for delays entirely of the Lender's own making.

379.     Meanwhile, the Buyer was entirely unaware of this new "extension" condition at the time, as he had not been copied on that communication. Under CFPB TRID regulations, the timing adjustment triggered by a delayed CD should have been automatic and self-executing as a matter of federal law; it does not require a voluntary "extension" by either party. Accordingly, Change could have lawfully proceeded to consummation on the adjusted timeline regardless of whether the Buyer obtained another contractual extension, because federal law had already supplied the required timing accommodation. Under these circumstances, the Lender's obligation to comply with TRID should have automatically extended the Closing Date under Section 5(a) of the FAR/BAR contract at the end of business on the contractual Closing Date, and both Buyer and Seller would have *shared the corresponding duty to perform* on that automatically extended schedule.

380.     But that is not how the court in the Buyer/Seller dispute saw it. The Court concluded that the Lender's earlier request for a CFPB-based extension had already "used up" the Buyer's contractual protection, leaving the Buyer—despite being the consumer TRID is *designed to protect*—stripped of the benefit of federal law protections because of the Lender's premature and

150

legally improper "use" of his contractual extension rights. In practical effect, because the Lender had made the initial request, and because the Realtor suggested attaching that request to the Buyer's own extension request (Addendum 3), and because the Buyer understood that the Lender's request was being included (per the Lender professional request and the Realtor's professional suggestion), the Buyer inadvertently and unknowingly forfeited the very federal "Consumer Financial Protections" TRID provides. While the Court's determination was, respectfully, legally unsound, it nevertheless stands.

381.    When the Buyer later became aware that an extension would be needed, it inspired the Buyer's "plan" (discussed below) to incorporate a Lender-generated extension addendum directly into the closing documents, so that the extension would be acknowledged at consummation by *both parties* and memorialize that the Buyer's performance complied with federal law. Under that structure, once the Buyer signed, he would have fully performed in accordance with Section 5(a), and any refusal by the Seller to sign would constitute an independent breach, as it would represent the Seller's rejection of a self-executing, federally imposed extension that existed to protect the Buyer's consumer-lending rights. That strategy should have prevailed in court, but, again, because the Lender had prematurely requested the CFPB extension, it too was deemed ineffective.

382.    The Agent's subsequent request that the Buyer obtain a voluntary written extension from the Seller was accordingly procedurally baseless, a condition neither required by law nor capable of being met given the Seller's prior termination posture. Yet that misplaced demand on the Buyer became the inadvertent pretext for the Realtor's introduction of a falsified extension addendum into the file, further corrupting the record of performance and misleading Change.

383. Upon information and belief, Duval, *acting entirely outside the Buyer's knowledge or consent,* fabricated or altered an extension addendum (possibly Addendum 4) and delivered it to Belese, who then transmitted it to Change as an official extension (without the Buyer's or Seller's knowledge) to satisfy the Lender's internal extension requirement. This unauthorized document, in theory, enabled the loan to proceed toward closing even though neither the Buyer nor the Seller ever saw, approved, or executed it.

384. The Realtor's misconduct compounded the harm by falsifying that document to satisfy a condition the Lender should never have imposed on the Buyer in the first place, all *without* the Buyer's knowledge or authorization. RE/MAX, as Duval's supervising brokerage, is vicariously liable for her actions, which constitute, at minimum, material misrepresentation, breach of fiduciary duty, and negligent supervision under Florida law.

385. At 2:13 p.m. EST, Agent messaged Buyer: "She's calling me back." Upon information and belief, "she" referred to Noreen, the underwriter. At 3:16 p.m. EST, Agent messaged again: "Is there a reason you are calling David [Stein]?" Buyer replied: "Yeah. I want to see if your company [FFF] will involve an attorney." Buyer was not legally represented at the time and had grown increasingly concerned that both his Agent and Realtor were ill-equipped to challenge the Seller's counsel (a concern that proved true). Since the Lender was a main cause of the delays, Buyer sought to escalate the matter to Agent's supervisor, Stein, to determine whether FFF (or Change) would take the necessary responsibility and engage legal counsel formally to address the Seller's termination attempt.

386. Despite FFF's malfeasance in handling the loan, FFF and/or Change declined to involve an attorney to protect the Buyer's interests. The Buyer was left to fend for himself to deal

152

with the problems that the Lender had created for him. Agent then replied: "I [will] call you in a minute. David is in a meeting—asked me to call you."

387.   At 4:49 p.m. EST, Buyer asked: "Did you ever hear from Lorene [Seeler]?" Agent responded a minute later: "No. I just called again but her office closes at 4 p.m."

388.   At 5:31 p.m. EST, Buyer asked: "Will David be getting back to me?" Agent replied: "No. I told him I'll handle the letter, and he will send it to you, but I told him what you wanted." Buyer had hoped to speak directly with Stein to escalate the issue and request that FFF involve legal counsel to intervene with the Seller's attorney, but Stein could not be bothered to take the call or call back. Instead, Agent stepped in to handle the matter herself, despite having no authority to engage or direct legal counsel on behalf of FFF.

389.   At 5:45 p.m. EST, Buyer wrote: "That needs to happen ASAP. Also, I sent the attorney [Seller] one last offer to settle it amicably." Agent acknowledged: "I saw it." Buyer had offered to return the $10,000.00 seller's concession; the goal was to persuade the Seller to voluntarily proceed with closing and avoid litigation. FFF's refusal to intervene or formally involve legal counsel, however, left the Buyer with no other practical recourse other than to prepare for his own legal action.

390.   At 9:58 p.m. EST, after conducting his own research online, Buyer messaged Agent: "When was the CD disclosed on this loan?" He then sent an image from the Berlin Patten Law Group website quoting Section 5(a) of the Florida FAR/BAR real estate contract, followed by: "May have an idea."

391.   The Buyer was now actively educating himself on the CFPB regulations (knowledge the Lender, as a licensed professional, should have possessed) and on the very provisions the Lender should have properly invoked at the end of business on the Closing Date if

it was not ready to fund the loan, rather than prematurely requesting an extension and using up Buyer's CFPB extension before it was actually needed. By this point, Buyer was effectively doing the Lender's job, identifying the legal mechanisms that could have saved the transaction (*i.e.,* had the court come to the proper legal conclusion). Buyer then sent an image that explained that, under Section 5(a) of the FAR/BAR contract, if a lender's funds are not available at the time of closing because the lender must comply with mandatory federal disclosure requirements, the Closing Date "shall be extended" until those requirements are satisfied. In this case, the Lender could (and should) have directly notified the Seller's attorney, substantively stating along these lines:

> Pursuant to Section 5(a) of the FAR/BAR Contract, the lender's funds were not available at close of business on January 18, 2022 at the end of business day, because federal CFPB disclosure regulations required additional time to fund. Accordingly, the Closing Date shall be extended until those requirements are met, which will occur on January 25, 2022, when the loan is ready for consummation whether the Seller agrees or not.

392.    Had such a communication come from the Lender (or from counsel acting on its behalf), the Seller would have had both notice and a legal basis to proceed with closing under the contract's automatic extension clause. Instead, Buyer, who was not a lawyer or a real estate professional and had no formal understanding of CFPB timing rules, was left to argue the point himself without the institutional authority or credibility necessary to compel Seller performance (*i.e.,* convince the Seller's attorney that the Seller was still obligated to perform after the Closing Date).

393.    At 10:12 p.m. EST, Agent responded: "I think Wednesday *after* the closing date." (emphasis added). Buyer replied: "Yeah[,] I just found it. Useless." Just as the court later held, the final CD had been delivered "after" the contractual Closing Date, and Buyer already recognized that this delayed delivery might render the CD "useless" for purposes of enforcing the CFPB's automatic extension. Ultimately, the court in the Buyer/Seller dispute held (rightly or wrongly)

that the CD's post-closing delivery disqualified the Buyer from invoking the CFPB timing extension as a matter of law.

394.    At 10:25 p.m. EST, Buyer messaged:

So, the way this reads … if the CD is not available on [the] Closing Date due to CFPB requirements (which it wasn't on the 18th) but delivered on the 19th instead, the Closing Date is auto-extended 10 days. Addendum 3 was an extension but not a CFPB extension because there is no mention of it. It was a straight extension. Thus the loan's CFPB requirements allow for 10 days from the closing deadline. The 18th pushes the deadline to the 28th which we can hit!

395.    Here, Buyer had accurately identified the pivotal timing issue – that under CFPB (TRID) regulations, the delivery of the CD *after* the Closing Date triggered a self-executing extension period, one that, if recognized by the court, would have preserved the contract through January 28, 2022. The court in the Buyer/Seller dispute, however, later disagreed, determining that the automatic extension did not apply retroactively to the expired Closing Date when the CD was delivered after the Closing Date.

396.    At 10:28 p.m. EST, Agent responded:

Yeah just look and see if the[y] want the issue date or the 3-day waiting period for the CD. So I think the law states you can waive the CD 3-day rule if you are in jeopardy of losing the home. So make sure the contract is talking about the lender issuing the CD or if they say it needed to be issued 3 days prior to the 18th OR if the contract protects you since the CD wasn't issued until after so you couldn't close since the lender didn't issue the CD. Understand?

397.    The Agent was, at this stage, attempting to clarify with the Agent (who professionally should of known, but did not) whether the CD had to be issued before the Closing Date or whether it could be issued afterward, provided the three-day acknowledgment rule was satisfied. This was precisely why the Buyer sought to involve the Lender's counsel, to obtain an authoritative legal interpretation of the CFPB timing rules and convey that position to the Seller's attorney, which might have facilitated Seller performance on January 25, 2022.

155

398.    Buyer's position (then and now) was that the CD could lawfully be issued any time prior to consummation or within the ten-day CFPB extension window, and that the contract's "time is of the essence" clause was subordinate to federal disclosure law, which preempts conflicting state deadlines. Nonetheless, the trial court reached the opposite conclusion, effectively penalizing the Buyer for the Lender's regulatory noncompliance, a result that turned the Lender's statutory duty into the Buyer's contractual burden, necessitating, along with everything else averred herein this action.

399.    At 11:54 p.m. EST, Buyer wrote excitedly:

Holy shit… we got this. CD was not supplied 3 days prior to close. We asked for an extension [ on January 3] which the seller agreed to [on January 4]. We got a voluntary extension [before the original Closing Date], which gave us 5(a) 'as a valuable backup tool.' The Seller doesn't want to close but this triggers the automatic extension pursuant to the rules of CFPB! CD was delivered on the 19th. Even if you consider the closing date as the 17th, we have till the 27th automatically. We are closing the 25th! Read this! We can stop them. http://berlinpatten/buyer-protection-what-about-the-automatic-extension/.

400.    Buyer then attached the following screenshots from the Berlin Patten Law Group's blog, which explained the automatic ten-day extension rule under the CFPB and advised that a Buyer should still seek a voluntary extension to preserve Section 5(a) of the contract "as a valuable backup tool." Despite having correctly identified the governing law and contractual safeguard, Buyer's discovery came too late, after the Lender had already failed to assert those protections on his behalf (through its own counsel, for example)  on the close of business on January 18, 2022, at precisely 5:00 p.m. EST.




401.    At 11:56 p.m. EST, Agent responded: "Yeah that was the point I was trying to make. Good. I'm glad. This will all work out hopefully. And then we can hopefully [close]. And then we can laugh about it lol." The loan ultimately did not close obviously, and Buyer is not laughing about it at all. He continues to fight (*years later*) to recover what he lost as a result of everyone else's incompetence, unprofessionalism, and/or apathy.

402.    On Saturday, January 22, 2022, at 9:57 a.m. EST, in response to an email from the Seller's attorney insisting that the Buyer was out of contract and had no extension rights, the Agent

texted: "Did you see email[?]" Buyer attempted to call the Agent but received no answer, then asked her to call him back so they could discuss it. He followed with another message: "You said awaiting scheduled date. Tuesday it's scheduled."

403.    More emails were exchanged between the Buyer and the Seller's attorney, prompting the Buyer's later text to the Agent at 11:44 a.m. EST: "The Seller is a f$%^ing idiot or just tried a bluff." At 2:51 p.m. EST, Buyer asked: "Would my preliminary email regarding the matter be helpful?" Later that evening, at 7:12 p.m. EST, Buyer asked the Agent: "Any update on getting in touch with that attorney friend?"

404.    Having received no assistance or response from Stein previously, the Agent indicated she was trying to involve a lawyer friend of hers to provide free *informal* legal guidance. No formal legal representation was ever engaged by the Lender or its Agent to assert the federal disclosure requirements of the Force Majeure on the Seller or Seller's counsel, despite the fact that it was the Lender (not the Buyer) who needed the extension to perform. The Lender was duty-bound (along with morally-bound, we submit) to defend and justify its own regulatory delays, not to shift that burden onto the Buyer.

405.    At this juncture, it was the Lender's responsibility (not the Buyer's) to defend its own delay and compel the Seller's compliance under the contract. The Lender alone had both the authority and obligation to explain that consummation could not occur on January 18, 2022, due to federal CFPB timing requirements, and that the contract was accordingly automatically extended under Section 5(a) of the FAR/BAR agreement. Instead, the Lender declined to engage counsel, forcing the Buyer to defend the Lender's failures without representation or institutional backing.

406.    That the Buyer had to even ask the Lender to "involve an attorney" underscores not only a breach of fiduciary duty and the covenant of good faith and fair dealing, but also willful negligence – a knowing decision to avoid performing for the Buyer once the transaction became difficult.

407.    On Sunday, January 23, 2022, at 9:49 a.m. EST, Buyer messaged the Agent: "I think I understand what their argument is going to be. Call me when you can." At 1:18 p.m. EST, Buyer texted again: "Susan… Steve [Agent's friend attorney] said he would reach out when he was less vodka induced today. I want to run an email past him and see his thoughts."

408.    At 2:20 p.m. EST, Buyer emailed the Title Agent, his Realtor, and Agent Belese (*see* below). In that message, Buyer confirmed his understanding that the Lender's disclosure delay should have triggered an automatic CFPB/TRID extension and sought to verify that analysis before responding to the Seller's attorney (something legal counsel could have done had the Lender obtained it). This contemporaneous email shows Buyer had correctly identified the legal basis to extend the closing under Section 5(a) (even though the court in the Buyer/Seller dispute later ruled otherwise) and that he alone was actively working to complete performance despite the Seller's refusal and the Lender's failure to formally assert the protections necessitated by its own delay.



409.    On Monday, January 24, 2022, at 7:55 a.m. EST, Buyer messaged Agent: "Call me when you get going. I have a plan." The "plan" was, as mentioned previously, to incorporate a Lender-generated extension addendum (to be signed by both Buyer and Seller) into the closing documents. This would ensure that the loan package reflected both parties' acknowledgment of the CFPB's mandatory disclosure waiting period and confirm that the extended consummation date resulted from the Lender's federal compliance obligations, not from any failure or delay by the Buyer.

410.    Because the Lender could not lawfully fund the loan until the waiting period expired, the Buyer was effectively bound by the same federally imposed delay as the Seller. By including the addendum directly in the closing package, the Buyer sought to memorialize his

continued readiness and compliance, while also pushing back the duty of securing an extension (from both Buyer and Seller) onto the Lender (again, because he was unaware the Realtor had provided a forged extension to the Lender), the party actually responsible for creating the overall delay. In doing so, the Buyer was performing the Lender's job (and to some degree even the Realtor's job) for them – crafting the legal mechanism necessary to preserve the transaction's validity and ensure that consummation could proceed within the bounds of federal law (had a future court correctly ruled). Buyer was already preparing for the legal fight that he saw brewing on the horizon if the Seller failed to consummate the closing documents.

411.    Agent immediately replied: "Just woke up. Drove home yesterday give me a few." A little over an hour later, at 9:25 a.m. EST, Buyer asked: "Do you have the wire amount?" The bank had just opened, and Buyer was preparing to head to Fulton Bank to initiate the wire transfer to the Title Company. Agent responded: "Joanne does." Buyer immediately replied: "I got it. The CD has it. $259,553.32 is what I have."

412.    At 9:39 a.m. EST, Agent stated: "Ask Joanne cuz you have to make sure about any adjustments for taxes etc We don't give finals. Title co and lawyers [do]." At 9:42 a.m. EST, Buyer said: "I got it. I have one outstanding real estate question. That needs to be resolved." Agent said: "Ok."

413.    At 11:46 a.m. EST, Buyer tried calling the Agent. The Agent texted back: "Call you right back."

414.    At 12:50 p.m. EST, Agent sent the email shown below to the Title Agent, the Seller's attorney, and the Buyer, while also copying both Realtors and the Seller himself. In other words, every principal and professional involved in the transaction was made aware of this communication.

161



415.    This email confirms beyond any doubt that **"the buyer was ready, willing, and able to close at any time."** It further acknowledges: **"This was out of the buyer's control and we ask that the seller reconsider his position."** The message explained that the delay was caused *entirely* by the Lender's failure to timely issue the CD required by CFPB (TRID) regulations, not by any failure of the Buyer to perform. The Agent expressly noted that additional time was needed to meet federal disclosure requirements, and that the Lender had issued the CD on January 19, 2022, which placed the earliest lawful consummation date for the Buyer, Seller, and Lender at January 25, 2022.

416. Much of the later judicial confusion stemmed from inadvertent clerical misstatements in this very correspondence. The CFPB does not require delivery of the CD "prior to closing," it requires delivery three business days *prior to consummation*. Likewise, the TRID extension is not a matter of "request" or "approval," it is self-executing under the law. Nonetheless, the court mistakenly treated the Lender's January 4, 2022, reference to a "request" for extension as though it were a one-time election (*i.e.,* "use"), and accordingly declined to recognize the automatic extension triggered by the January 19, 2022, CD delivery.

417. While the court's holding was facially erroneous, it has now compounded the harm the Buyer has suffered – first at the hands of the Lender (who caused the overall delay), then at the hands of the Seller (who refused to perform pursuant to Section 5 of the Contract), and the court, which completely misapplied the governing federal regulations. The cumulative result is that every contributing party escaped responsibility, while the Buyer (who remained ready, willing, and able to close throughout) has suffered the full measure of the loss.

418. Had the CFPB regulations been properly conveyed by competent counsel acting on behalf of the Lender, the Seller may well have reconsidered his position and proceeded to comply with the contract, rather than initiating litigation that (due, in part, to the court's misunderstanding of the applicable law) ultimately resulted in an adverse outcome for the Buyer. The decisive failure was not the Buyer's conduct, but the absence of legal precision and authority in the Lending Agent's (*i.e.,* Agent acting as Change Mortgage's Broker) communications. Without the weight of opposing counsel affirming both the legal validity of the CFPB's automatic extension and the Lender's responsibility for the delay, the Seller and his attorney understandably dismissed the Agent's informal statements as nonbinding. This failure of representation (both in expertise and authority) ultimately caused the Seller to stand firm, refuse to close, and drive the Buyer into

litigation, where the error was compounded by the trial court's own legal misunderstanding of federal lending law. *Ultimately, none of this happens if Defendants had not so royally screwed things up … if Defendants had not so badly failed Fyk (time and time again) throughout the subject real estate transaction, Fyk would have long ago owned and enjoyed the Property.*

419.    At 1:15 p.m. EST, Buyer called again, and the Agent responded: "On hold for Lorene. Hang on." Buyer replied: "Don't say much. The seller has to sign the extension but that's on the seller, not the buyer." At this point, the Buyer believed he had placed the Seller in a form of legal check (chess) – if the Buyer signed the closing documents (even after the Closing Date)he would cure any technical default within the federal TRID timeline (assuming the Court applied federal law correctly). Under that structure, a refusal by the Seller to sign would constitute a material breach. The Buyer could not reasonably have foreseen the Court's later misapplication of federal lending law, which resulted in the Seller (who admitted he "chose" not to close for financial reasons) being effectively rewarded, while the Buyer (whom the court acknowledged caused no delays) was penalized for the Lender's failures.

420.    Consistent with the Buyer's "plan," an extension permitting consummation on January 25, 2022, was, upon information and belief, included in the final Closing Documents prepared for execution. Under the governing TRID and FAR/BAR framework, the Buyer's formal execution of those documents (signing) would have fully cured his technical default, and the Seller's refusal to sign the ministerial, Lender-prepared extension (necessary to effectuate the automatic federal timing adjustment) would have shifted the failure of performance to the Seller. In other words, the Buyer would have fully complied with the contractual and statutory structure, while the Seller's refusal to execute the extension would have constituted a willful breach.

421. That legal distinction was, however, never properly recognized in court. Rather than properly assigning responsibility to the Seller for failing to execute the ministerial act necessary to close (or to the Lender for creating the delay in the first place), the trial court improperly attributed the performance failure entirely to the Buyer who had literally done *nothing wrong*. This misallocation of fault ignored the reality that the Lender caused the delay, the Buyer timely cured it, and the Seller obstructed the final step necessary to complete performance, while the court in the Buyer/Seller dispute disregarded federal law and consumer-protection principles in finding against the Buyer. The court's determination is admittedly bizarre, but again, *it is what it is*.

422. Between 1:22 p.m. and 4:02 p.m. EST, several calls between the Agent and Buyer were requested and took place as the situation grew increasingly uncertain.

423. At 4:29 p.m. EST, Agent messaged Rothstein: "Hey Russell, can you ask your closing department to send me closing instructions stating extension to contract before funding. Where do you put that[?]"

424. Consistent with the Buyer's "plan," and upon information and belief, the Agent was requesting that Change's closing department include a Lender-generated extension acknowledgment, a formal document recognizing that the closing date had been extended by operation of federal law (CFPB/TRID) to accommodate the delayed disclosure period. Her follow-up question ("Where do you put that?") confirms that the Agent was seeking guidance on where to integrate that extension acknowledgment within the loan's closing package.

425. This message is particularly significant because it shows the Lender recognized that an extension was required before funding yet failed to take responsibility for issuing or obtaining it directly. Instead of formally preparing and executing its own extension acknowledgment,

165

Change shifted that compliance duty onto the brokering Agent and Buyer (parties without the authority or legal obligation to fulfill it).

426.    It is believed that in the Realtor's rush to close the deal, this abdication of responsibility became the pretext for her fabricating the fake extension agreement to satisfy the Lender's condition requirement. That falsified document, however, appears to have been abandoned mid-process (possibly never transmitted to Change) because the Buyer's lawful and well-reasoned "plan" sought to correct the error (extension responsibility duties) by incorporating a legitimate, Change-generated extension directly into the closing package.

427.    In short, what should have been a straightforward Lender duty to issue and document a federal compliance-based extension was instead mishandled, misdelegated, and ultimately corrupted, forcing the Buyer to devise a solution that should have properly originated from the Lender's legal or underwriting department.

428.    At 5:32 p.m. EST (still on January 24, 2022), Buyer messaged the Agent: "How long would the loan be good for? Assuming he doesn't sign. The day goes by. We go to mediation and he agrees to close [in] a couple weeks. Could the loan be reinstated?"

429.    At 5:37 p.m. EST, the Agent replied: "Yeah we would hold it open with a new estimated closing date." Buyer responded: "Perfect. Ok so the gauntlet has been thrown [the chess move had been made]. Now we see what they do." The Agent replied with a crossed-fingers emoji, signaling hope that the Seller would simply relent and close. This exchange reflects that, even at this late stage, the Buyer remained fully engaged and prepared to perform and defend his contractual rights, while the professionals responsible for managing the transaction (the Lender, Realtor, and even the Seller) had already abdicated their respective duties, leaving the Buyer to navigate an increasingly untenable situation *alone*.

430. At 9:01 a.m. EST on January 25, 2022, the operative consummation/closing date, Agent texted Russell Rothstein: "2 min." Rothstein replied: "We going to close?" At 10:26 a.m. EST, Agent sent another message: "I'm not 100 on that. They are trying to work it out with lawyers. Lol." Rothstein responded with a rolling eyes emoji. Once more, this situation was by no means something to "lol" (laugh out loud) about or roll eyes over.

431. At 10:29 a.m. EST, Agent messaged the Buyer: "What, no call, text, or email? I'm not sure what to do with my day when I don't hear from you lol. Jk [just kidding] What's the latest?" Buyer attempted to call but did not reach her. At 10:34 a.m. EST, Agent replied: "I have to call you back, have a conference call." Two minutes later, Buyer responded: "Ok."

432. That same day, the Title Company sent a notary to the Buyer's home in Pennsylvania with all consummation/closing documentation. The Buyer signed the loan documents, confirming that he was (and had always been) financially qualified and capable of closing. The failure to close on time was not due to Buyer's inability to perform or inability to obtain financing, but rather the Lender's repeated administrative and procedural delays that prevented timely preparation of the loan package. The Seller nevertheless declined to perform, terminating the contract. Mediation was subsequently scheduled, but resulted in an impasse, forcing the Buyer to proceed with litigation against the Seller for specific performance and damages (and also, for that matter, to exhaust absolutely every avenue of recourse before resorting to this lawsuit).

433. At the conclusion of mediation on February 2, 2022, Fyk commenced litigation against the Seller in the Seventeenth Judicial Circuit Court in and for Broward County, Florida, seeking specific performance and damages arising from the Seller's refusal to close on a residential real estate contract (*i.e.,* 2752 NE 3rd St., Pompano Beach, Florida 33062). This action was the

167

Buyer's initial and proper avenue for relief, as the Seller was the contracting party under the Residential Purchase and Sale Agreement ("Contract") and Fyk deemed it appropriate to first pursue the party in privity of Contract before asserting claims against non-contracting third parties (Defendants here).

434. In this Buyer/Seller dispute, Fyk alleged that the parties entered into a valid and enforceable agreement, that he was ready, willing, and able to perform all contractual obligations at all times, that he believed (based on representations made by his Lender) that he had timely obtained financing approval on November 9, 2021, and that he stood prepared to close in full compliance with the Contract terms. Although later evidence revealed, as detailed in this Complaint above, that the purported November 9, 2021, loan approval issued by FFF was fake, the Buyer's good-faith understanding at the time of filing (and later testifying) was that financing had been properly secured in November 2021 and that he remained fully prepared to perform under that Loan Approval and the Contract at all times. Fyk alleged that, despite the extension provisions in the Contract, that the Lender attempted to invoke on two separate occasions, the Seller refused to proceed with consummation (in contravention of the Contract's requirement of continued performance after the Closing Date pursuant to Section 5) and wrongfully attempted to terminate the agreement prematurely and without lawful cause.

435. The complaint in the Buyer/Seller dispute asserted that the Seller's refusal to close constituted a material breach of contract and was done in bad faith, depriving the Buyer of the benefit of his bargain and causing substantial harm. In other words, the Buyer had forced the Seller into legal cheek-mate had the court properly applied the law I the Buyer/Seller dispute. The Buyer maintained that the Property was unique and that monetary damages alone could not provide an adequate remedy. Accordingly, the primary relief sought was specific performance along with

incidental damages, compelling the Seller to complete the sale as originally agreed and to compensate the Buyer for the financial harm incurred as a result of the Seller's failure to perform.

436.    In the alternative, should specific performance prove impossible or impracticable, the Buyer sought full compensatory damages for the Seller's breach, including return of deposits, consequential damages, loss of the benefit of the bargain, and recovery of attorneys' fees and costs. The complaint in the Buyer/Seller dispute further alleged that all conditions precedent to bringing suit had been satisfied or waived, and that any failure to close was attributable solely to the Seller's conduct, not the Buyer's. As later evidence revealed, however, to the extent the failure to close was not the result of the Seller's premature termination, it was directly attributable to the Lender's misrepresentations and internal mishandling of the loan process … never to any act or omission by the Buyer.

437.    This Buyer/Seller action represented the Buyer's exhaustion of all contractual remedies against the Seller *before* pursuing any claims against the non-contracting parties (Defendants here) whose negligence and misrepresentations later came to light (actually, very recently, such as in October 2025 when Agent Belese voluntarily relinquished her written messaging to Fyk, following Fyk's transmission of the notice/cure correspondence attached here as composite **Exhibit A** and incorporated fully herein by reference). The filing concluded with a request for equitable and monetary relief, asserting that the Seller's wrongful conduct resulted in the loss of a unique Property, significant financial harm, and other damages caused by the Seller's unjustified refusal to perform under the Contract.

438.    On Thursday, November 17, 2022, the deposition of Agent Belese was conducted remotely *via* Zoom before Eleanor M. Evensen, Registered Professional Reporter and Notary Public for the State of Florida, in connection with the matter *Jason Fyk v. A & P Home Investment,*

169

*LLC*, Case No. CACE 22-001692, Div. 21 (Fla. 17th Cir. Ct.). The proceeding was held from 1:30 p.m. to 4:29 p.m. EST and attended by David M. Beckerman, Esquire, of *David M. Beckerman, P.A.*, counsel for the Plaintiff, Jason Fyk (who was also present); and David A. Levine, Esquire, of *Levine Legal, P.A.*, together with Lorene Seeler Young, Esquire, appearing on behalf of the Defendant, A & P Home Investment, LLC.

439. On January 19, 2023, the Seller filed a Motion for Summary Final Judgment. The motion relied on the *"time-is-of-the-essence"* provision of the Contract and the *November 9, 2021 loan-commitment requirement* (which was later discovered to be fake), asserting that the Buyer failed to close by January 18, 2022. The Seller further alleged that the Buyer's *lender caused the delay* by requesting a CFPB/TRID extension due to (foreseeable and preventable) COVID-related staffing issues and by later *requiring* the Buyer to switch loan products after discovering an outstanding condition (a missing Certificate of Good Standing for the Buyer's Delaware corporation … also caused by the Lender). The Seller argued he was entitled to retain the deposit and obtain judgment in his favor.[9]

440. For example, the Seller alleged: "The Buyer's Agent stated to the Seller's Agent that '[p]ursuant to Section 5 of the [C]ontract, the [Buyer's] lender has requested a CFPB extension while the underwriter does the final sign off on the mortgage.' ... The lender needed the additional time for CFPB compliance... because several people had been out with COVID-19." This admission, again, shows that the Lender, not the Buyer, prematurely invoked (*i.e.,* "used" as the

---

[9] Notably, the Seller's attorney never raised any argument regarding the 1099 being issued to the wrong party, because (until this past October) no one other than the Lender knew that there was a second, truly insurmountable issue caused by lender oversight that forced the Buyer to switch loan products. Had the Seller known, it might have offered another point of argument, but it would not have changed the legal analysis: the Buyer had every right to change loan products at any time before the Closing Date, and it was the Lender's oversight—not anything the Buyer did—that made timely closing of that "total new loan" impossible.

court later held) the CFPB extension prior to the Closing Date. Similarly, the Seller stated: "Attached as Exhibit 'B' is an email from the Buyer's lender, Susan Belese of Family First Funding ('Lender') [...] confirming that an extension was being requested 'as per the [C]ontract provision regarding the CFPB rules.'" Again, this shows that the Lender, not the Buyer, prematurely triggered the CFPB extension under Section 5(a) of the Contract. The Seller also asserted: "The Lender testified that they 'weren't ready to close on January 5th' and that no clear to close was obtained by January 5th," confirming that the extension was necessitated by the Lender's inability to close, not by any inaction of the Buyer.

441.    The Seller further alleged: "After the January 18, 2022, extension was entered, it was determined that the Buyer would not be able to close by that date due to an outstanding condition of his loan, which required a certificate of good standing for Buyer's dissolved Delaware corporation." In truth, the corporation was not dissolved; it had merely failed to maintain a registered agent in Delaware, a minor and easily curable issue that could have been resolved had the Buyer been timely advised that the certificate was a prerequisite condition to closing, rather than being notified the day after the original Closing Date. This sequence demonstrates, again, that the Lender failed to timely identify or obtain the certificate, resulting in a last-minute condition that could not reasonably be satisfied before the extended Closing Date. Finally, the Seller stated: "As a result, the decision was made to have Buyer try to apply for a new loan product." The court later adopted this fact, holding *that the loan-product change caused the Buyer's inability to meet the extended Closing Date*, which, of course, was itself the result of the Lender's prior untimely notice requiring a Certificate of Good Standing.

442.    In short, nothing in the Seller's Motion for Summary Judgment identified any actual failure by the Buyer. Instead, every alleged failure was attributed to the Lender's errors, from

171

prematurely invoking the CFPB extension, to missing internal compliance steps, to forcing an unnecessary loan-product change. In other words, the Seller's own motion affirmatively attributed the failure to close to the Lender's mistakes, not to any act or omission by the Buyer.

443.    On October 27, 2023, the Seller filed its Response to Plaintiff's Motion for Summary Judgment opposing a cross-motion the Buyer advanced on April 25, 2023, for specific performance and damages. The Seller re-incorporated his earlier January 19, 2023, Motion for Summary Judgment in full and again argued that the dispute turned on whether the Buyer's lender was entitled to a second CFPB/TRID extension under Section 5 of the Contract. The Seller claimed that the Buyer's agent (*i.e.,* Belese or Duval, not the Buyer himself) had "demanded" an extension on January 5, 2022, stating that the lender was invoking the CFPB provision because several employees were out with COVID-19. According to the Seller, this communication, together with Addendum 3 extending the Closing Date to January 18, 2022, demonstrated that the lender had already "used" the Contract's ten-day CFPB extension and that the Buyer could not rely on it again. The Agent's premature "demand" to invoke the CFPB extension on or before the original January 5, 2022, Closing Date waived the Buyer's own CFPB consumer protection rights afforded under the Contract, rights that existed to protect the Buyer, not to be prematurely exercised/demanded by Change, its brokering Agent (Belese), or the Realtor (Duval). The Seller further asserted that Addendum 3 was ambiguous as to the parties' intent and that parol evidence should therefore be permitted to clarify that the extension was executed solely to accommodate the lender's CFPB request.

444.    Ultimately, the court declined to summarily adjudicate the Buyer/Seller dispute for either party and the matter proceeded to trial; but, relevant to this action are Seller's key arguments that ultimately, at trial, carried the day and that Seller's key arguments all revolved around the

172

wrongdoing/blunders of Defendants here. In a subsequent rehearing, the court also declared that all delays were attributable to the Lender and that the Buyer had caused *none*. And the parties (Buyer and Seller) submitted the following unopposed order for the court's entry:

Case Number: CACE22001692

Closing Disclosure, causing Buyer to not be ready to close on or before January 18. 2022. However, the Court found that no further extension of the closing date was required, since (a) the Seller's intent in executing Addendum No. 3 was based upon the CFPB extension under Section 5(a), and (b) the Buyer's failure to disclose his change in loan products to the Seller – of which the Buyer did not become aware was necessary until on or about January 6, 2022, after the January 4, 2022 Addendum was already executed and in effect - was an independent basis to deny the extension. Therefore, no further CFPB extension was required.

3.  Based upon the foregoing, the Court affirms its findings as set forth in its Final Judgment entered in this case, and Plaintiff's Motion for Reconsideration and Rehearing is Denied.

**DONE AND ORDERED** in Chambers at Broward County, Florida on .

Judge Name
**CIRCUIT COURT JUDGE**
DRAFT DRAFT DRAFT DRAFT

Page 2 of 2

445.    Critically, the Unopposed Order acknowledged: "Furthermore, the Court concluded that the reason the transaction did not close on January 18, 2022, was **due to the lender's error, not the Buyer's,** which ultimately necessitated a change in the loan product, which was not

173

174

disclosed to the Seller. This change in loan product would have required a reissuance of the loan Closing Disclosure, causing Buyer to not be ready to close on or before January 18, 2022." (emphasis added).

446.     Had the Lender not committed repeated, compounding mistakes, the Buyer would never have been placed in such a vulnerable position in court proceedings against the Seller.

447.     Ultimately, the court in the Buyer/Seller dispute chose to simplify the parties' proposed order (see below), but that does not change the fact of what the parties acknowledged and agreed to in the above unopposed order (namely, in pertinent part here, that it was Defendants who screwed everything up).

Filing # 227934783 E-Filed 07/23/2025 09:00:26 PM

**IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

CASE NO. **CACE22001692**   DIVISION: **21**   JUDGE: **Singer, Michele Towbin (21)**

**Jason Fyk, et al**

Plaintiff(s) / Petitioner(s)

v.

**A & P Home Investments LLC, et al**

Defendant(s) / Respondent(s)

_____ /

**ORDER DENYING MOTION FOR REHEARING - UNOPPOSED**

This cause having come before the Court for hearing on July 18, 2025 upon Plaintiff's Motion for Reconsideration and Rehearing, and the Court having reviewed the Motion and Response filed by Defendant, and having reviewed other matters of record, and hearing the argument of counsel and being otherwise duly advised, it is hereby ORDERED AND ADJUDGED that while Plaintiff made strong arguments upon the points raised in his Motion, the Court stands by its Final Judgment entered on April 28, 2025 and Plaintiff's Motion for Reconsideration and Rehearing is Denied

**DONE AND ORDERED** in Chambers at Broward County, Florida on 23rd day of July, 2025.

CACE22001692 07-23-2025 1:13 PM

CACE22001692 07-23-2025 1:13 PM
Hon. Michele Towbin Singer
**CIRCUIT COURT JUDGE**
Electronically Signed by Michele Towbin Singer

**Copies Furnished To:**
David Andrew Levine , E-mail : sarah@levine-legal.com

Page 1 of 2

175

Case Number: CACE22001692

David Andrew Levine , E-mail : david@levine-legal.com
David M Beckerman , E-mail : Diane@Beckermanlaw.com
David M Beckerman , E-mail : DavidMBeckermanPA@gmail.com
David M Beckerman , E-mail : David@Beckermanlaw.com
Lorene Seeler Young , E-mail : Emily@Lsy-Law.com
Lorene Seeler Young , E-mail : ServiceFL@Lsy-Law.com
Lorene Seeler Young , E-mail : Lorene@Lsy-Law.com

448.     On March 10-12, and 21, 2025, a bench trial was held before Judge Michele Towbin Singer to determine which party breached the Contract, and, vicariously, whether the Buyer's inability to close was attributable to his own conduct or to the Lender's mishandling. Although the trial was nominally about breach, the evidence and argument focused almost entirely on the *Lender's conduct*, including its untimely notice requiring a Certificate of Good Standing and its subsequent loan-product change, both of which directly prevented Buyer's timely closing. The Buyer maintained that he (independently) was ready, willing, and able to perform, and that any delays were caused exclusively by the Lender's failures, which were outside his control.

449.     Despite recognizing during trial that the Lender had, in fact, caused "all the delays," the Court nevertheless concluded that the Buyer breached the Contract. The Court reasoned that, even though the Lender's errors caused the inability to close, the Buyer was still in breach because he had not personally ensured that the Seller was informed of the specific detail that the "loan product" had changed despite repeatedly informing him or his agent of the general status of the loan. This conclusion rested almost entirely on the Agent's inaccurate testimony that she never informed the Seller's attorney of the loan change, though later evidence showed that she had.

450.     Moreover, as previously explained, the Agent's January 10, 2022, email explicitly containing the specific loan "product" switch change update (sent to the Buyer's Realtor, Duval) was never properly transmitted/forwarded to the Seller or its agents, despite Duval's independent

176

professional duty to do so. A Buyer is rarely, *if ever*, required to personally convey loan application, approval, or processing updates to the Seller; that function is performed by the Buyer's real estate agent or the lending agent. Thus, any failure to inform the Seller of the specific loan-product change (especially given the repeated status updates already provided and the contract's broad language) was the responsibility of the Realtor or the Agent, certainly not the Buyer.

451. On April 28, 2025, the Court entered its Final Order, ruling in favor of Defendant/Counter-Plaintiff A&P Home Investments, LLC on both the Buyer's Complaint and the Seller's Counterclaim.

452. The court in the Buyer/Seller dispute found that the Seller had no obligation to grant a second CFPB extension or to perform after the contractual Closing Date, and that the Lender-caused delays did not excuse the Buyer's "time is of the essence" performance on January 18, 2022. The Court further rejected the Buyer's force majeure and Property-condition defenses, ruling that COVID-related staffing issues did not qualify as an "Act of God" under the Contract and that the Seller's countertop alterations (a direct breach of Addendum 1) were immaterial. Ultimately, though, the court's decision came down to the following holding: "In any event, **the Court finds that the Buyer switching loan products was the true reason he was unable to close timely**." (emphasis added)

453. And, as plainly demonstrated throughout this entire Complaint, the "switching loan products" was 1000% the result of Defendants' misconduct (serial delays, procedural errors, etc.).

454. More specifically, as made clear throughout this Complaint, the following Defendants errors necessitated a remedial loan-product change (requiring a totally new loan application and totally new loan approval, which delayed the final CD until after the Closing Date):

- The late loan-file submittal, which resulted in the falsified loan approval;

177

- The late registration with the underwriting bank, delaying the first Closing Disclosure;

- The untimely request for the Certificate of Good Standing; and

- The delay in obtaining the Buyer's 1099 "transcript" (which was actually the Lender's failure to recognize that the 1099 had been issued in the wrong name), making timely closing on the original loan impossible.

455.    To punctuate the point, the "loan-product change" notification obligation on which the court in the Buyer/Seller dispute rested its "Seller wins" determination arose entirely from the Lender's own failures and from the Realtor's failure to convey that specific detail to the Seller when explicitly informed by the Agent—not from any contractual duty owed by the Buyer. Had the Lender performed properly at all material times, the Buyer would have closed on schedule, rendering any alleged failure to "fully inform" legally immaterial regardless. Performance would have occurred by both Buyer and Seller, and no prejudice could have resulted. Indeed, under the court's own reasoning, the so-called "fully informed" breach could exist only because of the Lender's missed closing and the Agent's false testimony, not the other way around.

456.    In sum, FFF's early mistakes set off a domino effect of deception and negligence that ultimately cost the Buyer his home. To compensate for its previous failure to timely secure underwriting approval from Change, FFF fabricated a false "loan approval" under its own letterhead, concealing from the Buyer that the actual lending bank had never approved the loan. To maintain that illusion, FFF's Agent repeatedly misrepresented the loan's status to the Buyer (and even to the court), falsely portraying the November 9, 2021, "approval" as legitimate.

457.    The Buyer, acting in good faith and unaware of FFF's deception, proceeded under the mistaken belief that his financing had been validly approved since November 9, 2021. In truth, upon information and belief and as previously discussed herein, Change did not issue its actual

178

loan approval until December 10, 2021 (a month later), after the contractual loan-approval deadline had passed. Had the Buyer been told the truth, he could have lawfully canceled the contract or the Seller could have exercised its right to do so at that time. Instead, the concealment of that truth deprived both parties (Buyer and Seller) of their contractual exit remedies, resulting in the breakdown of the transaction later on.

458.    When Change later congratulated the Buyer on his real loan approval, the Agent downplayed the message, further obscuring the fact that the December 10, 2021, approval was the first legitimate lender approval ever issued. By the time the truth surfaced, the damage was irreversible – the Buyer was locked into a transaction structured around false information.

459.    FFF's conduct (fabricating an approval, concealing its falsity, misrepresenting the Buyer's actions, and failing to meet basic underwriting standards) was not mere negligence but part of a pattern of egregious professional misconduct. Change compounded this harm through its own disorganization and late disclosure of essential underwriting conditions, including the last-minute demand for a Corporate Certificate of Good Standing and its failure to recognize the 1099 issuance error, both of which necessitated the loan-product change that further harmed the Buyer. What the court ultimately mischaracterized as a "lender switch" was in fact the culmination of months of deception, delay, and procedural failure by FFF and Change, failures that rendered timely closing impossible and shifted unjust blame to the Buyer.

460.    At every step, the Buyer remained diligent, ready, willing, and able to perform. Indeed, this was Fyk's trial testimony in the Buyer / Seller dispute:

Beckerman:  What was your goal in this whole transaction?

Fyk:  To close. We – I wanted to buy the house. I still want to buy the house.

Beckerman:  Okay. Was your goal to delay the process?

179

Fyk: No. No, I didn't – I mean, clearly from all of the evidence, I didn't want to delay it. I was trying to close on the timeframe, but I was a passenger on this, I was subject to what the lender could do.

461. It was the Lender's misconduct (not any act or omission of the Buyer) that caused the loss of the Property, the legal costs, and the cascading financial harm that followed. The record now makes clear that this case was not about a Buyer's breach, but about Defendants' betrayal and unprofessionalism.

462. The foregoing acts and omissions by FFF and Change included, for examples: (a) missing and/or belatedly asserting material underwriting conditions (*e.g.*, certificate of good standing); (b) failing to timely request and process necessary documentation; (c) failing to assign or maintain underwriting continuity amidst known staffing outages; (d) imposing new requirements and a product change after the original closing date; and (e) failing to meet CFPB/TRID timing in a manner consistent with diligent, workmanlike loan processing.

463. As a direct and proximate result, Fyk did not close on the Property within the previously scheduled date, incurred higher loan costs and terms under the alternate product, and, ultimately, lost the opportunity to purchase the Property, with that loss realized in 2025 and resulting in substantial financial harm.

464. The aforementioned 2025 realization of loss was the product of the Seller prevailing over Fyk in the Buyer/Seller dispute, and Seller prevailed due to the wrongdoing of Defendants discussed herein.

465. By letter dated August 5, 2025, Fyk, pursuant to Section 627.4137 of the Florida Statutes put FFF and Change on notice of his claim of lending errors and omissions. That letter also requested statutorily prescribed documentation and information from Defendants, such as liability insurance information. Notwithstanding the 30-day deadline, Defendants failed to respond

to the August 5, 2025, letter. The August 5, 2025, correspondence is part of Exhibit A and incorporated fully herein by reference.

466.    Rather than race to the courthouse, Fyk sent out follow-up email correspondence to FFF and Change on September 8, 2025. Other than Gabriel Gillen (FFF) acknowledging receipt of the correspondence and an email read receipt being returned from Russel Rothstein (Change), neither FFF nor Change responded to the September 8, 2025, correspondence that had also (re-)attached the August 5, 2025, correspondence. Indeed, in an abundance of caution, Fyk patiently waited for another 30 (30-plus, actually) days to pass after the September 8, 2025, correspondence before resorting to this lawsuit as his regrettable last recourse. The September 8, 2025, email follow-up is also attached as part of Exhibit A and incorporated fully herein by reference.

467.    Still rather than racing to the courthouse, Fyk sent this Complaint (in un-filed form) to AnnieMac, FFF, Change, and RE/MAX on December 9, 2025, and requested that they immediately make this situation right, *see* composite **Exhibit B**, attached hereto (sans the draft Complaint enclosure/attachment due to size) and incorporated fully herein by reference. Thiry days passed since that correspondence, and here we are, without any of the Defendants endeavoring to rectify the glaring (and undisputable) wrongs set forth in this Complaint. Defendants either affirmatively confirmed receipt of the December 9, 2025, correspondence (*e.g.*, Duval of RE/MAX) or queued up an e-mail read receipt (*e.g.*, Rothstein of Change). The only purported response to the December 9, 2025, letter that endeavored to go beyond confirmation of receipt was from AnnieMac (attached as part of Ex. B); "purported" because, after undersigned counsel replied to counsel for AnnieMac (which such reply is also attached as part of Ex. B) and invited further conversation as to AnnieMac's supposed prerogative that it somehow should not be named in this case, radio silence ensued from AnnieMac's counsel.

181

## COUNT I – BREACH OF CONTRACT(S) (RE: FFF / ANNIEMAC & CHANGE)

Fyk re-alleges paragraphs 1 through 467 as if fully set forth herein, and further alleges as follows:[10]

468. The elements of a breach of contract cause of action in Florida are: (a) the existence of a valid contract; (b) a material breach of that contract; and (c) damages resulting from the breach.

469. Plaintiff and the Seller entered into an "AS IS" Residential Contract For Sale And Purchase for 2752 NE 3rd Street, Pompano Beach, Broward County, Florida, Folio No. 4843-31-17-0130, with an effective date on or about June 10, 2021, a purchase price of $1,310,000.00, an initial deposit of $25,000.00 via ACES Title, a $10,000.00 seller concession, financing of approximately 65%, and an initial closing date on or before September 3, 2021, later extended to on or before January 5, 2022.

470. Addendum No. 01 provided, among other things, that the appraisal contingency was waived.

471. Addendum No. 02 set a prequalification date of July 9, 2021, and a loan commitment/approval date of November 9, 2021.

472. Addendum No. 03 set an extended closing date of January 17, 2022, and specified that all other terms of the Property sales contract remained the same.

473. FFF served as the originating broker, and Change acted as the wholesale bank responsible for underwriting and funding the mortgage.

---

[10] All contract documents (or contract related documents) associated with this cause of action are attached here as Composite **Exhibit C** and incorporated fully herein by reference.

474.     On November 9, 2021, FFF issued a document titled "Preliminary Loan Approval" listing, inter alia, a loan amount of $982,500.00, an interest rate of 3.600, a 75% LTV, the "1099 Only" program, and a commitment expiration date of January 9, 2022, and addressing interest rate establishment five days prior to closing unless previously locked.

475.     Plaintiff fulfilled or stood ready to fulfill his obligations, repeatedly providing requested documentation, prepaying insurance at the lenders' request, and preparing to wire funds to close.

476.     Defendants materially breached their lending and processing obligations by, for examples, issuing a falsified or unauthorized "Preliminary Loan Approval" on November 9, 2021, failing to timely and properly underwrite and clear conditions, failing to timely lock the interest rate, failing to timely provide disclosures necessary to close by the contractual deadline and agreed extensions, and simply failed across the board at closing by January 17, 2022, as specified by Addendum No. 3 noted above.

477.     As a direct and proximate result, Plaintiff was unable to close by the required dates and suffered damages including loss of the Property opportunity and increased borrowing costs when later forced into a higher-rate, higher-cost product.

478.     Fyk has no other adequate remedy at law to address the injuries suffered as a result of Defendants' contract breaches and / or in violation of the law.

479.     As a result of Defendants' contractual breaches and / or violation of the law, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Jason Fyk, respectfully requests entry of a judgment against Defendants, FFF / AnnieMac, and Change, for joint and several liability and monetary damages

well in excess of the threshold $75,000.00 jurisdictional amount in controversy, all available forms of interest, all awardable attorneys' fees (*e.g.*, Fed. R. Civ. P. 68), all awardable costs, and any other relief this Court deems equitable, just, and proper.

### COUNT II – BREACH OF WARRANTY (DUTY TO PERFORM IN WORKMANLIKE MANNER) (RE: FFF / ANNIEMAC & CHANGE)

Fyk re-alleges paragraphs 1 through 467 as if fully set forth herein, and further alleges as follows:

480.    The elements of a breach of warranty cause of action in Florida, specifically regarding the duty to perform in a workmanlike manner, are rooted in both common law principles and statutory provisions. Florida law recognizes implied warranties of fitness and merchantability in certain contexts, including real estate transactions, and imposes a duty to perform work in a good and workmanlike manner.

481.    Under Florida law, there is an implied duty to perform work in a good and workmanlike manner, even in the absence of a written contract. This duty requires that the work be performed according to generally accepted standards of workmanship and performance.

482.    To establish a breach of warranty cause of action in Florida, the plaintiff must generally prove the following elements: (a) existence of a warranty (express or implied); (b) breach of the warranty by failing to perform work in a good and workmanlike manner; (c) privity of contract between the plaintiff and the defendant; and (d) damages resulting from the breach. These principles are supported by case law and statutory provisions, and they apply to various contexts, including real estate transactions.

483.    The facts set forth in the above Common Allegations indicate that FFF and Change were engaged to provide mortgage brokerage and underwriting services, respectively, for Fyk's residential property purchase. The fact pattern details that both FFF and Change failed to process

184

the loan with due care, with specific reference to Change's internal delays and failure to timely request necessary documentation, which, for example, directly resulted in Fyk's losing out on the purchase of the Property (which such loss was realized in 2025 as detailed herein). The testimony of Belese, the FFF loan officer, confirms that the delays were not attributable to the borrower but to the lender's lack of diligence. This supports a claim that the services were not performed in a good and workmanlike manner, as required by the implied warranty for professional services. The standard of care for mortgage professionals in similar circumstances would require timely processing and communication, which was not met here.

484.    FFF and Change, as Plaintiff's mortgage broker and wholesale lender/underwriter, warranted and were obligated to perform their services in a good and workmanlike manner consistent with industry standards.

485.    Defendants breached this duty and warranty by, inter alia, issuing an unauthorized "Preliminary Loan Approval," failing to timely submit and underwrite the file, failing to timely lock the interest rate, failing to timely identify and communicate material conditions, and failing to timely provide disclosures necessary to close by the contractual deadlines and extensions.

486.    As a direct, foreseeable, and proximate result of Defendants' breach of warranty (duty to perform in workmanlike manner), Fyk has suffered and continues to suffer damages (*e.g.*, loss of the Property opportunity and increased financing costs).

487.    Fyk has no other adequate remedy at law to address the injuries suffered as a result of Defendants' breach of warranty.

488.    As a result of Defendants' breach of warranty, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

185

WHEREFORE, Plaintiff, Jason Fyk, respectfully requests entry of a judgment against Defendants, FFF / AnnieMac, and Change, for joint and several liability and monetary damages well in excess of the threshold $75,000.00 jurisdictional amount in controversy, all available forms of interest, all awardable attorneys' fees (*e.g.*, Fed. R. Civ. P. 68), all awardable costs, and any other relief this Court deems equitable, just, and proper.

### COUNT III – NEGLIGENCE (RE: FFF / ANNIEMAC & CHANGE)

Fyk re-alleges paragraphs 1 through 467 as if fully set forth herein, and further alleges as follows:

489.    The foundational elements of a negligence cause of action are as follows: (a) the defendant must owe a legal duty to the plaintiff, which such duty is recognized by law and requires the defendant to conform to a certain standard of conduct for the protection of others; (b) the defendant must fail to perform the duty owed to the plaintiff, which such failure constitutes a breach of the standard of conduct required; (c) the breach of duty must be the legal cause of the plaintiff's injury, in relation to both actual cause and proximate cause, linking the defendant's breach to the harm suffered by the plaintiff; and (d) the plaintiff must suffer actual injury or damages as a result of the defendant's breach of duty

490.    The facts set forth in the above Common Allegations support a claim for negligence. Both FFF and Change had a legal duty to process Fyk's mortgage application with due care. The above fact pattern details specific breaches of that duty, for examples: (a) failure to process the loan with due care; (b) delays caused by Change's internal operations; and (c) the late request for a Notice of Good Standing, which was admitted to be the lender's responsibility. These breaches foreseeably resulted in harm to Fyk, as, for example, he lost out on the purchase of the Property (which such loss was realized in 2025 as detailed herein). The risk of such harm was

reasonably foreseeable in the context of mortgage lending. Thus, the elements of duty, breach, causation, and damages are all present.

491. As licensed mortgage professionals and a wholesale lender/underwriter handling Plaintiff's loan, Defendants owed Plaintiff a duty to exercise reasonable care consistent with applicable industry standards and timing/disclosure requirements.

492. Defendants breached their duties by, among other things, submitting the file late, issuing an unsigned broker "Loan Approval," failing to lock the rate, mishandling CFPB/TRID timing and disclosures, and raising new conditions (including a Delaware Notice of Good Standing) at the last minute as a "missed condition by the original underwriter."

493. As a direct, foreseeable, and proximate result of Defendants' negligence, Fyk has suffered and continues to suffer damages.

494. Fyk has no other adequate remedy at law to address the injuries suffered as a result of Defendants' negligence.

495. As a result of Defendants' negligence, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Jason Fyk, respectfully requests entry of a judgment against Defendants, FFF / AnnieMac, and Change, for joint and several liability and monetary damages well in excess of the threshold $75,000.00 jurisdictional amount in controversy, all available forms of interest, all awardable attorneys' fees (*e.g.*, Fed. R. Civ. P. 68), all awardable costs, and any other relief this Court deems equitable, just, and proper.

## COUNT IV – PROFESSIONAL MALPRACTICE (RE: FFF / ANNIEMAC & CHANGE)

Fyk re-alleges paragraphs 1 through 467 as if fully set forth herein, and further alleges as follows:

187

496.     The general elements of a professional malpractice cause of action are duty, breach, causation, and damages.

497.     In the context of real estate transactions, Florida law imposes specific duties on professionals, including real estate brokers, to adhere to standards of care and fiduciary responsibilities.

498.     The above elements apply broadly to professionals, including real estate brokers, who are considered to render professional services under Florida law. The duty element requires the professional to perform services in accordance with the standard of care used by similar professionals in the community under similar circumstances. Breach occurs when the professional fails to meet this standard, and causation requires a direct link between the breach and the damages suffered by the plaintiff.

499.     Real estate brokers in Florida are subject to specific duties of care. For example, brokers acting as fiduciaries owe duties of loyalty, confidentiality, obedience, full disclosure, accounting, and the duty to use skill, care, and diligence. Even when acting as transaction brokers, who provide limited representation, brokers must adhere to professional standards and avoid actions detrimental to either party. Additionally, Florida law recognizes that professionals, including brokers, may owe duties to third parties even in the absence of a direct contractual relationship. Put differently, real estate brokers/lenders owe duties to buyers even when acting as agents for sellers (*i.e.*, in Florida, professionals can be held liable even where there is a lack of privity with the aggrieved party), reflecting the broader responsibilities imposed on real estate professionals in Florida.

500.     The facts support a claim for professional malpractice against FFF and Change. Both entities acted as mortgage professionals, owed a duty of care to Fyk in processing his loan,

and failed to exercise reasonable care. Specific breaches include, for example, failing to timely process the loan, not requesting the Notice of Good Standing until after the original closing date, and failing to assign a replacement underwriter during a COVID-related absence. These failures directly resulted in, for example, Fyk losing out on the purchase of the Property Fyk (which such loss was realized in 2025 as detailed herein), which resulted in substantial financial harm as detailed herein. The standard of care for mortgage professionals is that degree of care which a reasonably careful professional in the field would exercise, and the facts indicate that this standard was not met.

501.    FFF's personnel, including a Senior Loan Officer (NMLS 1315455), and Change, a wholesale lender/underwriter, provided professional mortgage services to Plaintiff and owed duties to exercise the level of skill, care, and diligence ordinarily possessed and exercised by reasonably prudent mortgage professionals under similar circumstances.

502.    Defendants deviated from the applicable professional standard of care by mishandling underwriting and TRID timing, issuing/using an unauthorized "Preliminary Loan Approval," directing alteration and off-file transmission of a document, failing to timely identify and communicate conditions (including the Delaware good standing requirement), and failing to ensure continuity of underwriting to avoid preventable delay.

503.    As a direct, foreseeable, and proximate result of Defendants' professional malpractice, Fyk has suffered and continues to suffer damages.

504.    Fyk has no other adequate remedy at law to address the injuries suffered as a result of Defendants' professional malpractice.

505.    As a result of Defendants' professional malpractice, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

189

WHEREFORE, Plaintiff, Jason Fyk, respectfully requests entry of a judgment against Defendants, FFF / AnnieMac, and Change, for joint and several liability and monetary damages well in excess of the threshold $75,000.00 jurisdictional amount in controversy, all available forms of interest, all awardable attorneys' fees (*e.g.*, Fed. R. Civ. P. 68), all awardable costs, and any other relief this Court deems equitable, just, and proper.

## COUNT V – NEGLIGENT MISREPRESENTATION (RE: CHANGE)

Fyk re-alleges paragraphs 1 through 467 as if fully set forth herein, and further alleges as follows:

506.    The elements of a negligent misrepresentation cause of action are as follows: (a) the defendant must make a misrepresentation of a material fact that they believed to be true but was, in fact, false; (b) the defendant must have been negligent in making the statement, meaning they should have known the representation was false or made the representation under circumstances in which they ought to have known of its falsity; (c) the defendant must have intended for the plaintiff to rely on the misrepresentation; and (d) the plaintiff must have acted in justifiable reliance on the misrepresentation, and this reliance must have resulted in injury to the plaintiff.

507.    The evidence establishes that the underwriter (Change) did not list the State of Delaware good standing certification pertaining to Fyk's business as a condition on the conditional loan approval letter, and that both Fyk was accordingly unaware the certificate was required until days before closing.

508.    Change lacked reasonable care in identifying and communicating the full set of lending conditions, amounting to false information supplied in the course of business, without reasonable care on which Fyk relied to his detriment.

509. In the course of its lending and underwriting business, Change supplied information for the guidance of Plaintiff regarding his loan approval and conditions.

510. Change represented and/or allowed the representation that Plaintiff had a qualifying "Preliminary Loan Approval" or commitment sufficient to satisfy the Contract's approval contingency as of November 9, 2021, and failed to disclose material conditions, including the requirement for a Delaware good standing certification, which the underwriter did not list on the conditional loan approval letter.

511. These representations and omissions were made without reasonable care because Change had not completed underwriting approval as of November 9, 2021, and later acknowledged the good standing item as a missed condition by the original underwriter, first raised on January 6, 2022.

512. Plaintiff justifiably relied upon these statements and omissions by proceeding as though loan approval and conditions were satisfied, preparing for closing and taking steps in reliance.

513. As a direct, foreseeable, and proximate result of Change's negligent misrepresentation concerning the State of Delaware certificate of good standing, Fyk has suffered and continues to suffer damages.

514. Fyk has no other adequate remedy at law to address the injuries suffered as a result of Change's negligent misrepresentation.

515. As a result of Change's negligent misrepresentation, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Jason Fyk, respectfully requests entry of a judgment against Defendant, Change, for liability and monetary damages well in excess of the threshold $75,000.00

jurisdictional amount in controversy, all available forms of interest, all awardable attorneys' fees (*e.g.*, Fed. R. Civ. P. 68), all awardable costs, and any other relief this Court deems equitable, just, and proper.

## COUNT VI – FRAUD / FRAUDULENT MISREPRESENTATION
## (RE: FFF / ANNIEMAC, CHANGE, & RE/MAX)

Fyk re-alleges paragraphs 1 through 467 as if fully set forth herein, and further alleges as follows:

516. The elements of a fraud and/or fraudulent misrepresentation cause of action in Florida are: (a) the defendant must make a false statement regarding a specific material fact; (b) the defendant must know that the representation is false at the time it is made; (c) the defendant must intend for the plaintiff to rely on the false representation; and (d) the plaintiff must rely on the false representation to their detriment, resulting in injury or damages.

517. Defendants, acting individually and/or in concert, made materially false statements and omissions to Plaintiff concerning the existence, nature, and status of a Loan Approval for the subject mortgage financing. Specifically, on November 9, 2021, FFF (through its agent(s)) emailed Plaintiff and his Realtor a "Prelim Mortgage Commitment" with an attachment titled "FYK Loan Commitment.pdf," purporting to evidence an approval sufficient to satisfy the Contract's financing contingency, when Change had not underwritten or approved the loan and the file had just been submitted to Change.

518. The November 9, 2021, "Preliminary Loan Approval" was issued on FFF letterhead, unsigned, identified a 1099-Only program with floating rate, and included terms and fee items, but did not reflect lender underwriting review or signature; FFF Agent's testimony later admitted the document was prepared by FFF management rather than signed by Change underwriters.

192

519.     Notwithstanding knowledge that Change had not issued a bona fide commitment, Defendants continued to represent to Plaintiff and others that the loan was "Approved" (December 10, 2021) and that "we have a mortgage commitment," thereby reinforcing the false impression that underwriting had been completed and conditions satisfied.

520.     Defendants further misdirected attention to purported last-minute issues (such as a Delaware "good standing" problem and late insurance prepayment demands) while concealing that TRID/CD timing and 1099 underwriting impediments remained unresolved, thereby perpetuating the initial misrepresentation and inducing Plaintiff to proceed.

521.     Plaintiff reasonably relied on Defendants' misrepresentations and omissions, including the November 9, 2021, document and subsequent "Approved" communications, to continue performance under the Contract, forego alternative financing options, and remain committed to close, exposing his deposit and the unique Property opportunity to risk.

522.     Defendants made the misrepresentations knowingly, intentionally, or at minimum with reckless disregard for the truth, including by issuing a fabricated or invalid approval to meet a contractual loan-approval deadline, omitting signatures and lender underwriting indicia, and continuing to assert "approval" after being told the November 9, 2021, approval "was not a real approval."

523.     As a direct and proximate result, Plaintiff suffered damages including loss of the Property, loss of appreciation and market opportunity, increased financing costs, and emotional distress.

524.     Fyk has no other adequate remedy at law to address the injuries suffered as a result of Defendants' fraud.

525. As a result of Defendants' fraud, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Jason Fyk, respectfully requests entry of a judgment against Defendants, FFF / AnnieMac, Change, and RE/MAX for joint and several liability and monetary damages well in excess of the threshold $75,000.00 jurisdictional amount in controversy, all available forms of interest, all awardable attorneys' fees (*e.g.*, Fed. R. Civ. P. 68), all awardable costs, and any other relief this Court deems equitable, just, and proper.

## COUNT VII – BREACH OF FIDUCIARY DUTY (RE: FFF / ANNIEMAC & CHANGE)

Fyk re-alleges paragraphs 1 through 467 as if fully set forth herein, and further alleges as follows:

526. The elements of a breach of fiduciary duty cause of action in Florida are: (a) the plaintiff must demonstrate that the defendant owed them a fiduciary duty; (b) the plaintiff must show that the defendant violated or failed to uphold the fiduciary duty owed to them; (c) the plaintiff must prove that the breach of fiduciary duty was the proximate cause of their harm or damages; and (d) the plaintiff must establish that they suffered damages as a result of the breach.

527. As licensed mortgage originators/broker and wholesale lender engaged to procure, process, underwrite, and fund Plaintiff's loan, FFF and Change owed duties of full candor, honesty, diligence, and truthful disclosure to Plaintiff regarding the status and conditions of his financing.

528. Defendants breached their fiduciary duties by, inter alia: (a) issuing and/or accepting a falsified or invalid "Loan Approval"; (b) failing to timely submit/register and process underwriting; (c) failing to communicate accurate conditions; (d) directing or facilitating alteration of a state-record page for "good standing"; and (e) failing to lock Plaintiff's rate consistent with representations and timing.

194

529.    Defendants further breached their duties by shifting blame to Plaintiff while acknowledging internally that lender-side delays were responsible and "of no fault of the buyer."

530.    As a direct and proximate result, Plaintiff suffered damages including the loss of the Property and increased finance costs, as well as emotional distress.

531.    Fyk has no other adequate remedy at law to address the injuries suffered as a result of Defendants' breaches of fiduciary duties.

532.    As a result of Defendants' fiduciary duty breaches, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Jason Fyk, respectfully requests entry of a judgment against Defendants, FFF / AnnieMac, and Change, for joint and several liability and monetary damages well in excess of the threshold $75,000.00 jurisdictional amount in controversy, all available forms of interest, all awardable attorneys' fees (*e.g.*, Fed. R. Civ. P. 68), all awardable costs, and any other relief this Court deems equitable, just, and proper.

### COUNT VIII – BREACH OF COVENANT OF GOOD FAITH & FAIR DEALING (RE: FFF / ANNIEMAC & CHANGE)

Fyk re-alleges paragraphs 1 through 467 as if fully set forth herein, and further alleges as follows:

533.    Under Florida law, the implied covenant of good faith and fair dealing is recognized in every contract and is intended to protect the reasonable expectations of the contracting parties in light of their express agreement. This covenant is designed to ensure that neither party unfairly interferes with the other party's right to receive the benefits of the contract. It protects the reasonable expectations of the contracting parties and is implied by law in all contractual relationships.

534.   To establish a cause of action for breach of the implied covenant of good faith and fair dealing in Florida, the following elements must be proven: (a) the existence of a valid contract between the parties; (b) a breach of an express term of the contract by the defendant; and (c) the breach interfered with the plaintiff's reasonable expectations under the contract.

535.   The parties' agreements and lending relationship, including the processing and issuance of approvals/commitments and disclosures, imposed an implied covenant of good faith and fair dealing requiring Defendants to act honestly and not to frustrate Plaintiff's contractual rights and benefits.

536.   Defendants breached the covenant by delaying underwriting submission, fabricating an approval, failing to lock the rate, and imposing new/later conditions (insurance prepayment; good standing) that precipitated missed deadlines and undermined Plaintiff's ability to timely close.

537.   Defendants also failed to meet TRID timing for issuing a Closing Disclosure and sought extensions based on their own noncompliance, thereby frustrating the benefit of the bargain.

538.   Plaintiff sustained damages including loss of the Property and increased borrowing costs.

539.   Fyk has no other adequate remedy at law to address the injuries suffered as a result of Defendants' violations of the covenant of good faith and fair dealing.

540.   As a result of Defendants' violations of the covenant of good faith and fair dealing, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Jason Fyk, respectfully requests entry of a judgment against Defendants, FFF / AnnieMac, and Change, for joint and several liability and monetary damages

196

well in excess of the threshold $75,000.00 jurisdictional amount in controversy, all available forms of interest, all awardable attorneys' fees (*e.g.*, Fed. R. Civ. P. 68), all awardable costs, and any other relief this Court deems equitable, just, and proper.

## COUNT IX – VIOLATION OF FEDERAL AND/OR STATE LENDING AND DISCLOSURE STATUTES OR REGULATIONS (RE: FFF / ANNIEMAC & CHANGE)

Fyk re-alleges paragraphs 1 through 467 as if fully set forth herein, and further alleges as follows:

541. The loan transaction was subject to "CFPB" and "TRID" requirements, including Regulation Z/12 C.F.R. § 1026.19(f)(2)(ii); 12 C.F.R. § 1026.37(a)(13) and (b); 12 C.F.R. § 1026.19(e)(1)(iii)(B); and 12 C.F.R. § 1026.19(f)(1)(ii)(A), as interpreted by applicable Official Interpretations.

542. Defendants failed to comply with applicable TRID/CD timing requirements, including issuing the final Closing Disclosure after the extended closing date and then asserting an automatic extension to cure their own delay.

543. Defendants' issuance of a broker-generated "approval" absent lender underwriting/signature and presentation of a floating rate as an "approval" further violated and/or was inconsistent with the disclosure and timing protections intended by TRID.

544. Plaintiff was harmed by the noncompliance, including failure to timely close and loss of the Property and related financial harms.

545. Fyk has no other adequate remedy at law to address the injuries suffered as a result of Defendants' lending and disclosure violations.

546. As a result of Defendants' lending and disclosure violations, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

197

WHEREFORE, Plaintiff, Jason Fyk, respectfully requests entry of a judgment against Defendants, FFF / AnnieMac, and Change, for joint and several liability and monetary damages well in excess of the threshold $75,000.00 jurisdictional amount in controversy, all available forms of interest, all awardable attorneys' fees (*e.g.*, Fed. R. Civ. P. 68), all awardable costs, and any other relief this Court deems equitable, just, and proper.

## COUNT X – VIOLATION OF STATE UNFAIR AND DECEPTIVE ACTS AND PRACTICES STATUTES (RE: FFF / ANNIEMAC, CHANGE & RE/MAX)

Fyk re-alleges paragraphs 1 through 467 as if fully set forth herein, and further alleges as follows:

547.    The statutory predicate for this Count is the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), found in Chapter 501, Part II of the Florida Statutes. Specifically, sections 501.201 to 501.213 outline the provisions related to unfair and deceptive trade practices.

548.    FDUTPA is designed to protect consumers and businesses from unfair methods of competition, as well as unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce. The elements of a claim under FDUTPA generally include: (a) deceptive act or unfair practice; (b) causation; and (c) actual damages.

549.    Defendants engaged in unfair and deceptive acts and practices, including fabricating or issuing an invalid approval, misrepresenting rate-lock and TRID timing obligations, shifting blame to Plaintiff for lender-caused delays, and concealing the true reasons (including 1099-program underwriting issues) for failure to close.

550.    More generally put, the above common allegations of fabricating approvals, misrepresenting rate-lock and TRID timing obligations, and concealing underwriting issues constitute deceptive or unfair practices under FDUTPA. These actions misled the Plaintiff.

551.    Plaintiff relied on these deceptive practices to his detriment and sustained damages, including loss of the Property and emotional distress.

552.    Fyk has no other adequate remedy at law to address the injuries suffered as a result of Defendants' FDUTPA violations.

553.    As a result of Defendants' FDUTPA violations, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Jason Fyk, respectfully requests entry of a judgment against Defendants, FFF / AnnieMac, Change, and RE/MAX for joint and several liability and monetary damages well in excess of the threshold $75,000.00 jurisdictional amount in controversy, all available forms of interest, all awardable attorneys' fees (*e.g.*, Fed. R. Civ. P. 68), all awardable costs, and any other relief this Court deems equitable, just, and proper.

## COUNT XI – CIVIL CONSPIRACY AND/OR AIDING AND ABETTING (RE: FFF / ANNIEMAC, CHANGE & RE/MAX)

Fyk re-alleges paragraphs 1 through 467 as if fully set forth herein, and further alleges as follows:

554.    The elements of a civil conspiracy cause of action in Florida are: (a) there must be an agreement or understanding between two or more individuals or entities to act together; (b) the agreement must be aimed at either committing an unlawful act or achieving a lawful objective through unlawful means; (c) at least one overt act must be performed in furtherance of the conspiracy; and (d) the plaintiff must suffer damages as a direct result of the acts committed under the conspiracy.

555.    For aiding and abetting in Florida, essential elements include: (a) the wrongful act committed by a principal causing injury; (b) the defendant's (aider and abettor's) general

awareness of their role within the illegal activity; and (c) the defendant's (aider and abettor's) knowing and substantial assistance to the violation.

556. Defendants combined, agreed, or otherwise acted in concert to accomplish unlawful acts or lawful acts by unlawful means, including the concealment of the true loan status, the use of a fabricated approval, and the manipulation or alteration of documents to satisfy internal lender requirements.

557. In furtherance thereof, the Agent transmitted an altered/state "good standing" image outside the formal loan file to Change's representative for informal review and kept it out of the official record; coordination is evidenced by contemporaneous texts and off-file communications.

558. Additionally, Plaintiff alleges that the Realtor fabricated or altered an extension addendum, delivered it to Agent Belese, and Belese then transmitted it to Change to satisfy an internal extension requirement without Plaintiff's knowledge or authorization, thereby aiding and abetting the wrongful scheme.

559. Plaintiff suffered damages as a result, including loss of the Property and related financial harms.

560. Fyk has no other adequate remedy at law to address the injuries suffered as a result of Defendants' conspiring and aiding and abetting.

561. As a result of Defendants' conspiring and aiding and abetting, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Jason Fyk, respectfully requests entry of a judgment against Defendants, FFF / AnnieMac, Change, and RE/MAX for joint and several liability and monetary

200

damages well in excess of the threshold $75,000.00 jurisdictional amount in controversy, all available forms of interest, all awardable attorneys' fees (*e.g.*, Fed. R. Civ. P. 68), all awardable costs, and any other relief this Court deems equitable, just, and proper.

## COUNT XII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (RE: FFF / ANNIEMAC, CHANGE & RE/MAX)

Fyk re-alleges paragraphs 1 through 467 as if fully set forth herein, and further alleges as follows:

562.   To establish a claim for intentional infliction of emotional distress in Florida, the plaintiff must prove the following elements: (a) the defendant's conduct must be intentional or reckless, meaning the defendant intended the behavior or knew or should have known that emotional distress would likely result; (b) the conduct must be so outrageous as to go beyond all bounds of decency and be regarded as odious and utterly intolerable in a civilized community; (c) the conduct must directly cause the emotional distress; and (d) the emotional distress suffered by the plaintiff must be severe.

563.   Defendants engaged in extreme and outrageous and/or negligent conduct by fabricating an approval, repeatedly delaying and shifting explanations, threatening denial, and trivializing the consequences of their misconduct, causing severe emotional distress to Plaintiff during a time-sensitive real estate transaction for a unique property.

564.   Plaintiff's acute distress was contemporaneously acknowledged by Defendants' Agent, who described Plaintiff as experiencing severe stress and fear of catastrophic consequences from the continuing delays.

565.   As a direct and proximate result, Plaintiff sustained severe emotional distress and related damages.

201

566.    Fyk has no other adequate remedy at law to address the injuries suffered as a result of Defendants' intentional infliction of emotional distress.

567.    As a result of Defendants' intentional infliction of emotional distress, undersigned counsel was retained for representation in this action and is entitled to a reasonable fee for services rendered.

WHEREFORE, Plaintiff, Jason Fyk, respectfully requests entry of a judgment against Defendants, FFF / AnnieMac, Change, and RE/MAX for joint and several liability and monetary damages well in excess of the threshold $75,000.00 jurisdictional amount in controversy, all available forms of interest, all awardable attorneys' fees (*e.g.*, Fed. R. Civ. P. 68), all awardable costs, and any other relief this Court deems equitable, just, and proper.

### COUNT XIII – PRAYER FOR PUNITIVE DAMAGES AND GROSS NEGLIGENCE (RE: FFF / ANNIEMAC, CHANGE & RE/MAX)

Fyk re-alleges paragraphs 1 through 467 as if fully set forth herein, and further alleges as follows:

568.    Defendants' conduct (*e.g.*, issuing a falsified or invalid approval, concealing material facts, and engaging in a calculated pattern of affirmative misrepresentation) constituted gross negligence and intentional misconduct demonstrating reckless disregard for Plaintiff's rights.

569.    The nature and degree of Defendants' misconduct warrants the imposition of punitive damages to punish and deter such conduct.

WHEREFORE, Plaintiff, Jason Fyk, requests punitive damages in an amount to be determined at trial, along with all other available relief.

## COUNT XIV – VICARIOUS LIABILITY (RE: FFF / ANNIEMAC, CHANGE & RE/MAX)

Fyk re-alleges paragraphs 1 through 467 as if fully set forth herein, and further alleges as follows:

570.    At all relevant times, the individuals acting on behalf of the corporate Defendants—including FFF's Senior Loan Officer and Branch Manager, Change's underwriting and representatives, and the supervising brokerage for the Realtor—acted within the course and scope of their agency and/or employment.

571.    RE/MAX, as the supervising brokerage for the Realtor, is vicariously liable for her actions in connection with the falsified extension and related conduct.

572.    FFF and Change are vicariously liable for the acts and omissions of their respective agents and employees described herein.

WHEREFORE, Plaintiff, Jason Fyk, seeks judgment holding Defendants vicariously liable for the acts of their agents, and awarding damages and other relief as appropriate.

## COUNT XV – STATUTORY PENALTY FOR FAILURE OT RESPOND TO INSURANCE INFORMATION DEMAND (RE: ALL DEFENDANTS AS APPLICABLE)

Fyk re-alleges paragraphs 1 through 467 as if fully set forth herein, and further alleges as follows:

573.    By letter dated August 5, 2025 (and follow-up emails), Plaintiff, pursuant to Section 627.4137 of the Florida Statutes, requested liability insurance information from Defendants; Defendants failed to respond within the 30-day statutory deadline. *See* Ex. A.

574.    By letter dated December 9, 2025, Plaintiff afforded Defendants yet another 30-day cure period, this time even attaching the draft Complaint for Defendants' consideration. *See* Ex.

B. Defendants failed to substantively respond, and several Defendants did not bother to respond at all. *See id.*

575.    Plaintiff is entitled to relief and penalties as provided by statute.

WHEREFORE, Plaintiff, Jason Fyk, seeks all statutory penalties, remedies, and attorneys' fees authorized under Section 627.4137, Florida Statutes, and such other relief as the Court deems just and proper.

## RESERVATION OF RIGHTS AND DAMAGES PRAYER

576.    As should be clear at the conclusion of each above Count (but reiterated here in an abundance of caution), Plaintiff, Jason Fyk, seeks damages in excess of the jurisdictional threshold, including compensatory damages, consequential damages, punitive damages where allowed, all available forms of interest, all awardable attorneys' fees and costs, and any other relief this Court deems equitable, just, and proper.

## JURY DEMAND

577.    Plaintiff, Jason Fyk, demands a trial by jury on all issues so triable as a matter of right.

Dated: February 2, 2026.

Respectfully submitted,

**GREYBER LAW, PLLC**
8903 Glades Rd., Ste A8 #111
Boca Raton, Florida  33434
Tel: (561) 702-7673; Fax: (833) 809-0137

/s/ Jeffrey L. Greyber
**Jeffrey L. Greyber, Esq.**
Florida Bar No. 41103
jgreyber@greyberlaw.com
*Attorney for Plaintiff*

204